UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| FEDERAL HOUSING FINANCE AGENCY, AS CONSERVATOR FOR THE FEDERAL NATIONAL MORTGAGE ASSOCIATION AND THE FEDERAL HOME LOAN MORTGAGE CORPORATION,<br><br>        Plaintiff,<br><br>      -against-<br><br>THE ROYAL BANK OF SCOTLAND GROUP PLC; RBS HOLDINGS USA, INC.; RBS SECURITIES, INC. (f/k/a GREENWICH CAPITAL MARKETS, INC.); RBS FINANCIAL PRODUCTS, INC. (f/k/a GREENWICH CAPITAL FINANCIAL PRODUCTS, INC.), RBS ACCEPTANCE, INC. (f/k/a GREENWICH CAPITAL ACCEPTANCE, INC.); FINANCIAL ASSET SECURITIES CORP.; JOSEPH N. WALSH III; CAROL P. MATHIS; ROBERT J. MCGINNIS; JOHN C. ANDERSON; and JAMES M. ESPOSITO,<br><br>        Defendants. | \_\_\_ **CIV.** \_\_\_ (\_\_)<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br><br><br><br><br><br><br>**SEPTEMBER 2, 2011** |

# TABLE OF CONTENTS

NATURE OF ACTION ...................................................................................................1

PARTIES ....................................................................................................................10

    The Plaintiff and the GSEs ..................................................................................10

    The Defendants ....................................................................................................10

    The Non-Party Originators ..................................................................................13

JURISDICTION AND VENUE ....................................................................................13

FACTUAL ALLEGATIONS ........................................................................................14

I.      THE SECURITIZATIONS....................................................................................14

    A.      Residential Mortgage-Backed Securitizations In General ......................14

    B.      The Securitizations At Issue In This Case ...............................................15

    C.      The Securitization Process .......................................................................20

          1.      RBS Financial Products Groups Mortgage Loans in Special Purpose Trusts...............................................................................20

          2.      The Trusts Issue Securities Backed by the Loans.......................21

II.     THE DEFENDANTS' PARTICIPATION IN THE SECURITIZATION PROCESS ...............................................................................................................26

    A.      The Role of Each of the Defendants.........................................................26

          1.      RBS Financial Products..............................................................27

          2.      RBS Acceptance .........................................................................28

          3.      FAS Corp. ...................................................................................29

          4.      RBS Securities ............................................................................29

          5.      RBS Holdings .............................................................................30

          6.      RBS Group...................................................................................31

          7.      The Individual Defendants...........................................................31

    B.      Defendants' Failure To Conduct Proper Due Diligence............................32

III.  THE STATEMENTS IN THE REGISTRATION STATEMENTS AND
      PROSPECTUS SUPPLEMENTS ............................................................. 35

      A.  Compliance With Underwriting Guidelines ................................. 35

      B.  Statements Regarding Occupancy Status of Borrower ................. 38

      C.  Statements Regarding Loan-to-Value Ratios ............................... 41

      D.  Statements Regarding Credit Ratings ......................................... 45

IV.   FALSITY OF STATEMENTS IN THE REGISTRATION STATEMENTS AND
      PROSPECTUS SUPPLEMENTS ............................................................. 47

      A.  The Statistical Data Provided in the Prospectus Supplements Concerning
          Owner Occupancy and LTV Ratios Was Materially False ................... 47

          1.  Owner Occupancy Data Was Materially False ........................... 47

          2.  Loan-to-Value Data Was Materially False ................................. 50

      B.  The Originators of the Underlying Mortgage Loans Systematically
          Disregarded Their Underwriting Guidelines .......................................... 54

          1.  A Forensic Review of Loan Files Has Revealed Pervasive Failure
              to Adhere to Underwriting Guidelines ......................................... 55

              a.  Stated Income Was Not Reasonable ............................... 57

              b.  Evidence of Occupancy Misrepresentations .................. 59

              c.  Debts Incorrectly Calculated; Debt-to-Income Exceeded
                  Guidelines ....................................................................... 61

              d.  Credit Inquiries that Indicated Misrepresentation of Debt ........... 61

          2.  Government Investigations Have Confirmed That the Originators
              of the Loans in the Securitizations Systematically Failed to Adhere
              to Their Underwriting Guidelines ................................................ 63

          3.  The Collapse of the Certificates' Credit Ratings Further Indicates
              that the Mortgage Loans were not Originated in Adherence to the
              Stated Underwriting Guidelines ................................................... 70

          4.  The Surge in Mortgage Delinquency and Default Further
              Demonstrates that the Mortgage Loans Were Not Originated in
              Adherence to the Stated Underwriting Guidelines ..................... 73

V.   FANNIE MAE'S AND FREDDIE MAC'S PURCHASES OF THE GSE
     CERTIFICATES AND THE RESULTING DAMAGES .................................................76

FIRST CAUSE OF ACTION ..................................................................................................80

SECOND CAUSE OF ACTION .............................................................................................83

THIRD CAUSE OF ACTION .................................................................................................87

FOURTH CAUSE OF ACTION .............................................................................................91

FIFTH CAUSE OF ACTION ..................................................................................................94

SIXTH CAUSE OF ACTION ..................................................................................................98

SEVENTH CAUSE OF ACTION .........................................................................................101

EIGHTH CAUSE OF ACTION ............................................................................................105

PRAYER FOR RELIEF ........................................................................................................109

JURY TRIAL DEMANDED .................................................................................................111

Plaintiff Federal Housing Finance Agency ("FHFA"), as conservator of The Federal National Mortgage Association ("Fannie Mae") and The Federal Home Loan Mortgage Corporation ("Freddie Mac"), by its attorneys, Shipman & Goodwin LLP and Quinn Emanuel Urquhart & Sullivan, LLP, for its Complaint herein against The Royal Bank of Scotland Group PLC ("RBS Group"), RBS Holdings USA, Inc. ("RBS Holdings"), RBS Financial Products, Inc. ("RBS Financial Products"), RBS Acceptance, Inc. ("RBS Acceptance"), RBS Securities, Inc. ("RBS Securities") and Financial Asset Securities Corporation ("FAS Corp.") (collectively, "RBS"), Joseph N. Walsh III, Carol P. Mathis, Robert J. McGinnis, John C. Anderson, and James M. Esposito (the "Individual Defendants") (together with RBS, the "Defendants") alleges as follows:

## NATURE OF ACTION

1.     This action arises out of Defendants' actionable conduct in connection with the offer and sale of certain residential mortgage-backed securities to Fannie Mae and Freddie Mac (collectively, the "Government Sponsored Enterprises" or "GSEs"). These securities were sold pursuant to registration statements, including prospectuses and prospectus supplements that formed part of those registration statements, which contained materially false or misleading statements and omissions. Defendants falsely represented that the underlying mortgage loans complied with certain underwriting guidelines and standards, including representations that significantly overstated the ability of the borrowers to repay their mortgage loans. These representations were material to the GSEs, as reasonable investors, and their falsity violates Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. § 77a *et seq*., Sections 13.1-522(A)(ii) and 13.1-522(C) of the Virginia Code, Sections 31-5606.05(a)(1)(B) and 31-5606.05(c) of the District of Columbia Code, and constitutes common law negligent misrepresentation.

2.      Between September 30, 2005 and January 23, 2008, Fannie Mae and Freddie Mac purchased over $30.4 billion in residential mortgage-backed securities (the "GSE Certificates") issued in connection with 68 RBS-sponsored and/or RBS-underwritten securitizations.[1]  The GSE Certificates purchased by Freddie Mac, along with date and amount of the purchases, are listed below in Table 10.  The GSE Certificates purchased by Fannie Mae, along with the date and amount of the purchases, are listed below in Table 11.  The 68 Securitizations at issue are:

i.      American Home Mortgage Assets Trust Mortgage-Backed Pass-Through Certificates, Series 2007-3 ("AHMA 2007-3");

ii.     Ameriquest Mortgage Securities DSLA Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2005-R9 ("AMSI 2005-R9");

iii.    Ameriquest Mortgages Securities Trust Asset-Backed Pass-Through Certificates, Series ARSI 2006-M3 ("ARSI 2006-M3");

iv.     Argent Securities Inc., Asset-Backed Pass-Through Certificates, Series 2006-W5 ("ARSI 2006-W5");

v.      DSLA Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2005-AR6 ("DSLA 2005-AR6");

vi.     DSLA Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2005-AR2 ("DSLA 2006-AR2");

vii.    DSLA Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2007-AR 1 ("DSLA 2007-AR1");

viii.   First Franklin Mortgage Loan Trust Asset Backed Certificates, Series  2006-FF16 ("FFML 2006-FF16");

ix.     First Franklin Mortgage Loan Trust Asset Backed Certificates, Series  2006-FF8 ("FFML 2006-FF8");

x.      First Franklin Mortgage Loan Trust Asset Backed Certificates, Series 2005-FFH4 ("FFML 2005-FFH4");

---

[1]  For purposes of this Complaint, the securities issued under the Registration Statements (as defined in note 2 below) are referred to as "Certificates," while the particular Certificates that Fannie Mae and Freddie Mac purchased are referred to as the "GSE Certificates."  Holders of Certificates are referred to as "Certificateholders."

xi.   Fremont Home Loan Trust Asset Backed Certificates, Series 2006-1 ("FHLT 2006-1");

xii.   Fremont Home Loan Trust Asset Backed Certificates, Series 2006-2 ("FHLT 2006-2");

xiii.   Fremont Home Loan Trust Asset Backed Certificates, Series 2006-3 ("FHLT 2006-3");

xiv.   Fremont Home Loan Trust Asset Backed Certificates, Series 2006-A ("FHLT 2006-A");

xv.   Fremont Home Loan Trust Asset Backed Certificates, Series 2006-D ("FHLT 2006-D");

xvi.   HarborView Mortgage Loan Trust Mortgage Loan Pass Through Certificates, Series 2005-12 ("HVMLT 2005-12");

xvii.   HarborView Mortgage Loan Trust Mortgage Loan Pass Through Certificates, Series 2005-13 ("HVMLT 2005-13");

xviii.   HarborView Mortgage Loan Trust Mortgage Loan Pass Through Certificates, Series 2005-15 ("HVMLT 2005-15");

xix.   HarborView Mortgage Loan Trust Mortgage Loan Pass Through Certificates, Series 2005-16 ("HVMLT 2005-16");

xx.   HarborView Mortgage Loan Trust Mortgage Loan Pass Through Certificates, Series 2006-1 ("HVMLT 2006-1");

xxi.   HarborView Mortgage Loan Trust Mortgage Loan Pass Through Certificates, Series 2006-4 ("HVMLT 2006-4");

xxii.   HarborView Mortgage Loan Trust Mortgage Loan Pass Through Certificates, Series 2006-5 ("HVMLT 2006-5");

xxiii.   HarborView Mortgage Loan Trust Mortgage Loan Pass Through Certificates, Series 2006-6 ("HVMLT 2006-6");

xxiv.   HarborView Mortgage Loan Trust Mortgage Loan Pass Through Certificates, Series 2006-7 ("HVMLT 2006-7");

xxv.   HarborView Mortgage Loan Trust Mortgage Loan Pass Through Certificates, Series 2006-8 ("HVMLT 2006-8");

xxvi.    HarborView Mortgage Loan Trust Mortgage Loan Pass Through Certificates, Series 2006-9 ("HVMLT 2006-9");

xxvii.    HarborView Mortgage Loan Trust Mortgage Loan Pass Through Certificates, Series 2006-10 ("HVMLT 2006-10");

xxviii.    HarborView Mortgage Loan Trust Mortgage Loan Pass Through Certificates, Series 2006-12 ("HVMLT 2006-12");

xxix.    HarborView Mortgage Loan Trust Mortgage Loan Pass Through Certificates, Series 2006-14 ("HVMLT 2006-14");

xxx.    HarborView Mortgage Loan Trust Mortgage Loan Pass Through Certificates, Series 2006-BU1 ("HVMLT 2006-BU1");

xxxi.    HarborView Mortgage Loan Trust Mortgage Loan Pass Through Certificates, Series 2006-CB1 ("HVMLT 2006-CB1");

xxxii.    HarborView Mortgage Loan Trust Mortgage Loan Pass Through Certificates, Series 2007-1 ("HVMLT 2007-1");

xxxiii.    HarborView Mortgage Loan Trust Mortgage Loan Pass Through Certificates, Series 2007-2 ("HVMLT 2007-2");

xxxiv.    HarborView Mortgage Loan Trust Mortgage Loan Pass Through Certificates, Series 2007-3 ("HVMLT 2007-3");

xxxv.    HarborView Mortgage Loan Trust Mortgage Loan Pass Through Certificates, Series 2007-4 ("HVMLT 2007-4");

xxxvi.    HarborView Mortgage Loan Trust Mortgage Loan Pass Through Certificates, Series 2007-6 ("HVMLT 2007-6");

xxxvii.    HarborView Mortgage Loan Trust Mortgage Loan Pass Through Certificates, Series 2007-7 ("HVMLT 2007-7");

xxxviii.    Home Equity Loan Trust Home Equity Loan Asset-Backed Certificates, Series 2007-FRE1("HELT 2007-FRE1");

xxxix.    Home Equity Loan Trust Home Equity Loan Asset-Backed Trust, Series INABS 2007-B ("INABS 2007-B");

xl.    IndyMac INDX Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2006-AR6 ("INDX 2006-AR6")

4

xli.    IndyMac INDX Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2006-AR35 ("INDX 2006-AR35");

xlii.   MortgageIT Loan Pass-Through Certificates Mortgage Loan Pass-Through Certificates, Series 2006-1("MHL 2006-1");

xliii.  Nationstar Home Equity Loan Asset Backed Certificates, Series 2007-B ("NSTR 2007-B");

xliv.   NovaStar Mortgage Funding Trust Home Equity Loan Asset-Backed Certificates, Series 2007-2 ("NHEL 2007-2");

xlv.    NovaStar Mortgage Funding Trust Home Equity Loan Asset-Backed Notes, Series 2006-MTA1 ("NMFT 2006-MTA1");

xlvi.   Option One Mortgage Loan Trust Asset-Backed Certificates, Series 2005-4 ("OOMLT 2005-4");

xlvii.  Option One Mortgage Loan Trust Asset-Backed Certificates, Series 2006-1 ("OOMLT 2006-1");

xlviii. Option One Mortgage Loan Trust Asset-Backed Certificates, Series 2006-3 ("OOMLT 2006-3");

xlix.   Option One Mortgage Loan Trust Asset-Backed Certificates, Series 2007-3 ("OOMLT 2007-3");

l.      Option One Mortgage Loan Trust Asset-Backed Certificates, Series 2007-4 ("OOMLT 2007-4");

li.     Option One Mortgage Loan Trust Asset-Backed Certificates, Series 2007-5 ("OOMLT 2007-5");

lii.    Option One Mortgage Loan Trust Asset-Backed Certificates, Series 2007-CP1 ("OOMLT 2007-CP1");

liii.   Option One Mortgage Loan Trust Asset-Backed Certificates, Series 2007-FXD2 ("OOMLT 2007-FXD2");

liv.    Popular Asset-Backed Securities Mortgage Pass-Through Trust, Series 2005-5 ("POPLR 2005-5");

lv.     Soundview Home Loan Trust Asset-Backed Certificates, Series 2005-4 ("SVHE 2005-4");

lvi.    Soundview Home Loan Trust Asset-Backed Certificates, Series 2005-OPT3 ("SVHE 2005-OPT3");

lvii.    Soundview Home Loan Trust Asset-Backed Certificates, Series 2005-OPT4 ("SVHE 2005-OPT4");

lviii.    Soundview Home Loan Trust Asset-Backed Certificates, Series 2006-OPT1 ("SVHE 2006-OPT1");

lix.    Soundview Home Loan Trust Asset-Backed Certificates, Series 2006-OPT3 ("SVHE 2006-OPT3");

lx.    Soundview Home Loan Trust Asset-Backed Certificates, Series 2006-OPT4 ("SVHE 2006-OPT4");

lxi.    Soundview Home Loan Trust Asset-Backed Certificates, Series 2006-OPT5 ("SVHE 2006-OPT5");

lxii.    Soundview Home Loan Trust Asset-Backed Certificates, Series 2007-1 ("SVHE 2007-1");

lxiii.    Soundview Home Loan Trust Asset-Backed Certificates, Series 2007-OPT1 ("SVHE 2007-OPT1");

lxiv.    Soundview Home Loan Trust Asset-Backed Certificates, Series 2007-OPT2 ("SVHE 2007-OPT2");

lxv.    Soundview Home Loan Trust Asset-Backed Certificates, Series 2007-OPT3 ("SVHE 2007-OPT3");

lxvi.    Soundview Home Loan Trust Asset-Backed Certificates, Series 2007-OPT4 ("SVHE 2007-OPT4");

lxvii.    Soundview Home Loan Trust Asset-Backed Certificates, Series 2007-OPT5 ("SVHE 2007-OPT5");

lxviii.    Soundview Home Loan Trust Asset-Backed Certificates, Series 2007-WMC1 ("SVHE 2007-WMC1");

(collectively, the "Securitizations").

3.    The Certificates were offered for sale pursuant to one of 16 shelf registration statements (the "Shelf Registration Statements") filed with the Securities and Exchange Commission (the "SEC"). Defendants RBS Acceptance and FAS Corp. filed three Shelf

Registration Statements that pertained to 47 of the Securitizations at issue in this action. The
Individual Defendants signed one or more of those three Shelf Registration Statements, and the
amendments thereto. With respect to all of the Securitizations, RBS Securities was the lead or
co-lead underwriter, and, with respect to all but two of the Securitizations, RBS Securities was
also the underwriter who sold the Certificates to the GSEs.

4.      For each Securitization, a prospectus ("Prospectus") and prospectus supplement
("Prospectus Supplement") were filed with the SEC as part of the Registration Statement[2] for
that Securitization. The GSE Certificates were marketed and sold to Fannie Mae and Freddie
Mac pursuant to the Registration Statements, including the Shelf Registration Statements and the
corresponding Prospectuses and Prospectus Supplements.

5.      The Registration Statements contained statements about the characteristics and
credit quality of the mortgage loans underlying the Securitizations, the creditworthiness of the
borrowers of those underlying mortgage loans, and the origination and underwriting practices
used to make and approve the loans. Such statements were material to a reasonable investor's
decision to invest in mortgage-backed securities by purchasing the Certificates. Unbeknownst to
Fannie Mae and Freddie Mac, these statements were materially false, as significant percentages
of the underlying mortgage loans were not originated in accordance with the represented
underwriting standards and origination practices, and had materially poorer credit quality than
what was represented in the Registration Statements.

6.      For example, a forensic review of over two thousand files for one of the
Securitizations, SVHE 2007-OPT1, has revealed that for the vast majority of loans in that

---

[2]   The term "Registration Statement" as used herein incorporates the Shelf Registration
Statement, the Prospectus and the Prospectus Supplement for each referenced Securitization,
except where otherwise indicated.

Securitization, there were numerous breaches of the originators' underwriting guidelines, such as failure to evaluate the reasonableness of the borrower's stated income or to correctly account for the borrower's debt, both key factors bearing on eligibility for a mortgage loan.  Adherence to underwriting guidelines, particularly on key criteria bearing on loan eligibility, is a material consideration to reasonable investors.

7.      The Registration Statements also contained statistical summaries of the groups of mortgage loans in each Securitization, such as the percentage of loans secured by owner-occupied properties and the percentage of the loan group's aggregate principal balance with loan-to-value ratios within specified ranges.  This information was also material to reasonable investors.  However, a loan level analysis of a sample of loans for each Securitization—a review that encompassed thousands of mortgages across all of the Securitizations—has revealed that these statistics were also false and omitted material facts due to widespread falsification of borrowers' incomes and debts, inflated property values, and misrepresentations of other key characteristics of the mortgage loans.

8.      For example, the percentage of owner-occupied properties is a material risk factor to the purchasers of Certificates, such as Fannie Mae and Freddie Mac, since a borrower who lives in a mortgaged property is generally less likely to stop paying his or her mortgage and more likely to take better care of the property.  The loan level review reveals that the true percentage of owner-occupied properties for the loans supporting the GSE Certificates was materially lower than what was stated in the Prospectus Supplements.  Likewise, the Prospectus Supplements misrepresented other material factors, including the true value of the mortgaged properties relative to the amount of the underlying loans and the actual ability of the individual mortgage holders to satisfy their debts.

9.      Defendants RBS Securities (an underwriter), RBS Acceptance (a depositor), FAS Corp. (a depositor) and the Individual Defendants (who signed the Registration Statements with respect to 47 of the Securitizations) are directly responsible for the misstatements and omissions of material fact contained in the Registration Statements because they prepared, signed, filed and/or used these documents to market and sell the Certificates to Fannie Mae and Freddie Mac.

10.     Defendants RBS Financial Products, RBS Holdings and RBS Group are also responsible for the misstatements and omissions of material fact contained in the Registration Statements by virtue of their direction and control over Defendants RBS Securities, RBS Acceptance and FAS Corp.  RBS Holdings and RBS Group directly participated in and exercised dominion and control over the business operations of Defendants RBS Securities, RBS Acceptance and FAS Corp.  RBS Financial Products (the sponsor) directly participated in and exercised dominion and control over the business operations of Defendants RBS Acceptance and FAS Corp.

11.     Fannie Mae and Freddie Mac purchased over $30.4 billion of the Certificates pursuant to the Registration Statements filed with the SEC.  These documents contained misstatements and omissions of material facts concerning the quality of the underlying mortgage loans, the creditworthiness of the borrowers, and the practices used to originate such loans.  As a result of Defendants' misstatements and omissions of material fact, Fannie Mae and Freddie Mac have suffered substantial losses as the value of their holdings has significantly deteriorated.

12.     FHFA, as Conservator of Fannie Mae and Freddie Mac, brings this action against the Defendants for violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77*l*(a)(2), 77o, Sections 13.1-522(A)(ii) and 13.1-522(C) of the Virginia Code,

Sections 31-5606.05(a)(1)(B) and 31-5606.05(c) of the District of Columbia Code, and for common law negligent misrepresentation.

## PARTIES

### *The Plaintiff and the GSEs*

13.    The Federal Housing Finance Agency is a federal agency located at 1700 G Street, NW in Washington, D.C.  FHFA was created on July 30, 2008 pursuant to the Housing and Economic Recovery Act of 2008 ("HERA"), Pub. L. No. 110-289, 122 Stat. 2654 (2008) (codified at 12 U.S.C. § 4617), to oversee Fannie Mae, Freddie Mac, and the Federal Home Loan Banks.  On September 6, 2008, under HERA, the Director of FHFA placed Fannie Mae and Freddie Mac into conservatorship and appointed FHFA as conservator.  In that capacity, FHFA has the authority to exercise all rights and remedies of the GSEs, including but not limited to, the authority to bring suits on behalf of and/or for the benefit of Fannie Mae and Freddie Mac.  12 U.S.C. § 4617(b)(2).

14.    Fannie Mae and Freddie Mac are government-sponsored enterprises chartered by Congress with a mission to provide liquidity, stability and affordability to the United States housing and mortgage markets.  As part of this mission, Fannie Mae and Freddie Mac invested in residential mortgage-backed securities.  Fannie Mae is located at 3900 Wisconsin Avenue, NW in Washington, D.C.  Freddie Mac is located at 8200 Jones Branch Drive in McLean, Virginia.

### *The Defendants*

15.    Defendant RBS Group is a multi-national corporation that delivers banking and financial services throughout the world.  RBS Group's principal office in the United States is located at 600 Washington Boulevard, Stamford, CT 06901.  RBS Group is the sole owner of RBS Holdings.

16.     Defendant RBS Holdings is a wholly owned subsidiary of RBS Group and is located at 600 Washington Boulevard, Stamford, CT 06901.  Prior to April 2009, RBS Holdings was known as Greenwich Capital Holdings, Inc.

17.     Defendant RBS Securities is an SEC-registered broker-dealer.  RBS Securities is principally located at 600 Washington Boulevard, Stamford, CT 06901, and is a wholly owned subsidiary of RBS Holdings and RBS Group.  Prior to April 2009, RBS Securities was known as Greenwich Capital Markets, Inc.  Defendant RBS Securities was the lead underwriter for each Securitization, and was intimately involved in the Securitizations.  Fannie Mae and Freddie Mac purchased the GSE Certificates for 66 of the 68 Securitizations from RBS Securities in its capacity as underwriter of the Securitizations.

18.     Defendant RBS Financial Products is a Delaware corporation incorporated in 1990, and is principally located at 600 Washington Boulevard, Stamford, CT 06901.  RBS Financial Products is a wholly owned subsidiary of RBS Holdings.  Prior to April 2009, RBS Financial Products was known as Greenwich Capital Financial Products, Inc.  RBS Financial Products was the sponsor of 39 of the Securitizations.

19.     Defendant RBS Acceptance is a wholly owned subsidiary of RBS Holdings and is located at 600 Washington Boulevard, Stamford, CT 06901.  Prior to August 2009, RBS Acceptance was known as Greenwich Capital Acceptance, Inc.  Defendant RBS Acceptance was the depositor for 26 of the Securitizations.  RBS Acceptance, as depositor, was also responsible for preparing and filing reports required under the Securities Exchange Act of 1934.

20.     Defendant FAS Corp. is a Delaware corporation with its principal place of business at 600 Washington Boulevard, Stamford, CT 06901.  FAS Corp. is an affiliate of RBS.

FAS Corp. was the depositor for 21 of the Securitizations.  FAS Corp., as depositor, was also responsible for preparing and filing reports required under the Securities Exchange Act of 1934.

21.     Defendant Joseph N. Walsh III is an individual residing in Greenwich, Connecticut.  Mr. Walsh was Head of Mortgage and Asset-Backed Trading, Origination and Finance at RBS Securities.  In April 2008, he was appointed by RBS Group as Global Co-Head of Credit Markets, Americas. Mr. Walsh also served as President, Managing Director, and Director of RBS Acceptance and FAS Corp.  Mr. Walsh signed three of the Shelf Registration Statements and the amendments thereto.

22.     Defendant Robert J. McGinnis is an individual residing in Greenwich, Connecticut.  Mr. McGinnis was a Managing Director and the Head of Asset-Backed Finance and Trading of Capital Markets.  He also served as President, Managing Director, and Director of RBS Acceptance and FAS Corp.  Mr. McGinnis signed three of the Shelf Registration Statements and the amendments thereto.

23.     Defendant Carol P. Mathis is an individual residing in Darien, Connecticut. Ms. Mathis was a Managing Director and the Chief Financial Officer of RBS Securities.  She also served as Chief Financial Officer and Managing Director of RBS Acceptance and FAS Corp. Ms. Mathis signed three of the Shelf Registration Statements and the amendments thereto.

24.     Defendant John C. Anderson is an individual residing in Darien, Connecticut. Mr. Anderson was head of RBS's U.S. structured finance and principal investment businesses. Mr. Anderson also served as Managing Director and Director of RBS Acceptance and FAS Corp. Mr. Anderson signed three of the Shelf Registration Statements and the amendments thereto.

25.     Defendant James M. Esposito is an individual residing in Bedford, New York. Mr. Esposito was Deputy General Counsel and a Managing Director of RBS Securities.  He also

served as General Counsel and Secretary, Managing Director and Director of RBS Acceptance and FAS Corp.  Mr. Esposito signed three of the Shelf Registration Statements and the amendments thereto.

### The Non-Party Originators

26.     The loans underlying the Certificates were acquired by the sponsor for each Securitization from non-party mortgage originators.  The originators principally responsible for the loans underlying the Certificates were Downey Savings and Loan Association, F.A. ("Downey"); First Franklin Financial Corporation ("First Franklin"); Countrywide Home Loans, Inc. ("Countrywide"); Fremont Investment & Loan ("Fremont"); IndyMac Bank, F.S.B. ("IndyMac"); and Option One Mortgage Corporation ("Option One").

## JURISDICTION AND VENUE

27.     Jurisdiction of this Court is founded upon 28 U.S.C. § 1345, which gives federal courts original jurisdiction over claims brought by FHFA in its capacity as conservator of Fannie Mae and Freddie Mac.

28.     Jurisdiction of this Court is also founded upon 28 U.S.C. § 1331 because the Securities Act claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o.  This Court further has jurisdiction over the Securities Act claims pursuant to Section 22 of the Securities Act of 1933, 15 U.S.C. § 77v.

29.     This Court has jurisdiction over the statutory claims of violations of Sections 13.1-522(A)(ii) and 13.1-522(C) of the Virginia Code and Sections 31-5606.05(a)(1)(B) and 31-5606.05(c) of the District of Columbia Code pursuant to this Court's supplemental jurisdiction under 28 U.S.C. § 1367(a).  This Court also has jurisdiction over the common law claim of negligent misrepresentation pursuant to this Court's supplemental jurisdiction under 28 U.S.C. § 1367(a).

30.     Venue is proper in this district pursuant to Section 22 of the Securities Act of 1933, 15 U.S.C. § 77v and 28 U.S.C. § 1391(b).  Several of the RBS Defendants are principally located in this district, several of the Individual Defendants reside in this district, and many of the acts and transactions alleged herein, including the preparation and dissemination of the Registration Statements, occurred in substantial part within this district.  Defendants are also subject to personal jurisdiction in this district.

## FACTUAL ALLEGATIONS

### I.     THE SECURITIZATIONS

#### A.     Residential Mortgage-Backed Securitizations In General

31.     Asset-backed securitization distributes risk by pooling cash-producing financial assets and issuing securities backed by those pools of assets.  In residential mortgage-backed securitizations, the cash-producing financial assets are residential mortgage loans.

32.     The most common form of securitization of mortgage loans involves a sponsor— the entity that acquires or originates the mortgage loans and initiates the securitization—and the creation of a trust, to which the sponsor directly or indirectly transfers a portfolio of mortgage loans.  The trust is established pursuant to a Pooling and Servicing Agreement entered into by, among others, the "depositor" for that securitization.  In many instances, the transfer of assets to a trust "is a two-step process:  the financial assets are transferred by the sponsor first to an intermediate entity, often a limited purpose entity created by the sponsor . . . and commonly called a depositor, and then the depositor will transfer the assets to the [trust] for the particular asset-backed transactions."  Asset-Backed Securities, Securities Act Release No. 33-8518, Exchange Act Release No. 34-50905, 84 SEC Docket 1624 (Dec. 22, 2004).

33.     Residential mortgage-backed securities are backed by the underlying mortgage loans.  Some residential mortgage-backed securitizations are created from more than one cohort

of loans called collateral groups, in which case the trust issues securities backed by different groups.  For example, a securitization may involve two groups of mortgages, with some securities backed primarily by the first group, and others primarily by the second group.  Purchasers of the securities acquire an ownership interest in the assets of the trust, which in turn owns the loans.  Within this framework, the purchasers of the securities acquire rights to the cash-flows from the designated mortgage group, such as homeowners' payments of principal and interest on the mortgage loans held by the related trust.

34.     Residential mortgage-backed securities are issued pursuant to registration statements filed with the SEC.  These registration statements include prospectuses, which explain the general structure of the investment, and prospectus supplements, which contain detailed descriptions of the mortgage groups underlying the certificates.  Certificates are issued by the trust pursuant to the registration statement, the prospectus and the prospectus supplement.  Underwriters sell the certificates to investors.

35.     A mortgage servicer is necessary to manage the collection of proceeds from the mortgage loans.  The servicer is responsible for collecting homeowners' mortgage loan payments, which the servicer remits to the trustee after deducting a monthly servicing fee.  The servicer's duties include making collection efforts on delinquent loans, initiating foreclosure proceedings, and determining when to charge off a loan by writing down its balance.  The servicer is required to report key information about the loans to the trustee.  The trustee (or trust administrator) administers the trust's funds and delivers payments due each month on the certificates to the investors.

**B.     The Securitizations At Issue In This Case**

36.     This case involves the 68 Securitizations listed in paragraph 2 above, 39 of which were sponsored by RBS Financial Products and all of which were underwritten by RBS

Securities.  For each of the 68 Securitizations, Table 1 identifies:  (1) the sponsor; (2) the

depositor; (3) the lead underwriter; (4) the principal amount issued for the tranches[3] purchased

by the GSEs; (5) the date of issuance; and (6) the loan group or groups backing the GSE

Certificate for that Securitization (referred to as the "Supporting Loan Groups").

### Table 1

| Transaction | Tranche | Sponsor | Depositor | Lead Underwriter | Principal Amount Issued ($) | Date of Issuance | Supporting Loan Group(s) |
|---|---|---|---|---|---|---|---|
| AHMA 2007-3 | II A1 | American Home Mortgage Corp. | American Home Mortgage Assets LLC | RBS Securities | 86,835,000 | June 6, 2007 | Group I-1 |
| | III A1 | American Home Mortgage Corp. | American Home Mortgage Assets LLC | RBS Securities | 192,050,000 | June 6, 2007 | Group II-1 |
| AMSI 2005-R9 | A1 | Ameriquest Mortgage Company | Ameriquest Mortgage Securities Inc | RBS Securities | 669,500,000 | Oct. 27, 2005 | Group 1 |
| ARSI 2006-M3 | A1 | Ameriquest Mortgage Company | Ameriquest Mortgage Securities Inc. | RBS Securities | 786,305,000 | Sept. 27, 2006 | Group 1 |
| ARSI 2006-W5 | A1 | Ameriquest Mortgage Company | Argent Securities Inc. | RBS Securities | 535,800,000 | May 25, 2006. | Group 1 |
| DSLA 2005-AR6 | 1A1A | RBS Financial Products | RBS Acceptance | RBS Securities | 254,726,000 | Sept. 30, 2005 | Group 1 |
| | 1A1B | RBS Financial Products | RBS Acceptance | RBS Securities | 63,681,000 | Sept. 30, 2005 | Group 1 |
| DSLA 2006-AR2 | 1A1A | RBS Financial Products | RBS Acceptance | RBS Securities | 341,948,000 | Sept. 12, 2006 | Group 1 |
| | 1A1B | RBS Financial Products | RBS Acceptance | RBS Securities | 146,549,000 | Sept. 12, 2006 | Group 1 |
| DSLA 2007-AR1 | 1A1A | RBS Financial Products | RBS Acceptance | RBS Securities | 168,508,000 | Feb. 22, 2007 | Group 1 |
| | 1A1B | RBS Financial Products | RBS Acceptance | RBS Securities | 112,339,000 | Feb. 22, 2007 | Group 1 |
| FFML 2006-FF16 | 1A1 | RBS Financial Products | FAS Corp. | RBS Securities | 325,847,000 | Nov. 30, 2006 | Group 1 |
| FFML 2005-FFH4 | 1A1 | RBS Financial Products | FAS Corp. | RBS Securities | 370,777,000 | Dec. 15, 2005 | Group 1 |
| FFML 2006-FF8 | 1A1 | RBS Financial Products | FAS Corp. | RBS Securities | 241,515,000 | June 29, 2006 | Group 1 |
| FHLT 2006-1 | 1A1 | RBS Financial Products | FAS Corp. | RBS Securities | 334,852,000 | April 13, 2006 | Group 1 |
| FHLT 2006-2 | 1A1 | RBS Financial Products | FAS Corp. | RBS Securities | 278,772,000 | April 28, 2006 | Group 1 |
| FHLT 2006-3 | 1A1 | RBS Financial Products | FAS Corp. | RBS Securities | 527,107,000 | Oct. 19, 2006 | Group 1 |

---

[3]  A tranche is one of a series of certificates or interests created and issued as part of the same transaction.

| Transaction | Tranche | Sponsor | Depositor | Lead Underwriter | Principal Amount Issued ($) | Date of Issuance | Supporting Loan Group(s) |
|---|---|---|---|---|---|---|---|
| FHLT 2006-A | 1A1 | Fremont Investment & Loan | FAS Corp. | RBS Securities | 235,410,000 | May 10, 2006 | Group 1 |
| FHLT 2006-D | 1A1 | Fremont Investment & Loan | Fremont Mortgage Securities Corporation | RBS Securities | 602,413,000 | Nov. 3, 2006. | Group 1 |
| HELT 2007-FRE1 | 1AV1 | Nationstar Mortgage LLC | Nationstar Funding LLC | RBS Securities | 666,197,000 | July 10, 2007 | Group 1 |
| HVMLT 2005-12 | 1A1A | RBS Financial Products | RBS Acceptance | RBS Securities | 429,357,000 | Sept. 30, 2005 | Group 1 |
| HVMLT 2005-13 | 1A1A | RBS Financial Products | RBS Acceptance | RBS Securities | 131,197,000 | Sept. 30, 2005 | Group 1 |
| | 1A1B | RBS Financial Products | RBS Acceptance | RBS Securities | 87,465,000 | Sept. 30, 2005 | Group 1 |
| HVMLT 2005-15 | 1A1A | RBS Financial Products | RBS Acceptance | RBS Securities | 144,466,000 | Oct. 31, 2005 | Group 1 |
| | 1A1B | RBS Financial Products | RBS Acceptance | RBS Securities | 36,116,000 | Oct. 31, 2005 | Group 1 |
| HVMLT 2005-16 | 1A1A | RBS Financial Products | RBS Acceptance | RBS Securities | 150,733,000 | Nov. 30, 2005 | Group 1 |
| | 1A1B | RBS Financial Products | RBS Acceptance | RBS Securities | 100,487,900 | Nov. 30, 2005 | Group 1 |
| HVMLT 2006-1 | 1A1A | RBS Financial Products | RBS Acceptance | RBS Securities | 312,518,000 | Feb. 7, 2006 | Group 1 |
| | 1A1B | RBS Financial Products | RBS Acceptance | RBS Securities | 208,344,000 | Feb. 7, 2006 | Group 1 |
| HVMLT 2006-10 | 1A1A | RBS Financial Products | RBS Acceptance | RBS Securities | 450,326,000 | Nov. 13, 2006 | Group 1 |
| | 1A1B | RBS Financial Products | RBS Acceptance | RBS Securities | 112,582,000 | Nov. 13, 2006 | Group 1 |
| HVMLT 2006-12 | 1A1A | RBS Financial Products | RBS Acceptance | RBS Securities | 1,200,000,000 | Dec. 13, 2006 | Group 1 |
| HVMLT 2006-14 | 1A1A | RBS Financial Products | RBS Acceptance | RBS Securities | 544,308,000 | Dec. 22, 2006 | Group 1 |
| HVMLT 2006-4 | 1A2A | RBS Financial Products | RBS Acceptance | RBS Securities | 278,494,000 | April 28, 2006 | Group 1A2 |
| | 1A2B | RBS Financial Products | RBS Acceptance | RBS Securities | 69,623,000 | April 28, 2006 | Group 1A2 |
| | 1A1B | RBS Financial Products | RBS Acceptance | RBS Securities | 151,470,000 | April 28, 2006 | Group 1A1 |
| | 1A1A | RBS Financial Products | RBS Acceptance | RBS Securities | 353,429,000 | April 28, 2006 | Group 1A1 |
| HVMLT 2006-5 | 1A1A | RBS Financial Products | RBS Acceptance | RBS Securities | 424,667,000 | June 29, 2006 | Group 1 |
| | 1A1B | RBS Financial Products | RBS Acceptance | RBS Securities | 106,166,000 | June 29, 2006 | Group 1 |
| HVMLT 2006-6 | 2A1A | RBS Financial Products | RBS Acceptance | RBS Securities | 112,861,000 | June 30, 2006 | Group 2 |
| HVMLT 2006-7 | 1A | RBS Financial Products | RBS Acceptance | RBS Securities | 756,376,000 | Aug. 15, 2006 | Group 1 |
| HVMLT 2006-8 | 1A1 | RBS Financial Products | RBS Acceptance | RBS Securities | 360,539,000 | Aug. 30, 2006 | Group 1 |
| HVMLT 2006-9 | 1A1A | RBS Financial Products | RBS Acceptance | RBS Securities | 832,459,000 | Oct. 4, 2006 | Group 1 |
| HVMLT 2006-BU1 | 1A1A | RBS Financial Products | RBS Acceptance | RBS Securities | 212,112,000 | Mar. 30, 2006 | Group 1 |
| | 1A1B | RBS Financial Products | RBS Acceptance | RBS Securities | 53,028,000 | Mar. 30, 2006 | Group 1 |
| HVMLT 2006-CB1 | 2A2 | RBS Financial Products | RBS Acceptance | RBS Securities | 65,551,000 | Feb. 28, 2006 | Group 2C |

| Transaction | Tranche | Sponsor | Depositor | Lead Underwriter | Principal Amount Issued ($) | Date of Issuance | Supporting Loan Group(s) |
|---|---|---|---|---|---|---|---|
| HVMLT 2007-1 | 1A1A | RBS Financial Products | RBS Acceptance | RBS Securities | 379,466,000 | Mar. 9, 2007 | Group 1 |
| | 1A1B | RBS Financial Products | RBS Acceptance | RBS Securities | 252,977,000 | Mar. 9, 2007 | Group 1 |
| HVMLT 2007-2 | 1A1A | RBS Financial Products | RBS Acceptance | RBS Securities | 331,371,000 | Mar. 30, 2007 | Group 1 |
| HVMLT 2007-3 | 1A1A | RBS Financial Products | RBS Acceptance | RBS Securities | 293,300,000 | April 27, 2007 | Group 1 |
| HVMLT 2007-4 | 1A1 | RBS Financial Products | RBS Acceptance | RBS Securities | 244,312,000 | June 14, 2007 | Group 1 |
| HVMLT 2007-6 | 1A1A | RBS Financial Products | RBS Acceptance | RBS Securities | 199,253,000 | July 31, 2007 | Group 1 |
| HVMLT 2007-7 | 1A1A | RBS Financial Products | RBS Acceptance | RBS Securities | 531,326,000 | Oct. 2, 2007 | Group 1 |
| INABS 2007-B | 1A1 | IndyMac Bank, F.S.B. | IndyMac ABS, Inc. | RBS Securities (co-lead) | 129,689,000 | June 12, 2007 | Group 1 |
| | 1A2 | IndyMac Bank, F.S.B. | IndyMac ABS, Inc. | RBS Securities (co-lead) | 129,689,000 | June 12, 2007 | Group 1 |
| INDX 2006-AR6 | 1A1A | IndyMac Bank, F.S.B. | IndyMac MBS, Inc | RBS Securities | 650,332,000 | April 28, 2006 | Group 1 |
| | 1A1B | IndyMac Bank, F.S.B. | IndyMac MBS, Inc | RBS Securities | 162,583,000 | April 28, 2006 | Group 1 |
| INDX 2006-AR35 | 1A1A | IndyMac Bank, F.S.B | IndyMac MBS, Inc | RBS Securities | 346,464,000 | Nov. 30, 2006 | Group 1 |
| MHL 2006-1 | 1A1 | MortgageIT, Inc. | RBS Acceptance | RBS Securities | 178,942,000 | Feb. 22, 2006 | Group 1-A1 |
| NHEL 2007-2 | A1A | NovaStar Mortgage, Inc. | NovaStar Mortgage Funding Corporation | RBS Securities (co-lead) | 779,369,000 | June 1, 2007 | Group 1 |
| NMFT 2006-MTA1 | 1A1 | NovaStar Mortgage, Inc. | NovaStar Certificates Financing Corporation | RBS Securities | 518,700,000 | June 8, 2006 | Group 1 |
| NSTR 2007-B | 1AV1 | Nationstar Mortgage LLC | Nationstar Funding LLC | RBS Securities | 235,626,000 | April 19, 2007 | Group 1 |
| OOMLT 2005-4 | A1 | Option One Mortgage Corporation | Option One Mortgage Acceptance Corporation | RBS Securities (co-lead) | 841,679,000 | Oct. 5, 2005 | Group 1 |
| OOMLT 2006-1 | 1A1 | Option One Mortgage Corporation | Option One Mortgage Acceptance Corporation | RBS Securities (co-lead) | 1,424,974,000 | Feb. 3, 2006 | Group 1 |
| OOMLT 2006-3 | 1A1 | Option One Mortgage Corporation | Option One Mortgage Acceptance Corporation | RBS Securities (co-lead) | 539,019,000 | Oct. 27,2006 | Group 1 |
| OOMLT 2007-3 | 1A1 | Option One Mortgage Corporation | Option One Mortgage Acceptance Corporation | RBS Securities (co-lead) | 398,178,000 | April 12, 2007 | Group 1 |
| OOMLT 2007-4 | 1A1 | Option One Mortgage Corporation | Option One Mortgage Acceptance Corporation | RBS Securities (co-lead) | 462,095,000 | April 19, 2007 | Group 1 |
| OOMLT 2007-5 | 1A1 | Option One Mortgage Corporation | Option One Mortgage Acceptance Corporation | RBS Securities (co-lead) | 629,973,000 | April 27, 2007 | Group 1 |

| Transaction | Tranche | Sponsor | Depositor | Lead Underwriter | Principal Amount Issued ($) | Date of Issuance | Supporting Loan Group(s) |
|---|---|---|---|---|---|---|---|
| OOMLT 2007-CP1 | IA1 | Option One Mortgage Corporation | Option One Mortgage Acceptance Corporation | RBS Securities (co-lead) | 335,983,000 | Feb. 22, 2007 | Group I |
| OOMLT 2007-FXD2 | IA1 | Option One Mortgage Corporation | Option One Mortgage Acceptance Corporation | RBS Securities (co-lead) | 388,352,000 | Mar. 29, 2007 | Group I |
| POPLR 2005-5 | AV-1 | Popular Financial Funding, LLC | Popular ABS, Inc. | RBS Securities (co-lead) | 160,250,000 | Oct. 21, 2005 | Group II-A |
| SVHE 2005-4 | IA1 | RBS Financial Products | FAS Corp. | RBS Securities | 331,971,000 | Dec. 21, 2005 | Group I |
| SVHE 2005-OPT3 | A1 | Option One Mortgage Corporation | FAS Corp. | RBS Securities | 639,502,000 | Sept. 30, 2005 | Group I |
| SVHE 2005-OPT4 | IA1 | Option One Mortgage Corporation | FAS Corp. | RBS Securities | 557,005,000 | Nov. 30, 2005 | Group I |
| SVHE 2006-OPT1 | IA1 | Option One Mortgage Corporation | FAS Corp. | RBS Securities | 464,580,000 | Mar. 10, 2006 | Group I |
| SVHE 2006-OPT3 | IA1 | Option One Mortgage Corporation | FAS Corp. | RBS Securities | 751,533,000 | May 12, 2006 | Group I |
| SVHE 2006-OPT4 | IA1 | Option One Mortgage Corporation | FAS Corp. | RBS Securities | 321,226,000 | May 26, 2006 | Group I |
| SVHE 2006-OPT5 | IA1 | Option One Mortgage Corporation | FAS Corp. | RBS Securities | 1,233,308,000 | June 19, 2006 | Group I |
| SVHE 2007-1 | IA1 | RBS Financial Products | FAS Corp. | RBS Securities | 227,948,000 | Feb. 28, 2007 | Group I |
| SVHE 2007-OPT1 | IA1 | RBS Financial Products | FAS Corp. | RBS Securities | 925,181,000 | May 15, 2007 | Group I |
| SVHE 2007-OPT2 | IA1 | RBS Financial Products | FAS Corp. | RBS Securities | 270,982,000 | July 10, 2007 | Group I |
| SVHE 2007-OPT3 | IA1 | RBS Financial Products | FAS Corp. | RBS Securities | 258,585,000 | July 10, 2007 | Group I |
| SVHE 2007-OPT4 | IA1 | RBS Financial Products | FAS Corp. | RBS Securities | 233,489,000 | Oct. 11, 2007 | Group I |
| SVHE 2007-OPT5 | IA1 | RBS Financial Products | FAS Corp. | RBS Securities | 542,518,000 | Oct. 30, 2007 | Group I |
| SVHE 2007-WMC1 | IA1 | RBS Financial Products | FAS Corp. | RBS Securities | 254,857,000 | Mar. 21, 2007 | Group I |

C.     **The Securitization Process**

1.     **RBS Financial Products Groups Mortgage Loans in Special Purpose Trusts**

37.     As the sponsor for 39 of the 68 Securitizations, RBS Financial Products purchased the mortgage loans underlying the Certificates for those 39 Securitizations after the loans were originated, either directly from the originators or through affiliates of the originators.[4]

38.     RBS Financial Products then sold the mortgage loans for the 39 Securitizations that it sponsored to one of two depositors, both of which are RBS-affiliated entities:  RBS Acceptance and FAS Corp.  With respect to eight of the remaining Securitizations, non-parties Fremont, Option One and MortgageIT sold the mortgage loans to Defendant FAS Corp., as depositor.  With respect to the remaining 21 Securitizations, non-party sponsors sold the mortgage loans to non-party depositors, as reflected in Table 1, above at paragraph 36; Defendant RBS Securities was the lead or co-lead underwriter for those 21 Securitizations, and the selling underwriter for 19 of those 21 Securitizations.

39.     RBS Acceptance was a wholly owned, limited-purpose financial subsidiary of RBS Holdings, and FAS Corp. was a limited-purpose affiliate of RBS.  The sole purpose of RBS Acceptance and FAS Corp. as depositors was to act as a conduit through which loans acquired by the sponsor could be securitized and sold to investors.

40.     As depositors for 47 of the Securitizations, RBS Acceptance and FAS Corp. transferred the relevant mortgage loans to the trusts.  As part of each of the Securitizations, the trustee, on behalf of the Certificateholders, executed a Pooling and Servicing Agreement

---

[4]   Non-party sponsors Option One Mortgage Corp., Mortgage IT, Inc., American Home Mortgage Corp., Ameriquest Mortgage Co., Fremont Investment & Loan, IndyMac Bank, F.S.B., NationStar Mortgage LLC, Popular Financial Funding LLC and NovaStar Mortgage Inc. were each a sponsor of one or more of the remaining 29 Securitizations.  The sponsor for each Securitization is included in Table 1, above at paragraph 36.

("PSA") with the relevant depositor and the parties responsible for monitoring and servicing the mortgage loans in that Securitization. The trust, administered by the trustee, held the mortgage loans pursuant to the related PSA and issued Certificates, including the GSE Certificates, backed by such loans. The GSEs purchased the GSE Certificates, through which they obtained an ownership interest in the assets of the trust, including the mortgage loans.

**2.     The Trusts Issue Securities Backed by the Loans**

41.     Once the mortgage loans were transferred to the trusts in accordance with the PSAs, each trust issued Certificates backed by the underlying mortgage loans. The Certificates were then sold to investors like Fannie Mae and Freddie Mac, which thereby acquired an ownership interest in the assets of the corresponding trust. Each Certificate entitles its holder to a specified portion of the cashflows from the underlying mortgages in the Supporting Loan Group. The level of risk inherent in the Certificates was a function of the capital structure of the related transaction and the credit quality of the underlying mortgages.

42.     The Certificates were issued pursuant to one of 16 Shelf Registration Statements filed with the SEC on a Form S-3. The Shelf Registration Statements were amended by one or more Forms S-3/A filed with the SEC (the "Amendments"). Each Individual Defendant signed the three Shelf Registration Statements that were filed by RBS Acceptance and FAS Corp., including any amendments thereto. The SEC filing number, registrants, signatories and filing dates for the 16 Shelf Registration Statements and amendments thereto, as well as the Certificates covered by each Shelf Registration Statement, are reflected in Table 2 below.

**Table 2**

| SEC File No. | Date Registration Statement Filed | Date(s) Amended Registration Statement Filed | Registrants | Covered Certificates | Signatories of Registration Statement | Signatories of Amendments |
|---|---|---|---|---|---|---|
| 333-115371 | 5/11/2004 | 8/13/2004 | Popular ABS, Inc. | POPLR 2005-5 | Cameron E. Williams, James H. Jenkins, John N. Martella, Gregory Fisher, Thomas M. Strauss, Mary Alice Avery | Cameron E. Williams, James H. Jenkins, Cameron E. Williams as attorney in fact on behalf of Thomas M. Strauss and Mary Alice Avery |
| 333-121781 | 12/30/2004 | Not applicable | Ameriquest Mortgage Securities Inc. | AMSI 2005-R9 | John P. Grazer, Adam J. Bass, Andrew L. Stidd | Not applicable |
| 333-126920 | 7/27/2005 | Not applicable | Option One Mortgage Acceptance Corporation | OOMLT 2005-4 OOMLT 2006-1 | Robert E. Dubrish, Steven L. Nadon, William L. O'Neill | Not applicable |
| 333-127352 | 8/9/2005 | 8/31/2005 | RBS Acceptance, FAS Corp. | DSLA 2005-AR6 FFML 2005-FFH4 FHLT 2006-1 HVMLT 2005-12 HVMLT 2005-15 HVMLT 2005-16 HVMLT 2006-1 HVMLT 2006-BU1 HVMLT 2006-CB1 MHL 2006-1 SVHE 2005-4 HVMLT 2005-13 SVHE 2005-OPT4 SVHE 2006-OPT1 SVHE 2005-OPT3 | Joseph N. Walsh III, Carol P. Mathis, Robert J. McGinnis, John C. Anderson, James M. Esposito | Joseph N. Walsh III, Carol P. Mathis, Robert J. McGinnis, John C. Anderson, James M. Esposito |
| 333-130642 | 12/22/2005 | 3/3/2006 4/3/2006 4/19/2006 4/28/2006 | NationStar Funding LLC (f/k/a Chec Funding LLC) | NSTR 2007-B HELT 2007-FRE1 | Anthony H. Barone, Jesse K. Bray, Gerard A. Berrens, Leldon E. Echols | Anthony H. Barone, Jesse K. Bray, Gerard A. Berrens, Leldon E. Echols |
| 333-130870 | 1/5/2006 | 3/31/2006 3/30/2006 3/17/2006 3/02/2006 2/10/2006 | Option One Mortgage Acceptance Corporation | OOMLT 2006-3 OOMLT 2007-3 OOMLT 2007-4 OOMLT 2007-5 OOMLT 2007-CP1 OOMLT 2007-FXD2 | Robert E. Dubrish, Steven L. Nadon, William L. O'Neill | Robert E. Dubrish, Steven L. Nadon, William L. O'Neill |

| 333-130961 | 1/11/2006 | 2/23/2006 3/16/2006 3/31/2006 | RBS Acceptance, FAS Corp. | FFML 2006-FF16 FFML 2006-FF8 FHLT 2006-3 HVMLT 2006-10 HVMLT 2006-12 HVMLT 2006-14 HVMLT 2006-4 HVMLT 2006-5 HVMLT 2006-7 HVMLT 2006-8 HVMLT 2006-9 HVMLT 2007-1 SVHE 2006-OPT3 SVHE 2006-OPT4 SVHE 2006-OPT5 SVHE 2007-WMC1 FHLT 2006-A FHLT 2006-2 HVMLT 2006-6 DSLA 2006-AR2 DSLA 2007-AR1 | Joseph N. Walsh III, Carol P. Mathis, Robert J. McGinnis, John C. Anderson, James M. Esposito | Joseph N. Walsh III, Carol P. Mathis, Robert J. McGinnis, John C. Anderson, James M. Esposito |
| 333-140279 | 1/29/2007 | 3/16/2007 3/23/2007 | RBS Acceptance and FAS Corp. | HVMLT 2007-2 HVMLT 2007-3 HVMLT 2007-4 HVMLT 2007-6 HVMLT 2007-7 SVHE 2007-1 SVHE 2007-OPT1 SVHE 2007-OPT2 SVHE 2007-OPT3 SVHE 2007-OPT4 SVHE 2007-OPT5 | Joseph N. Walsh III, Carol P. Mathis, Robert J. McGinnis, John C. Anderson, James M. Esposito | Joseph N. Walsh III, Carol P. Mathis, Robert J. McGinnis, John C. Anderson, James M. Esposito |
| 333-132540 | 3/17/2006 | 5/16/2006, 6/23/2006 | Fremont Mortgage Securities Corp. | FHLT 2006-D | Murray L. Zoota, Louis Rampino, Thomas Hayes, Donald Puglisi, Kyle R. Walker, Ronald Nicolas, Jr., Wayne R. Bailey | 5/16/2006: Murray L. Zoota, Louis Rampino, Wayne R. Bailey, Thomas Hayes, Donald Puglisi, Patrick E. Lamb, Alan Faigin 6/23/2006: Kyle W. Walker, Murray L. Zoota, Louis J. Rampino, Wayne R. Bailey, Thomas W. Hayes, Donald Puglisi, Ronald S. Nicolas, Alan Faigin |

| 333-131111 | 1/19/2006 | 3/24/2006 4/13/2006 | NovaStar Mortgage Funding Corporation | NMFT 2006-MTA1 | Scott F. Hartman, Greg Metz, W. Lance Anderson, Mark Herpich | Scott F. Hartman, Greg Metz (4/12/2006 amendment only), W. Lance Anderson (4/12/2006 amendment only), Mark Herpich (4/12/2006 amendment only) |
|---|---|---|---|---|---|---|
| 333-131452 | 2/1/2006 | Not applicable | Ameriquest Mortgage Securities Inc. | ARSI 2006-M3 | Adam J. Bass, John P. Grazer, Andrew L. Stidd | Not applicable |
| 333-131895 | 2/16/2006 | 3/17/2006 | Argent Securities Inc. | ARSI 2006-W5 | Adam J. Bass, John P. Grazer, Andrew L. Stidd | Adam J. Bass, John P. Grazer, Andrew L. Stidd |
| 333-132042 | 2/24/2006 | 3/29/2006 4/13/2006 6/5/2007 | IndyMac MBS, Inc. | INDX 2006-AR6; INDX 2006-AR35 | John Olinski, S. Blair Abernathy, Raphael Bostic, Samir Grover, Victor H. Woodworth | Simon Heyrick, Victor H. Woodworth, John Olinski, S. Blair Abernathy, Raphael Bostic |
| 333-134461 | 5/25/2006 | 6/16/2006 | Novastar Mortgage Funding Corporation; Novastar Certificates Financing Corporation | NHEL 2007-2 | Scott F. Hartman, Gregory S. Metz, W. Lance Anderson, Mark A. Herpich | Scott F. Hartman, Gregory S. Metz, W. Lance Anderson, Mark A. Herpich |
| 333-134691 | 6/2/2006 | 8/23/2006; 10/10/2006 | Indymac ABS, Inc. | INABS 2007-B | Blair Abernathy, John Olinski, Raphael Bostic, Simon Heyrick, Victor H. Woodworth | Blair Abernathy, John Olinski, Raphael Bostic, Simon Heyrick, Victor H. Woodworth |
| 333-140476 | 2/6/2007 | 2/12/2007 2/13/2007 | American Home Mortgage Assets LLC | AHMA 2007-3 | Michael Strauss, Stephen Hozie, Thomas McDonagh, Alan Horn | Michael Strauss, Stephen Hozie, Thomas McDonagh, Alan Horn |

43.     The Prospectus Supplement for each Securitization describes the underwriting guidelines that purportedly were used in connection with the origination of the underlying mortgage loans.  In addition, the Prospectus Supplements purport to provide accurate statistics regarding the mortgage loans in each group, including the ranges of and weighted average FICO credit scores of the borrowers, the ranges of and weighted average loan-to-value ratios of the loans, the ranges of and weighted average outstanding principal balances of the loans, the debt-to-income ratios, the geographic distribution of the loans, the extent to which the loans were for purchase or refinance purposes; information concerning whether the loans were secured by a

property to be used as a primary residence, second home, or investment property; and

information concerning whether the loans were delinquent.

44.   The Prospectus Supplements associated with each Securitization were filed with

the SEC as part of the Registration Statements.  The Form 8-Ks attaching the PSAs for each

Securitization were also filed with the SEC.  The date on which the Prospectus Supplement and

Form 8-K were filed for each Securitization, as well as the filing number of the Shelf

Registration Statement related to each, are set forth in Table 3 below.

### Table 3

| Transaction | Date Prospectus Supplement Filed | Date Form 8-K Attaching PSA | Filing No. of Related Registration Statement |
|---|---|---|---|
| AHMA 2007-3 | 6/7/2007 | 6/29/2007 | 333-140476 |
| AMSI 2005-R9 | 10/27/2005 | 11/14/2005 | 333-121781 |
| ARSI 2006-M3 | 9/27/2006 | 10/24/2006 | 333-131452 |
| ARSI 2006-W5 | 5/23/2006 | 6/8/2006 | 333-131895 |
| DSLA 2005-AR6 | 9/30/2005 | 1/12/2006 | 333-127352 |
| DSLA 2006-AR2 | 9/13/2006 | 9/28/2006 | 333-130961 |
| DSLA 2007-AR1 | 2/23/2007 | 3/8/2007 | 333-130961 |
| FFML 2005-FFH4 | 12/14/2005 | 12/28/2005 | 333-127352 |
| FFML 2006-FF16 | 11/17/2006 | 12/19/2006 | 333-130961 |
| FFML 2006-FF8 | 6/26/2006 | 7/24/2006 | 333-130961 |
| FHLT 2006-1 | 4/11/2006 | 5/3/2006 | 333-127352 |
| FHLT 2006-2 | 4/28/2006 | 5/16/2006 | 333-130961 |
| FHLT 2006-3 | 10/13/2006 | 11/7/2006 | 333-130961 |
| FHLT 2006-A | 5/9/2006 | 5/31/2006 | 333-130961 |
| FHLT 2006-D | 11/2/2006 | 11/17/2006 | 333-132540 |
| HELT 2007-FRE1 | 7/11/2007 | 7/25/2007 | 333-130642 |
| HVMLT 2005-12 | 9/28/2005 | 10/20/2005 | 333-127352 |
| HVMLT 2005-13 | 9/29/2005 | n/a | 333-127352 |
| HVMLT 2005-15 | 11/1/2005 | 11/18/2005 | 333-127352 |
| HVMLT 2005-16 | 12/1/2005 | 12/15/2005 | 333-127352 |
| HVMLT 2006-1 | 2/8/2006 | 2/22/2006 | 333-127352 |
| HVMLT 2006-10 | 11/15/2006 | 12/5/2006 | 333-130961 |
| HVMLT 2006-12 | 12/14/2006 | 12/27/2006 | 333-130961 |
| HVMLT 2006-14 | 12/26/2006 | 5/15/2006 | 333-130961 |
| HVMLT 2006-4 | 5/2/2006 | 5/15/2006 | 333-130961 |
| HVMLT 2006-5 | 6/30/2006 | 8/3/2006 | 333-130961 |
| HVMLT 2006-6 | 7/1/2006 | 8/3/2006 | 333-130961 |
| HVMLT 2006-7 | 8/14/2006 | 8/30/2006 | 333-130961 |
| HVMLT 2006-8 | 8/31/2006 | 9/14/2006 | 333-130961 |
| HVMLT 2006-9 | 10/6/2006 | 10/19/2006 | 333-130961 |
| HVMLT 2006-BU1 | 4/3/2006 | 4/14/2006 | 333-127352 |
| HVMLT 2006-CB1 | 3/2/2006 | 3/15/2006 | 333-127352 |
| HVMLT 2007-1 | 3/9/2007 | 3/19/2007 | 333-130961 |
| HVMLT 2007-2 | 4/2/2007 | 4/16/2007 | 333-140279 |
| HVMLT 2007-3 | 5/1/2007 | 5/11/2007 | 333-140279 |
| HVMLT 2007-4 | 6/15/2007 | 7/2/2007 | 333-140279 |
| HVMLT 2007-6 | 8/2/2007 | 8/15/2007 | 333-140279 |
| HVMLT 2007-7 | 10/4/2007 | 10/17/2007 | 333-140279 |
| INABS 2007-B | 6/12/2007 | 8/3/2007 | 333-134691 |

| Transaction | Date Prospectus Supplement Filed | Date Form 8-K Attaching PSA | Filing No. of Related Registration Statement |
|---|---|---|---|
| INDX 2006-AR35 | 12/1/2006 | 12/14/2006 | 333-132042 |
| INDX 2006-AR6 | 5/2/2006 | 5/15/2006 | 333-132042 |
| MHL 2006-1 | 2/24/2006 | 3/9/2006 | 333-127352 |
| NHEL 2007-2 | 5/25/2007 | 6/8/2007 | 333-134461 |
| NMFT 2006-MTA1 | 3/24/2006 | 6/6/2006 | 333-131111 |
| NSTR 2007-B | 5/1/2007 | 4/20/2007 | 333-130642 |
| POPLR 2005-5 | 10/19/2005 | 10/24/2005 | 333-115371 |
| OOMLT 2005-4 | 10/4/05 | 10/20/2005 | 333-126920 |
| OOMLT 2006-1 | 1/31/2006 | 3/14/2006 | 333-126920 |
| OOMLT 2006-3 | 10/27/2006 | 11/13/2006 | 333-130870 |
| OOMLT 2007-3 | 4/13/2007 | 5/11/2007 | 333-130870 |
| OOMLT 2007-4 | 4/19/2007 | 5/16/2007 | 333-130870 |
| OOMLT 2007-5 | 4/25/2007 | 5/18/2007 | 333-130870 |
| OOMLT 2007-CP1 | 2/22/2007 | 3/9/2007 | 333-130870 |
| OOMLT 2007-FXD2 | 3/28/2007 | 4/19/2007 | 333-130870 |
| SVHE 2005-4 | 12/19/2005 | 1/11/2006 | 333-127352 |
| SVHE 2005-OPT3 | 9/30/2005 | 10/17/2005 | 333-127352-01 |
| SVHE 2005-OPT4 | 11/23/2005 | 12/15/2006 | 333-127352 |
| SVHE 2006-OPT1 | 3/10/2006 | 4/19/2006 | 333-127352 |
| SVHE 2006-OPT3 | 5/10/2006 | 6/1/2006 | 333-130961 |
| SVHE 2006-OPT4 | 5/24/2006 | 6/29/2006 | 333-130961 |
| SVHE 2006-OPT5 | 6/19/2006 | 7/12/2006 | 333-130961 |
| SVHE 2007-1 | 3/6/2007 | 3/22/2007 | 333-140279 |
| SVHE 2007-OPT1 | 5/10/2007 | 6/14/2007 | 333-140279 |
| SVHE 2007-OPT2 | 7/9/2007 | 7/25/2007 | 333-140279 |
| SVHE 2007-OPT3 | 7/9/2007 | 7/26/2007 | 333-140279 |
| SVHE 2007-OPT4 | 10/11/2007 | 10/26/2007 | 333-140279 |
| SVHE 2007-OPT5 | 10/26/2007 | 11/14/2007 | 333-140279 |
| SVHE 2007-WMC1 | 3/21/2007 | 4/9/2007 | 333-130961 |

45.     The Certificates were issued pursuant to the PSAs, and Defendant RBS Securities offered and sold the GSE Certificates to Fannie Mae and Freddie Mac pursuant to the Registration Statements, which, as noted previously, included the Prospectuses and Prospectus Supplements.[5]

## II.     THE DEFENDANTS' PARTICIPATION IN THE SECURITIZATION PROCESS

### A.     The Role of Each of the Defendants

46.     Each of the Defendants, including the Individual Defendants, had a role in the securitization process and the marketing for most or all of the Certificates, which included purchasing the mortgage loans from the originators, arranging the Securitizations, selling the

---

[5]   RBS Securities was the selling underwriter for 66 of the Securitizations; for the remaining two Securitizations, the selling underwriter was a non-party underwriter.  The selling underwriter for each Securitization is reflected at Tables 10 and 11 below.

mortgage loans to the depositor, transferring the mortgage loans to the trustee on behalf of the Certificateholders, underwriting the public offering of the Certificates, structuring and issuing the Certificates, and marketing and selling the Certificates to investors such as Fannie Mae and Freddie Mac.

47.     With respect to each Securitization, the depositor, underwriter, and Individual Defendants who signed the Registration Statement, as well as the Defendants who exercised control over their activities, are liable, jointly and severally, as participants in the registration, issuance and offering of the Certificates, including issuing, causing, or making materially misleading statements in the Registration Statement, and omitting material facts required to be stated therein or necessary to make the statements contained therein not misleading.

### 1.     RBS Financial Products

48.     RBS Financial Products was formed in November 1990 as a wholly owned subsidiary of RBS Holdings for the purpose of issuing securities through its affiliates RBS Acceptance and FAS Corp.  RBS Financial Products is a leading sponsor of mortgage-backed securities.  As stated in the Prospectus Supplement for the HVMLT 2007-3 Securitization, from the period January 2000 through December 2006, RBS Financial Products securitized mortgage loans with an aggregate principal balance of approximately $132.4 billion; during the 2003, 2004, 2005 and 2006 fiscal years, RBS Financial Products securitized approximately $10.7 billion, $30.4 billion, $47.9 billion, and $39 billion of mortgage loans, respectively.

49.     Defendant RBS Financial Products, under its former name, Greenwich Capital Financial Products, Inc., was the sponsor of 39 of the 68 Securitizations.  In that capacity, RBS Financial Products determined the structure of the Securitizations, initiated the Securitizations, purchased the mortgage loans to be securitized, determined distribution of principal and interest, and provided data to the credit rating agencies to secure investment grade ratings for the GSE

Certificates.  RBS Financial Products also selected, in 47 of the Securitizations, RBS Acceptance or FAS Corp. as the special purpose vehicles that would be used to transfer the mortgage loans from RBS Financial Products to the trusts, and selected RBS Securities as the underwriter for the Securitizations.  In its role as sponsor, RBS Financial Products knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing such loans would be issued by the relevant trusts.

50.     For the 39 Securitizations that it sponsored, RBS Financial Products also conveyed the mortgage loans to RBS Acceptance or FAS Corp., as depositor, pursuant to an Assignment and Recognition Agreement or a Mortgage Loan Purchase Agreement.  In these agreements, RBS Financial Products made certain representations and warranties to RBS Acceptance and FAS Corp. regarding the groups of loans collateralizing the Certificates.  These representations and warranties were assigned by RBS Acceptance and FAS Corp. to the trustees for the benefit of the Certificateholders.

### 2.     RBS Acceptance

51.     Defendant RBS Acceptance has been engaged in the securitization of mortgage loans as a depositor since its incorporation in 1987.  It is a special purpose entity formed solely for the purpose of purchasing mortgage loans, filing registration statements with the SEC, forming issuing trusts, assigning mortgage loans and all of its rights and interests in such mortgage loans to the trustee for the benefit of the certificateholders, and depositing the underlying mortgage loans into the issuing trusts.

52.     RBS Acceptance was the depositor for 26 of the 68 Securitizations.  In its capacity as depositor, RBS Acceptance purchased the mortgage loans from RBS Financial Products (as sponsor) pursuant to the Assignment and Recognition Agreements or Mortgage Loan Purchase Agreements, as applicable.  RBS Acceptance then sold, transferred, or otherwise

conveyed the mortgage loans to be securitized to the trusts.  RBS Acceptance, together with the
other Defendants, was also responsible for preparing and filing the Registration Statements
pursuant to which the Certificates were offered for sale.  The trusts in turn held the mortgage
loans for the benefit of the Certificateholders, and issued the Certificates in public offerings for
sale to investors such as Fannie Mae and Freddie Mac.

### 3.    FAS Corp.

53.    Defendant FAS Corp. is an affiliate of RBS Securities.  Like RBS Acceptance,
FAS Corp. is a special purpose entity formed solely for the purpose of purchasing mortgage
loans, filing registration statements with the SEC, forming issuing trusts, assigning mortgage
loans and all of its rights and interests in such mortgage loans to the trustee for the benefit of the
certificateholders, and depositing the underlying mortgage loans into the issuing trusts

54.    FAS Corp. was the depositor for 21 of the 68 Securitizations.  In its capacity as
depositor, FAS Corp. purchased the mortgage loans from the sponsor (which was RBS Financial
Products for 14 of the 21 Securitizations for which FAS Corp. served as depositor) pursuant to
the Assignment and Recognition Agreements or Mortgage Loan Purchase Agreements, as
applicable.  FAS Corp. then sold, transferred, or otherwise conveyed the mortgage loans to be
securitized to the trusts.  FAS Corp., together with the other Defendants, was also responsible for
preparing and filing the Registration Statements pursuant to which the Certificates were offered
for sale.  The trusts in turn held the mortgage loans for the sole benefit of the Certificateholders,
and issued the Certificates in public offerings for sale to investors such as Fannie Mae and
Freddie Mac.

### 4.    RBS Securities

55.    Defendant RBS Securities was founded in 1981 and was acquired by RBS Group
in 2000.  Defendant RBS Securities is an investment bank, and was, at all relevant times, a

registered broker/dealer and one of the leading underwriters of mortgage and other asset-backed securities in the United States.

56.     RBS Securities is one of the nation's largest underwriters of asset-backed securities.  In 2006, *Inside Mortgage Finance* ranked RBS Securities as the fourth largest non-agency mortgage-backed securities underwriter, underwriting over $102 billion of mortgage-backed securities.[6]  In 2007, RBS Securities remained a strong force as the third largest subprime underwriter of non-agency mortgage-backed securities, underwriting over $19 billion.

57.     Defendant RBS Securities was the lead underwriter in each of the Securitizations. In that role, it was responsible for underwriting and managing the offer and sale of the Certificates to Fannie Mae and Freddie Mac and other investors.  RBS Securities was also obligated to conduct meaningful due diligence to ensure that the Registration Statements did not contain any material misstatements or omissions, including as to the manner in which the underlying mortgage loans were originated, transferred and underwritten.

### 5.     RBS Holdings

58.     RBS Holdings employed its wholly owned subsidiaries, RBS Financial Products, RBS Securities, and RBS Acceptance, as well as FAS Corp., an affiliate of RBS Securities, in the key steps of the securitization process.  Unlike typical arms' length securitizations, the Securitizations here involved various RBS subsidiaries and affiliates at virtually each step in the chain.  With respect to more than half of the Securitizations, the sponsor was RBS Financial Products, the depositor was RBS Acceptance or FAS Corp., and the lead underwriter was RBS

---

[6]  "Agency" mortgage-backed securities are guaranteed by a government agency or government-sponsored enterprise such as Fannie Mae or Freddie Mac, while "non-agency" mortgage-backed securities are issued by banks and financial companies not associated with a government agency or government sponsored enterprise.

Securities.  As to the remaining Securitizations, RBS Securities was the lead underwriter, and in eight instances, FAS Corp. or RBS Acceptance was the depositor.

59.     As the sole corporate parent of RBS Securities, RBS Acceptance, and RBS Financial Products, RBS Holdings had the practical ability to direct and control the actions of RBS Securities, RBC Acceptance, and RBS Financial Products related to the Securitizations, and in fact exercised such direction and control over the activities of these entities related to the issuance and sale of the Certificates.

### 6.     RBS Group

60.     Defendant RBS Group wholly owns RBS Holdings and is the ultimate parent of RBS Securities, RBS Financial Products, RBS Acceptance and FAS Corp.  Further, RBS Securities is included in RBS Group's consolidated financial statements, and, according to RBS Group's 2010 annual report, RBS Securities serves as RBS Group's "U.S. broker dealer" and one of its "U.S. brands," and RBS Group's Global Banking & Markets division conducts its business in the United States "principally" through RBS Securities.

61.     As detailed above, the Securitizations here involved RBS entities, including the aforementioned subsidiaries of the RBS Group, at virtually each step in the process.  RBS Group profited substantially from this vertically integrated approach to mortgage-backed securitization. Furthermore, RBS Group shares, and, on information and belief, shared, overlapping management with the other Defendant entities.  For instance, Defendant John C. Anderson is a Managing Director at RBS Securities; he signed three Shelf Registration Statements on behalf of RBS Acceptance and FAS Corp.; and he is the head of non-core markets for RBS Group.

### 7.     The Individual Defendants

62.     Defendant Joseph N. Walsh III was Head of Mortgage and Asset-Backed Trading, Origination and Finance at RBS Securities.  In April 2008, he was appointed by RBS Group as

31

Global Co-Head of Credit Markets, Americas.  Mr. Walsh also served as Director and President of RBS Acceptance and FAS Corp.  Mr. Walsh signed three of the Shelf Registration Statements and the amendments thereto.

63.     Defendant Robert J. McGinnis was a Managing Director and the Head of Asset-Backed Finance and Trading of RBS Securities.  He also served as a Managing Director and Director of RBS Acceptance and FAS Corp.  Mr. McGinnis signed three of the Shelf Registration Statements and the amendments thereto.

64.     Defendant Carol P. Mathis was a Managing Director and the Chief Financial Officer of RBS Securities.  She also served as Chief Financial Officer and Managing Director of RBS Acceptance and FAS Corp.  Ms. Mathis signed three of the Shelf Registration Statements and the amendments thereto.

65.     Defendant John C. Anderson was head of RBS's United States structured finance and principal investment businesses.  Mr. Anderson also served as a Managing Director and Director of RBS Acceptance and FAS Corp.  Mr. Anderson signed three of the Shelf Registration Statements and the amendments thereto.

66.     Defendant James M. Esposito was Deputy General Counsel and a Managing Director of RBS Securities.  He also served as the General Counsel and Secretary, and a Managing Director and Director, of RBS Acceptance and FAS Corp.  Mr. Esposito signed three of the Shelf Registration Statements and the amendments thereto.

**B.     Defendants' Failure To Conduct Proper Due Diligence**

67.     Defendants failed to conduct adequate and sufficient due diligence to ensure that the mortgage loans underlying the Securitizations complied with the representations in the Registration Statements.

68.     During the time period in which the Certificates were issued—approximately 2005 through 2007—RBS's involvement in the mortgage-backed securitization market was rapidly expanding.  In an effort to increase revenue and profits, RBS vastly expanded the volume of mortgage-backed securities it issued as compared to prior years.  RBS Financial Products initially securitized a relatively small volume of mortgage loans—less than $1 billion in 2000, less than $1 billion in 2001, and $2.4 billion in 2002.  In 2003, however, the volume of mortgage loans that RBS Financial Products securitized more than quadrupled to $10.7 billion.  In 2004, the volume tripled from $10.7 billion to $30.4 billion.  In 2005, RBS Financial Products securitized its largest volume of mortgage loans—$47.9 billion.  The volume of mortgage loans securitized by RBS Financial Products in 2006 remained high, totaling almost $40 billion.  *See* HVMLT 2007-3 Prospectus Supplement, filed May 1, 2007.

69.     Defendants had enormous financial incentives to complete as many offerings as quickly as possible without regard to ensuring the accuracy or completeness of the Registration Statements, or conducting adequate and reasonable due diligence.  For example, RBS Acceptance and FAS Corp., as the depositors, were paid a percentage of the total dollar amount of the offerings upon completion of the Securitizations, and RBS Securities, as the underwriter, was paid a commission based on the amount it received from the sale of the Certificates to the public.

70.     The push to securitize large volumes of mortgage loans contributed to the absence of controls needed to prevent the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.  In particular, Defendants failed to conduct adequate diligence or to otherwise ensure the accuracy of the statements in the Registrations Statements pertaining to the Securitizations.

71.     For instance, RBS retained third-parties, including Clayton Holdings, Inc. ("Clayton"), to analyze the loans it was considering placing in its securitizations, but waived a significant number of loans into the securitizations that these firms had recommended for exclusion, and did so without taking adequate steps to ensure that these loans had in fact been underwritten in accordance with applicable guidelines or had compensating factors that excused the loans' non-compliance with those guidelines.  On January 27, 2008, Clayton revealed that it had entered into an agreement with the New York Attorney General (the "NYAG") to provide documents and testimony regarding its due diligence reports, including copies of the actual reports provided to its clients.  According to *The New York Times*, as reported on January 27, 2008, Clayton told the NYAG "that starting in 2005, it saw a significant deterioration of lending standards and a parallel jump in lending expectations" and "some investment banks directed Clayton to halve the sample of loans it evaluated in each portfolio."

72.     RBS was negligent in allowing into the Securitizations a substantial number of mortgage loans that, as reported to RBS by third-party due diligence firms, did not conform to the underwriting standards stated in the Registration Statements, including the Prospectuses and Prospectus Supplements.  Even upon learning from the third-party due diligence firms that there were high percentages of defective or at least questionable loans in the sample of loans reviewed by the third-party due diligence firms, RBS failed to take any additional steps to verify that the population of loans in the Securitizations did not include a similar percentage of defective and/or questionable loans.

73.     Clayton's trending reports revealed that in the period from the first quarter of 2006 to the second quarter of 2007, 18 percent of the mortgage loans RBS submitted to Clayton to review in residential mortgage-backed securities groups were rejected by Clayton as falling

outside the applicable underwriting guidelines. Of the mortgage loans that Clayton found

defective, 53 percent of the loans were subsequently waived in by RBS without proper

consideration and analysis of compensating factors and included in securitizations such as the

ones in which Fannie Mae and Freddie Mac invested here. *See* Clayton Trending Reports,

available at http://fcic.law.Stamford.edu/hearings/testimony/the-impact-of-the-financial-crisis-

sacramento#documents.

74.     RBS's underwriting and due diligence practices with respect to mortgage-backed

securities are being investigated by the SEC. In March 2008, the SEC launched an informal

investigation into RBS's underwriting of mortgage-backed securities. That investigation was

upgraded, and became formal in March 2011.

## III.    THE STATEMENTS IN THE REGISTRATION STATEMENTS AND PROSPECTUS SUPPLEMENTS

### A.    Compliance With Underwriting Guidelines

75.     The Prospectus Supplements for each Securitization describe the mortgage loan

underwriting guidelines pursuant to which the mortgage loans underlying the related

Securitizations were to have been originated. These guidelines were intended to assess the

creditworthiness of the borrower, the ability of the borrower to repay the loan, and the adequacy

of the mortgaged property as security for the loan.

76.     The statements made in the Prospectus Supplements, which, as discussed, formed

part of the Registration Statement for each Securitization, were material to a reasonable

investor's decision to purchase and invest in the Certificates because the failure to originate a

mortgage loan in accordance with the applicable guidelines creates a higher risk of delinquency

and default by the borrower, as well as a risk that losses upon liquidation will be higher, thus

resulting in a greater economic risk to an investor.

77.     The Prospectus Supplements for the Securitizations contained several key statements with respect to the underwriting standards of the entities that originated the loans in the Securitizations.  For example, the Prospectus Supplement for the SVHE 2005-OPT4 Securitization, for which Option One was the originator, RBS Securities was the underwriter and FAS Corp. was the depositor, stated that:  "The Mortgage Loans will have been originated generally in accordance with Option One's Guidelines" and that "the Option One Underwriting Guidelines are primarily intended to assess the value of the mortgaged property, to evaluate the adequacy of such property as collateral for the mortgage loan and to assess the applicant's ability to repay the mortgage loan."

78.     The SVHE 2005-OPT4 Prospectus Supplement stated that "exceptions to the Option One Underwriting Guidelines" (including "a debt-to-income ratio exception, a pricing exception, a loan-to-value exception, a credit score exception or an exception from certain requirements of a particular risk category") are made on a "case-by-case basis," but emphasized that exceptions "are made where compensating factors exist."

79.     With respect to the information evaluated by the originator, the Prospectus Supplement stated that:  "Each mortgage loan applicant completes an application that includes information with respect to the applicant's liabilities, income, credit history, employment history and personal information.  The Option One Underwriting Guidelines require a credit report and, if available, a credit score, on each applicant from a credit-reporting agency.  The credit report typically contains information relating to such matters as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcies, repossessions or judgments."

80.     The Prospectus Supplement further stated that: "The Option One Underwriting Guidelines require that mortgage loans be underwritten in a standardized procedure which complies with applicable federal and state laws and regulations and require Option One's underwriters to be satisfied that the value of the property being financed, as indicated by an appraisal, supports the loan balance."

81.     The Prospectus and Prospectus Supplements for each of the Securitizations had similar representations to those quoted above.  The relevant representations in the Prospectus and Prospectus Supplements pertaining to originating entity underwriting standards for each Securitization are reflected in Appendix A to this Complaint.  As discussed below at paragraphs 109 through 142, in fact, the originators of the mortgage loans in the Supporting Loan Group for the Securitizations did not adhere to their stated underwriting guidelines, thus rendering the description of those guidelines in the Prospectus and Prospectus Supplements false and misleading.

82.     Further, for the vast majority of the Securitizations, the Prospectus and Prospectus Supplements described additional representations and warranties concerning the mortgage loans backing the Securitizations that were made by the originator to the seller in the PSA.  Such representations and warranties, which are described in greater detail for each Securitization in Appendix A, included: (i) the mortgage loans were underwritten in accordance with the originator's underwriting guidelines in effect at the time of origination, subject to only limited exceptions; and (ii) the origination and collection practices used by the originator with respect to each mortgage note and mortgage were in all respects legal, proper, prudent and customary in the mortgage origination and servicing business.

83.    The inclusion of these representations in the Prospectus and Prospectus Supplements had the purpose and effect of providing additional assurances to investors regarding the quality of the mortgage collateral underlying the Securitizations.  These representations were material to a reasonable investor's decision to purchase the Certificates.

**B.    Statements Regarding Occupancy Status of Borrower**

84.    The Prospectus Supplements contained collateral group-level information about the occupancy status of the borrowers of the loans in the Securitizations.  Occupancy status refers to whether the property securing a mortgage is to be the primary residence of the borrower, a second home, or an investment property.  The Prospectus Supplements for each of the Securitizations presented this information in tabular form, usually in a table entitled "Occupancy Status of the Mortgage Loans."  This table divided all the loans in the collateral group by occupancy status, *e.g.*, into the following categories:  (i) "Primary," or "Owner Occupied;" (ii) "Second Home," or "Secondary"; and (iii) "Investment" or "Non-Owner."  For each category, the table stated the number of loans in that category.  Occupancy statistics for the Supporting Loan Groups for each Securitization were reported in the Prospectus Supplements as follows:[7]

**Table 4**

| Transaction | Supporting Loan Group | Primary or Owner Occupied (%) | Second Home/Secondary (%) | Investor (%) |
|---|---|---|---|---|
| ARSI 2006-M3 | Group I | 86.67 | 1.26 | 12.07 |
| ARSI 2006-W5 | Group I | 82.54 | 1.35 | 16.11 |
| AHMA 2007-3 | Group I-1 | 38.46 | 5.13 | 56.41 |
|  | Group II-1 | 58.48 | 3.16 | 38.37 |
| AMSI 2005-R9 | Group I | 96.02 | 0.90 | 3.08 |

---

[7]    Each Prospectus Supplement provides the total number of loans and the number of loans in the following categories:  owner occupied, investor, and second home.  These numbers have been converted to percentages.

| Transaction | Supporting Loan Group | Primary or Owner Occupied (%) | Second Home/Secondary (%) | Investor (%) |
|---|---|---|---|---|
| DSLA 2005-AR6 | Group 1 | 88.96 | 0.51 | 10.53 |
| DSLA 2006-AR2 | Group 1 | 86.79 | 1.10 | 12.11 |
| DSLA 2007-AR1 | Group 1 | 85.77 | 2.23 | 12.00 |
| FFML 2005-FFH4 | Group 1 | 98.93 | 1.04 | 0.03 |
| FFML 2006-FF16 | Group 1 | 94.05 | 0.74 | 5.21 |
| FFML 2006-FF8 | Group 1 | 97.84 | 0.13 | 2.03 |
| FHLT 2006-1 | Group 1 | 89.38 | 1.08 | 9.54 |
| FHLT 2006-2 | Group 1 | 94.16 | 0.35 | 5.49 |
| FHLT 2006-3 | Group 1 | 89.40 | 1.39 | 9.21 |
| FHLT 2006-A | Group 1 | 93.52 | 1.07 | 5.41 |
| FHLT 2006-D | Group 1 | 93.18 | 0.58 | 6.24 |
| HELT 2007-FRE1 | Group 1 | 88.91 | 1.06 | 10.03 |
| HVMLT 2005-12 | Group 1 | 76.00 | 4.40 | 19.60 |
| HVMLT 2005-13 | Group 1 | 70.30 | 6.00 | 23.70 |
| HVMLT 2005-15 | Group 1 | 64.12 | 5.52 | 30.36 |
| HVMLT 2005-16 | Group 1 | 40.08 | 12.13 | 47.78 |
| HVMLT 2006-1 | Group 1 | 68.93 | 6.19 | 24.88 |
| HVMLT 2006-10 | Group 1 | 57.95 | 7.23 | 34.81 |
| HVMLT 2006-12 | Group 1 | 66.58 | 9.04 | 24.38 |
| HVMLT 2006-14 | Group 1 | 90.75 | 3.81 | 5.44 |
| HVMLT 2006-4 | Group 1A1 | 78.58 | 6.53 | 14.89 |
| | Group 1A2 | 70.27 | 10.74 | 19.00 |
| HVMLT 2006-5 | Group 1 | 68.85 | 8.95 | 22.21 |
| HVMLT 2006-6 | Group 2 | 83.73 | 6.76 | 9.51 |
| HVMLT 2006-7 | Group 1 | 61.99 | 8.06 | 29.95 |
| HVMLT 2006-8 | Group 1 | 49.57 | 7.96 | 42.47 |
| HVMLT 2006-9 | Group 1 | 63.59 | 9.90 | 26.51 |
| HVMLT 2006-BU1 | Group 1 | 71.60 | 14.79 | 13.62 |
| HVMLT 2006-CB1 | Group 2C | 85.12 | 2.18 | 12.70 |
| HVMLT 2007-1 | Group 1 | 71.53 | 6.70 | 21.77 |
| HVMLT 2007-2 | Group 1 | 81.89 | 3.70 | 14.41 |
| HVMLT 2007-3 | Group 1 | 68.55 | 3.58 | 27.87 |
| HVMLT 2007-4 | Group 1 | 82.29 | 2.13 | 15.58 |
| HVMLT 2007-6 | Group 1 | 80.72 | 2.77 | 16.51 |
| HVMLT 2007-7 | Group 1 | 77.88 | 4.46 | 17.67 |
| INABS 2007-B | Group 1 | 81.55 | 1.14 | 17.31 |
| INDX 2006-AR6 | Group 1 | 90.42 | 2.21 | 7.36 |
| INDX 2006-AR35 | Group 1 | 77.46 | 4.43 | 18.10 |
| MHL 2006-1 | Group 1-A1 | 81.71 | 3.05 | 15.24 |
| NHEL 2007-2 | Group 1 | 92.60 | 1.97 | 5.43 |
| NMFT 2006-MTA1 | Group 1 | 74.10 | 3.66 | 22.24 |
| NSTR 2007-B | Group 1 | 96.87 | 0.72 | 2.41 |
| OOMLT 2005-4 | Group 1 | 85.01 | 2.05 | 12.95 |
| OOMLT 2006-1 | Group 1 | 89.26 | 2.00 | 8.75 |
| OOMLT 2006-3 | Group 1 | 86.72 | 2.01 | 11.27 |
| OOMLT 2007-3 | Group 1 | 81.83 | 1.86 | 16.31 |
| OOMLT 2007-4 | Group 1 | 84.24 | 1.42 | 14.34 |
| OOMLT 2007-5 | Group 1 | 81.64 | 1.14 | 17.21 |
| OOMLT 2007-CP1 | Group 1 | 94.47 | 1.12 | 4.42 |
| OOMLT 2007-FXD2 | Group 1 | 94.09 | 0.81 | 5.10 |
| POPLR 2005-5 | Group II-A | 96.43 | 0.08 | 3.49 |
| SVHE 2005-4 | Group 1 | 89.70 | 1.08 | 9.21 |

| Transaction | Supporting Loan Group | Primary or Owner Occupied (%) | Second Home/Secondary (%) | Investor (%) |
|---|---|---|---|---|
| SVHE 2005-OPT3 | Group 1 | 92.34 | 1.33 | 6.33 |
| SVHE 2005-OPT4 | Group 1 | 91.60 | 1.47 | 6.94 |
| SVHE 2006-OPT1 | Group 1 | 93.63 | 0.77 | 5.60 |
| SVHE 2006-OPT3 | Group 1 | 95.42 | 0.78 | 3.79 |
| SVHE 2006-OPT4 | Group 1 | 94.53 | 0.75 | 4.72 |
| SVHE 2006-OPT5 | Group 1 | 94.47 | 0.74 | 4.79 |
| SVHE 2007-1 | Group 1 | 90.36 | 2.41 | 7.23 |
| SVHE 2007-OPT1 | Group 1 | 93.17 | 1.28 | 5.55 |
| SVHE 2007-OPT2 | Group 1 | 85.53 | 1.25 | 13.23 |
| SVHE 2007-OPT3 | Group 1 | 83.43 | 2.44 | 14.13 |
| SVHE 2007-OPT4 | Group 1 | 88.63 | 1.55 | 9.82 |
| SVHE 2007-OPT5 | Group 1 | 91.39 | 1.69 | 6.92 |
| SVHE 2007-WMC1 | Group 1 | 92.51 | 4.56 | 2.93 |

85.     As Table 4 makes clear, the Prospectus Supplements for nearly all of the Securitizations reported that an overwhelming majority of the mortgage loans in the Supporting Loan Groups were owner occupied, while a small percentage were reported to be non-owner occupied (*i.e.* a second home or investment property).

86.     The statements about occupancy status were material to a reasonable investor's decision to invest in the Certificates.  Information about occupancy status is an important factor in determining the credit risk associated with a mortgage loan and, therefore, the securitization that it collaterizes.  Because borrowers who reside in mortgaged properties are less likely to default than borrowers who purchase homes as second homes or investments and live elsewhere, and are more likely to care for their primary residence, the percentage of loans in the collateral group of a securitization that are secured by mortgage loans on owner-occupied residences is an important measure of the risk of the certificates sold in that securitization.  As stated in the Prospectus Supplement for the HVMLT 2007-3 Securitization and other Securitizations: "Mortgage loans secured by properties acquired by investors for the purposes of rental income or capital appreciation, or properties acquired as second homes, tend to have higher severities of default than properties that are regularly occupied by the related borrowers."

87.     Other things being equal, the higher the percentage of loans not secured by owner-occupied residences, the greater the risk of loss to the certificateholders.  Even small differences in the percentages of primary/owner-occupied, second home/secondary, and investment properties in the collateral group of a securitization can have a significant effect on the risk of each certificate sold in that securitization, and thus, are important to the decision of a reasonable investor whether to purchase any such certificate.  As discussed below at paragraphs 99 through 102, the Registration Statement for each Securitization materially overstated the percentage of loans in the Supporting Loan Groups that were owner occupied, thereby misrepresenting the degree of risk of the GSE Certificates.

C.     **Statements Regarding Loan-to-Value Ratios**

88.     The loan-to-value ratio of a mortgage loan, or LTV ratio, is the ratio of the balance of the mortgage loan to the value of the mortgaged property when the loan is made.

89.     The denominator in the LTV ratio is the value of the mortgaged property, and is generally the lower of the purchase price or the appraised value of the property.  In a refinancing or home-equity loan, there is no purchase price to use as the denominator, so the denominator is often equal to the appraised value at the time of the origination of the refinanced loan.  Accordingly, an accurate appraisal is essential to an accurate LTV ratio.  In particular, an inflated appraisal will understate, sometimes greatly, the credit risk associated with a given loan.

90.     The Prospectus Supplements for each Securitization also contained group-level information about the LTV ratio for the underlying group of loans as a whole.  The percentage of loans with an LTV ratio at or less than 80 percent and the percentage of loans with an LTV ratio

greater than 100 percent as reported in the Prospectus Supplements for the Supporting Loan

Groups are reflected in Table 5 below.[8]

### Table 5

| Transaction | Supporting Loan Group | Percentage of loans, by aggregate principal balance, with LTV less than or equal to 80% | Percentage of loans, by aggregate principal balance, with LTV greater than 100% |
|---|---|---|---|
| ARSI 2006-M3 | Group I | 49.60 | 0.00 |
| ARSI 2006-W5 | Group I | 56.15 | 0.00 |
| AHMA 2007-3 | Group I-1 | 86.49 | 0.00 |
| | Group II-1 | 91.61 | 0.00 |
| AMSI 2005-R9 | Group I | 54.44 | 0.00 |
| DSLA 2005-AR6 | Group I | 93.78 | 0.00 |
| DSLA 2006-AR2 | Group I | 97.43 | 0.00 |
| DSLA 2007-AR1 | Group I | 97.12 | 0.00 |
| FFML 2005-FFH4 | Group I | 3.42 | 0.00 |
| FFML 2006-FF16 | Group I | 60.15 | 0.00 |
| FFML 2006-FF8 | Group I | 61.06 | 0.00 |
| FHLT 2006-1 | Group I | 63.69 | 0.00 |
| FHLT 2006-2 | Group I | 63.38 | 0.00 |
| FHLT 2006-3 | Group I | 61.50 | 0.00 |
| FHLT 2006-A | Group I | 65.80 | 0.00 |
| FHLT 2006-D | Group I | 58.75 | 0.00 |
| HELT 2007-FRE1 | Group I | 49.99 | 0.00 |
| HVMLT 2005-12 | Group I | 74.30 | 0.00 |
| HVMLT 2005-13 | Group I | 70.38 | 0.00 |
| HVMLT 2005-15 | Group I | 95.78 | 0.00 |
| HVMLT 2005-16 | Group I | 80.90 | 0.00 |
| HVMLT 2006-1 | Group I | 83.92 | 0.00 |
| HVMLT 2006-10 | Group I | 80.9 | 0.00 |
| HVMLT 2006-12 | Group I | 87.41 | 0.00 |
| HVMLT 2006-14 | Group I | 92.09 | 0.00 |
| HVMLT 2006-4 | Group I A1 | 80.19 | 0.00 |

---

[8]   As used in this Complaint, "LTV" refers to the original loan-to-value ratio for first lien mortgages and for properties with second liens that are subordinate to the lien that was included in the securitization (*i.e.*, only the securitized lien is included in the numerator of the LTV calculation).  However, for second lien mortgages, where the securitized lien is junior to another loan, the more senior lien has been added to the securitized one to determine the numerator in the LTV calculation (this latter calculation is sometimes referred to as the combined-loan-to-value ratio, or "CLTV").

| Transaction | Supporting Loan Group | Percentage of loans, by aggregate principal balance, with LTV less than or equal to 80% | Percentage of loans, by aggregate principal balance, with LTV greater than 100% |
|---|---|---|---|
| | Group 1A2 | 86.01 | 0.00 |
| HVMLT 2006-5 | Group 1 | 82.45 | 0.00 |
| HVMLT 2006-6 | Group 2 | 93.29 | 0.00 |
| HVMLT 2006-7 | Group 1 | 85.45 | 0.00 |
| HVMLT 2006-8 | Group 1 | 80.70 | 0.00 |
| HVMLT 2006-9 | Group 1 | 84.71 | 0.00 |
| HVMLT 2006-BU1 | Group 1 | 85.85 | 0.00 |
| HVMLT 2006-CB1 | Group 2C | 36.31 | 0.00 |
| HVMLT 2007-1 | Group 1 | 88.31 | 0.00 |
| HVMLT 2007-2 | Group 1 | 89.09 | 0.00 |
| HVMLT 2007-3 | Group 1 | 94.06 | 0.00 |
| HVMLT 2007-4 | Group 1 | 99.85 | 0.00 |
| HVMLT 2007-6 | Group 1 | 87.52 | 0.00 |
| HVMLT 2007-7 | Group 1 | 82.70 | 0.00 |
| INABS 2007-B | Group 1 | 39.51 | 0.00 |
| INDX 2006-AR6 | Group 1 | 97.39 | 0.00 |
| INDX 2006-AR35 | Group 1 | 96.65 | 0.00 |
| MHL 2006-1 | Group 1-A1 | 98.06 | 0.00 |
| NHEL 2007-2 | Group 1 | 52.90 | 0.00 |
| NMFT 2006-MTA1 | Group 1 | 88.85 | 0.00 |
| NSTR 2007-B | Group 1 | 44.52 | 0.00 |
| OOMLT 2005-4 | Group 1 | 42.64 | 0.00 |
| OOMLT 2006-1 | Group 1 | 61.49 | 0.00 |
| OOMLT 2006-3 | Group 1 | 60.01 | 0.00 |
| OOMLT 2007-3 | Group 1 | 53.08 | 0.00 |
| OOMLT 2007-4 | Group 1 | 53.59 | 0.00 |
| OOMLT 2007-5 | Group 1 | 53.57 | 0.00 |
| OOMLT 2007-CP1 | Group 1 | 71.18 | 0.00 |
| OOMLT 2007-FXD2 | Group 1 | 63.09 | 0.00 |
| POPLR 2005-5 | Group II-A | 57.35 | 0.00 |
| SVHE 2005-4 | Group 1 | 50.77 | 0.00 |
| SVHE 2005-OPT3 | Group 1 | 74.48 | 0.00 |
| SVHE 2005-OPT4 | Group 1 | 70.57 | 0.00 |
| SVHE 2006-OPT1 | Group 1 | 64.17 | 0.00 |
| SVHE 2006-OPT3 | Group 1 | 62.43 | 0.00 |
| SVHE 2006-OPT4 | Group 1 | 60.03 | 0.00 |
| SVHE 2006-OPT5 | Group 1 | 62.77 | 0.00 |
| SVHE 2007-1 | Group 1 | 59.27 | 0.00 |
| SVHE 2007-OPT1 | Group 1 | 53.94 | 0.31 |
| SVHE 2007-OPT2 | Group 1 | 59.11 | 0.00 |

| Transaction | Supporting Loan Group | Percentage of loans, by aggregate principal balance, with LTV less than or equal to 80% | Percentage of loans, by aggregate principal balance, with LTV greater than 100% |
|---|---|---|---|
| SVHE 2007-OPT3 | Group 1 | 56.55 | 0.00 |
| SVHE 2007-OPT4 | Group 1 | 46.41 | 0.00 |
| SVHE 2007-OPT5 | Group 1 | 54.15 | 0.00 |
| SVHE 2007-WMC1 | Group 1 | 65.51 | 0.00 |

91.     As Table 5 makes clear, the Prospectus Supplement for nearly all of the Securitizations reported that many or most of the mortgage loans in the Supporting Loan Groups had an LTV ratio of 80 percent or less, and the Prospectus Supplement for all but one of the Securitizations reported that *zero* mortgage loans in the Supporting Loan Group had an LTV ratio over 100 percent.

92.     The LTV ratio is among the most important measures of the risk of a mortgage loan, and thus, it is one of the most important indicators of the default risk of the mortgage loans underlying the Certificates.  The lower the ratio, the less likely that a decline in the value of the property will wipe out an owner's equity, and thereby give an owner an incentive to stop making mortgage payments and abandon the property.  This ratio also predicts the severity of loss in the event of default.  The lower the LTV, the greater the "equity cushion," so the greater the likelihood that the proceeds of foreclosure will cover the unpaid balance of the mortgage loan.

93.     Thus, LTV ratio is a material consideration to a reasonable investor in deciding whether to purchase a certificate in a securitization of mortgage loans.  Even small differences in the LTV ratios of the mortgage loans in the collateral group of a securitization have a significant effect on the likelihood that the collateral groups will generate sufficient funds to pay certificateholders in that securitization, and thus are material to the decision of a reasonable investor whether to purchase any such certificate.  As discussed below at paragraphs 103 through 108, the Registration Statements for the Securitizations materially *overstated* the percentage of

loans in the Supporting Loan Groups with an LTV ratio at or less than 80 percent, and *materially understated* the percentage of loans in the Supporting Loan Groups with an LTV ratio over 100 percent, thereby misrepresenting the degree of risk of the GSE Certificates.[9]

### D.   Statements Regarding Credit Ratings

94.     Credit ratings are assigned to the tranches of mortgage-backed securitizations by the credit rating agencies, including Moody's Investors Service, Standard & Poor's, and Fitch Ratings. Each credit rating agency uses its own scale with letter designations to describe various levels of risk. In general, AAA or its equivalent ratings are at the top of the credit rating scale and are intended to designate the safest investments. C and D ratings are at the bottom of the scale and refer to investments that are currently in default and exhibit little or no prospect for recovery. At the time the GSEs purchased the GSE Certificates, investments with AAA or its equivalent ratings historically experienced a loss rate of less than .05 percent. Investments with a BBB rating, or its equivalent, historically experienced a loss rate of less than one percent. As a result, securities with credit ratings between AAA or its equivalent through BBB- or its equivalent were generally referred to as "investment grade."

95.     Rating agencies determine the credit rating for each tranche of a mortgage-backed securitization by comparing the likelihood of contractual principal and interest repayment to the "credit enhancements" available to protect investors. Rating agencies determine the likelihood of repayment by estimating cashflows based on the quality of the underlying mortgages by using sponsor-provided loan level data. Credit enhancements, such as subordination, represent the

---

[9]   The lone exception is FFML 2005-FFH4, for which the Registration Statement understated the percentage of loans with an LTV ratio above 100 percent by 34 percent, but did not overstate the percentage of loans with an LTV ratio at or less than 80 percent.

amount of "cushion" or protection from loss incorporated into a given securitization.[10]  This

cushion is intended to improve the likelihood that holders of highly rated certificates receive the

interest and principal to which they are contractually entitled.  The level of credit enhancement

offered is based on the make-up of the loans in the underlying collateral group and entire

securitization.  Riskier loans underlying the securitization necessitate higher levels of credit

enhancement to insure payment to senior certificate holders.  If the collateral within the deal is of

a higher quality, then rating agencies require less credit enhancement for an AAA or its

equivalent rating.

96.    Credit ratings have been an important tool to gauge risk when making investment

decisions.  For almost a hundred years, investors like pension funds, municipalities, insurance

companies, and university endowments have relied heavily on credit ratings to assist them in

distinguishing between safe and risky investments.   Fannie Mae and Freddie Mac's respective

internal policies limited their purchases of private label residential mortgage-backed securities to

those rated AAA (or its equivalent), and in very limited instances, AA or A bonds (or their

equivalent).

97.    Each tranche of the Securitizations received a credit rating upon issuance, which

purported to describe the riskiness of that tranche.  The Defendants reported the credit ratings for

each tranche in the Prospectus Supplements.  The credit rating provided for each of the GSE

Certificates was almost always AAA or its equivalent.  The accuracy of these ratings was

material to a reasonable investor's decision to purchase the GSE Certificates.  As set forth in

---

[10]  "Subordination" refers to the fact that the certificates for a mortgage-backed
securitization are issued in a hierarchical structure, from senior to junior.  The junior certificates
are "subordinate" to the senior certificates in that, should the underlying mortgage loans become
delinquent or default, the junior certificates suffer losses first.  These subordinate certificates
thus provide a degree of protection to the senior certificates from losses on the underlying loans.

Table 8, below at paragraph 139, the ratings for the Securitizations were inflated as a result of Defendants' provision of incorrect data concerning the attributes of the underlying mortgage collateral to the ratings agencies, and, as a result, Defendants sold and marketed the GSE Certificates as AAA (or its equivalent) when, in fact, they were not.

## IV. FALSITY OF STATEMENTS IN THE REGISTRATION STATEMENTS AND PROSPECTUS SUPPLEMENTS

### A. The Statistical Data Provided in the Prospectus Supplements Concerning Owner Occupancy and LTV Ratios Was Materially False

98.     A review of loan-level data was conducted in order to assess whether the statistical information provided in the Prospectus Supplements was true and accurate.  For each Securitization, the sample consisted of 1,000 randomly selected loans per Supporting Loan Group, or all of the loans in the group if there were fewer than 1,000 loans in the Supporting Loan Group.  The sample data confirms, on a statistically-significant basis, material misrepresentations of underwriting standards and of certain key characteristics of the mortgage loans across the Securitizations.  The data review demonstrates that the data concerning owner occupancy and LTV ratios was materially false and misleading.

### 1. Owner Occupancy Data Was Materially False

99.     The data review has revealed that the owner occupancy statistics reported in the Prospectus Supplements were materially false and inflated.  In fact, far fewer underlying properties were occupied by their owners than disclosed in the Prospectus Supplements, and more correspondingly were held as second homes or investment properties.

100.     To determine whether a given borrower actually occupied the property as claimed, a number of tests were conducted, including, *inter alia*, whether, months after the loan closed, the borrower's tax bill was being mailed to the property or to a different address; whether the borrower had claimed a tax exemption on the property; and whether the mailing address of

the property was reflected in the borrower's credit reports, tax records, or lien records. Failing two or more of these tests is a strong indication that the borrower did not live at the mortgaged property and instead used it as a second home or an investment property, both of which make it much more likely that a borrower will not repay the loan.

101.    A significant number of the loans failed two or more of these tests, indicating that the owner occupancy statistics provided to Fannie Mae and Freddie Mac were materially false and misleading. For example, for the HVMLT 2006-14 Securitization, for which RBS Financial Products was the sponsor and RBS Securities was the underwriter, the Prospectus Supplement stated that 9.25 percent of the underlying properties by loan count in the Supporting Loan Group were not owner-occupied. But the data review revealed that, for 16.14 percent of the properties represented as owner-occupied, the owners lived elsewhere, indicating that the true percentage of non-owner occupied properties was 23.90 percent, more than double the percentage reported in the Prospectus Supplement.[11]

102.    The data review revealed that for each Securitization, the Prospectus Supplement misrepresented the percentage of non-owner occupied properties. The true percentage of non-owner occupied properties, as determined by the data review, versus the percentage stated in the Prospectus Supplement for each Securitization, is reflected in Table 6 below. Table 6 demonstrates that the Prospectus Supplements for each Securitization understated the percentage of non-owner occupied properties by at least six percent, and for many Securitizations by ten percent or more.

---

[11]    This conclusion is arrived at by summing (a) the stated non-owner-occupied percentage in the Prospectus Supplement (here, 9.25 percent), and (b) the product of (i) the stated owner-occupied percentage (here, 90.75 percent) and (ii) the percentage of the properties represented as owner-occupied in the sample that showed strong indications that their owners in fact lived elsewhere (here, 16.14 percent).

**Table 6**

| Transaction | Supporting Loan Group | Reported Percentage of Non-Owner Occupied Properties | Percentage of Properties Reported as Owner-Occupied With Strong Indication of Non-Owner Occupancy[12] | Actual Percentage of Non-Owner Occupied Properties | Prospectus Percentage Understatement of Non-Owner Occupied Properties |
|---|---|---|---|---|---|
| ARSI 2006-M3 | Group 1 | 13.33 | 9.35 | 21.43 | 8.10 |
| ARSI 2006-W5 | Group 1 | 17.46 | 10.80 | 26.37 | 8.91 |
| AHMA 2007-3 | Group I-1 | 61.54 | 19.72 | 69.12 | 7.58 |
| | Group II-1 | 41.52 | 15.32 | 50.48 | 8.96 |
| AMSI 2005-R9 | Group 1 | 3.98 | 8.37 | 12.02 | 8.04 |
| DSLA 2005-AR6 | Group 1 | 11.04 | 14.83 | 24.23 | 13.19 |
| DSLA 2006-AR2 | Group 1 | 13.21 | 12.88 | 24.38 | 11.17 |
| DSLA 2007-AR1 | Group 1 | 14.23 | 13.93 | 26.18 | 11.95 |
| FFML 2005-FFH4 | Group 1 | 1.07 | 13.20 | 14.13 | 13.06 |
| FFML 2006-FF16 | Group 1 | 5.95 | 11.84 | 17.09 | 11.14 |
| FFML 2006-FF8 | Group 1 | 2.16 | 10.24 | 12.18 | 10.02 |
| FHLT 2006-1 | Group 1 | 10.62 | 15.16 | 24.17 | 13.55 |
| FHLT 2006-2 | Group 1 | 5.84 | 11.04 | 16.23 | 10.39 |
| FHLT 2006-3 | Group 1 | 10.60 | 14.25 | 23.34 | 12.74 |
| FHLT 2006-A | Group 1 | 6.48 | 11.93 | 17.64 | 11.16 |
| FHLT 2006-D | Group 1 | 6.82 | 15.07 | 20.86 | 14.04 |
| HELT 2007-FRE1 | Group 1 | 11.09 | 10.88 | 20.76 | 9.68 |
| HVMLT 2005-12 | Group 1 | 24.00 | 15.11 | 35.48 | 11.48 |
| HVMLT 2005-13 | Group 1 | 29.70 | 21.95 | 45.13 | 15.43 |
| HVMLT 2005-15 | Group 1 | 35.88 | 16.28 | 46.32 | 10.44 |
| HVMLT 2005-16 | Group 1 | 59.92 | 15.38 | 66.08 | 6.16 |
| HVMLT 2006-1 | Group 1 | 31.07 | 13.43 | 40.33 | 9.26 |
| HVMLT 2006-10 | Group 1 | 42.05 | 14.41 | 50.40 | 8.35 |
| HVMLT 2006-12 | Group 1 | 33.42 | 18.30 | 45.60 | 12.18 |
| HVMLT 2006-14 | Group 1 | 9.25 | 16.14 | 23.90 | 14.65 |
| HVMLT 2006-4 | Group 1A1 | 21.42 | 19.56 | 36.79 | 15.37 |
| | Group 1A2 | 29.73 | 16.37 | 41.23 | 11.50 |
| HVMLT 2006-5 | Group 1 | 31.15 | 17.70 | 43.34 | 12.19 |
| HVMLT 2006-6 | Group 2 | 16.27 | 13.49 | 27.56 | 11.29 |
| HVMLT 2006-7 | Group 1 | 38.01 | 37.50 | 61.26 | 23.25 |
| HVMLT 2006-8 | Group 1 | 50.43 | 18.14 | 59.42 | 8.99 |
| HVMLT 2006-9 | Group 1 | 36.41 | 15.40 | 46.20 | 9.79 |
| HVMLT 2006-BU1 | Group 1 | 28.40 | 14.37 | 38.69 | 10.29 |
| HVMLT 2006-CB1 | Group 2C | 14.88 | 17.02 | 29.37 | 14.49 |
| HVMLT 2007-1 | Group 1 | 28.47 | 18.99 | 42.06 | 13.59 |
| HVMLT 2007-2 | Group 1 | 18.11 | 12.84 | 28.62 | 10.51 |
| HVMLT 2007-3 | Group 1 | 31.45 | 13.40 | 40.64 | 9.19 |
| HVMLT 2007-4 | Group 1 | 17.71 | 13.10 | 28.49 | 10.78 |
| HVMLT 2007-6 | Group 1 | 19.28 | 14.02 | 30.60 | 11.32 |

---

[12]   As described more fully in paragraph 100, failing two or more tests of owner-occupancy is a strong indication that the borrower did not live at the mortgaged property and instead used it as a second home or an investment property.

49

| Transaction | Supporting Loan Group | Reported Percentage of Non-Owner Occupied Properties | Percentage of Properties Reported as Owner-Occupied With Strong Indication of Non-Owner Occupancy[12] | Actual Percentage of Non-Owner Occupied Properties | Prospectus Percentage Understatement of Non-Owner Occupied Properties |
|---|---|---|---|---|---|
| HVMLT 2007-7 | Group 1 | 22.13 | 15.14 | 33.92 | 11.79 |
| INABS 2007-B | Group 1 | 18.45 | 11.07 | 27.47 | 9.02 |
| INDX 2006-AR6 | Group 1 | 9.58 | 12.78 | 21.14 | 11.56 |
| INDX 2006-AR35 | Group 1 | 22.54 | 13.34 | 32.87 | 10.34 |
| MHL 2006-1 | Group 1A1 | 18.29 | 12.94 | 28.86 | 10.57 |
| NHEL 2007-2 | Group 1 | 7.40 | 10.39 | 17.02 | 9.62 |
| NMFT 2006-MTA1 | Group 1 | 25.90 | 15.64 | 37.49 | 11.59 |
| NSTR 2007-B | Group 1 | 3.13 | 11.88 | 14.63 | 11.51 |
| OOMLT 2005-4 | Group 1 | 14.99 | 11.52 | 24.78 | 9.79 |
| OOMLT 2006-1 | Group 1 | 10.74 | 11.38 | 20.90 | 10.16 |
| OOMLT 2006-3 | Group 1 | 13.28 | 13.12 | 24.66 | 11.38 |
| OOMLT 2007-3 | Group 1 | 18.17 | 9.78 | 26.18 | 8.01 |
| OOMLT 2007-4 | Group 1 | 15.76 | 7.69 | 22.24 | 6.48 |
| OOMLT 2007-5 | Group 1 | 18.36 | 11.44 | 27.70 | 9.34 |
| OOMLT 2007-CP1 | Group 1 | 5.53 | 8.06 | 13.15 | 7.61 |
| OOMLT 2007-FXD2 | Group 1 | 5.91 | 6.66 | 12.18 | 6.27 |
| POPLR 2005-5 | Group II-A | 3.57 | 12.53 | 15.65 | 12.08 |
| SVHE 2005-4 | Group 1 | 10.30 | 11.39 | 20.51 | 10.21 |
| SVHE 2005-OPT3 | Group 1 | 7.66 | 9.00 | 15.97 | 8.31 |
| SVHE 2005-OPT4 | Group 1 | 8.40 | 9.64 | 17.23 | 8.83 |
| SVHE 2006-OPT1 | Group 1 | 6.37 | 12.61 | 18.18 | 11.81 |
| SVHE 2006-OPT3 | Group 1 | 4.58 | 11.24 | 15.31 | 10.72 |
| SVHE 2006-OPT4 | Group 1 | 5.47 | 10.53 | 15.42 | 9.96 |
| SVHE 2006-OPT5 | Group 1 | 5.53 | 10.68 | 15.62 | 10.09 |
| SVHE 2007-1 | Group 1 | 9.64 | 9.98 | 18.66 | 9.02 |
| SVHE 2007-OPT1 | Group 1 | 6.83 | 10.06 | 16.20 | 9.37 |
| SVHE 2007-OPT2 | Group 1 | 14.47 | 9.64 | 22.72 | 8.25 |
| SVHE 2007-OPT3 | Group 1 | 16.58 | 10.83 | 25.61 | 9.04 |
| SVHE 2007-OPT4 | Group 1 | 11.37 | 10.69 | 20.84 | 9.47 |
| SVHE 2007-OPT5 | Group 1 | 8.61 | 8.02 | 15.94 | 7.33 |
| SVHE 2007-WMC1 | Group 1 | 7.49 | 10.38 | 17.09 | 9.60 |

## 2.     Loan-to-Value Data Was Materially False

103.    The data review has further revealed that the LTV ratios disclosed in the

Prospectus Supplements were materially false and understated, as more specifically set out

below.  For each of the sampled loans, an industry standard automated valuation model

("AVM") was used to calculate the value of the underlying property at the time the mortgage

loan was originated.  AVMs are routinely used in the industry as a way of valuing properties

during prequalification, origination, portfolio review and servicing.  AVMs rely upon similar

data as appraisers—primarily county assessor records, tax rolls, and data on comparable properties. AVMs produce independent, statistically-derived valuation estimates by applying modeling techniques to this data.

104.   Applying the AVM to the available data for the properties securing the sampled loans shows that the appraised value given to such properties was significantly higher than the actual value of such properties. The result of this overstatement of property values is a material understatement of LTV ratio. That is, if a property's true value is significantly less than the value used in the loan underwriting, then the loan represents a significantly higher percentage of the property's value. This, of course, increases the risk a borrower will not repay the loan and the risk of greater losses in the event of a default. As stated in the Prospectus Supplement for SVHE 2006-OPT1: "Mortgage loans with higher loan-to-value ratios may present a greater risk of loss than mortgage loans with loan-to-value ratios of 80% or below."

105.   For example, for the HVMLT 2007-3 Securitization, which was sponsored by RBS Financial Products and underwritten by RBS Securities, the Prospectus Supplement stated that no LTV ratios for the Supporting Loan Group were above 100 percent. In fact, 22.24 percent of the sample of loans included in the data review had LTV ratios above 100 percent. In addition, the Prospectus Supplement stated that 94.06 percent of the loans had LTV ratios at or below 80 percent. The data review indicated that only 37.50 percent of the loans had LTV ratios at or below 80 percent.

106.   The data review revealed that for each Securitization, the Prospectus Supplement misrepresented the percentage of loans with an LTV ratio above 100 percent, as well the percentage of loans that had an LTV ratio at or below 80 percent. Table 7 reflects (i) the true percentage of mortgages in the Supporting Loan Group with LTV ratios above 100 percent,

versus the percentage reported in the Prospectus Supplement; and (ii) the true percentage of

mortgages in the Supporting Loan Group with LTV ratios at or below 80 percent, versus the

percentage reported in the Prospectus Supplement.  The percentages listed in Table 7 were

calculated by aggregated principal balance.

**Table 7**

| Transaction | Supporting Loan Group | PROSPECTUS Percentage of Loans Reported to Have LTV Ratio At Or Less Than 80% | DATA REVIEW True Percentage of Loans With LTV Ratio At Or Less Than 80% | PROSPECTUS Percentage of Loans Reported to Have LTV Ratio Over 100% | DATA REVIEW True Percentage of Loans With LTV Ratio Over 100% |
|---|---|---|---|---|---|
| ARSI 2006-M3 | Group I | 49.60 | 36.09 | 0.00 | 21.19 |
| ARSI 2006-W5 | Group I | 56.15 | 41.37 | 0.00 | 13.54 |
| AHMA 2007-3 | Group I-1 | 86.49 | 44.65 | 0.00 | 21.16 |
| | Group II-1 | 91.61 | 56.94 | 0.00 | 13.68 |
| AMSI 2005-R9 | Group I | 54.44 | 47.20 | 0.00 | 11.54 |
| DSLA 2005-AR6 | Group I | 93.78 | 73.11 | 0.00 | 3.12 |
| DSLA 2006-AR2 | Group I | 97.43 | 62.47 | 0.00 | 6.02 |
| DSLA 2007-AR1 | Group I | 97.12 | 52.71 | 0.00 | 10.61 |
| FFML 2005-FFH4 | Group I | 3.42 | 6.22 | 0.00 | 34.34 |
| FFML 2006-FF16 | Group I | 60.15 | 38.48 | 0.00 | 16.14 |
| FFML 2006-FF8 | Group I | 61.06 | 45.69 | 0.00 | 12.89 |
| FHLT 2006-1 | Group I | 63.69 | 42.96 | 0.00 | 15.07 |
| FHLT 2006-2 | Group I | 63.38 | 35.01 | 0.00 | 20.52 |
| FHLT 2006-3 | Group I | 61.50 | 35.46 | 0.00 | 20.17 |
| FHLT 2006-A | Group I | 65.80 | 44.36 | 0.00 | 15.58 |
| FHLT 2006-D | Group I | 58.75 | 35.74 | 0.00 | 21.50 |
| HELT 2007-FRE1 | Group I | 49.99 | 28.10 | 0.00 | 27.21 |
| HVMLT 2005-12 | Group I | 74.30 | 47.45 | 0.00 | 10.94 |
| HVMLT 2005-13 | Group I | 70.38 | 44.70 | 0.00 | 12.62 |
| HVMLT 2005-15 | Group I | 95.78 | 69.61 | 0.00 | 4.34 |
| HVMLT 2005-16 | Group I | 80.90 | 54.53 | 0.00 | 10.63 |
| HVMLT 2006-1 | Group I | 83.92 | 48.39 | 0.00 | 12.68 |
| HVMLT 2006-10 | Group I | 80.90 | 42.15 | 0.00 | 16.56 |
| HVMLT 2006-12 | Group I | 87.41 | 43.01 | 0.00 | 16.72 |
| HVMLT 2006-14 | Group I | 92.09 | 53.32 | 0.00 | 9.75 |
| HVMLT 2006-4 | Group 1A1 | 80.20 | 37.91 | 0.00 | 13.75 |
| | Group 1A2 | 86.01 | 52.68 | 0.00 | 9.94 |
| HVMLT 2006-5 | Group I | 82.45 | 45.35 | 0.00 | 12.06 |
| HVMLT 2006-6 | Group 2 | 93.29 | 50.22 | 0.00 | 5.08 |
| HVMLT 2006-7 | Group I | 85.45 | 51.30 | 0.00 | 13.36 |
| HVMLT 2006-8 | Group I | 80.70 | 44.12 | 0.00 | 16.27 |
| HVMLT 2006-9 | Group I | 84.71 | 47.63 | 0.00 | 12.27 |
| HVMLT 2006-BU1 | Group I | 85.85 | 45.18 | 0.00 | 14.81 |
| HVMLT 2006-CB1 | Group 2C | 36.31 | 26.97 | 0.00 | 26.93 |
| HVMLT 2007-1 | Group I | 88.31 | 50.48 | 0.00 | 14.74 |
| HVMLT 2007-2 | Group I | 89.09 | 44.30 | 0.00 | 18.54 |

| Transaction | Supporting Loan Group | PROSPECTUS<br>Percentage of Loans Reported to Have LTV Ratio At Or Less Than 80% | DATA REVIEW<br>True Percentage of Loans With LTV Ratio At Or Less Than 80% | PROSPECTUS<br>Percentage of Loans Reported to Have LTV Ratio Over 100% | DATA REVIEW<br>True Percentage of Loans With LTV Ratio Over 100% |
|---|---|---|---|---|---|
| HVMLT 2007-3 | Group 1 | 94.06 | 37.50 | 0.00 | 22.24 |
| HVMLT 2007-4 | Group 1 | 99.85 | 65.57 | 0.00 | 6.02 |
| HVMLT 2007-6 | Group 1 | 87.52 | 47.92 | 0.00 | 15.80 |
| HVMLT 2007-7 | Group 1 | 82.70 | 46.18 | 0.00 | 17.81 |
| INABS 2007-B | Group 1 | 39.51 | 24.21 | 0.00 | 32.77 |
| INDX 2006-AR6 | Group 1 | 97.39 | 56.95 | 0.00 | 7.53 |
| INDX 2006-AR35 | Group 1 | 96.65 | 51.15 | 0.00 | 8.39 |
| MHL 2006-1 | Group 1-A1 | 98.06 | 67.77 | 0.00 | 4.79 |
| NHEL 2007-2 | Group 1 | 52.90 | 44.17 | 0.00 | 21.18 |
| NMFT 2006-MTA1 | Group 1 | 88.85 | 49.03 | 0.00 | 9.77 |
| NSTR 2007-B | Group 1 | 44.52 | 34.30 | 0.00 | 23.98 |
| OOMLT 2005-4 | Group 1 | 42.64 | 35.99 | 0.00 | 15.24 |
| OOMLT 2006-1 | Group 1 | 61.49 | 41.12 | 0.00 | 13.55 |
| OOMLT 2006-3 | Group 1 | 60.01 | 40.53 | 0.00 | 15.58 |
| OOMLT 2007-3 | Group 1 | 53.08 | 39.32 | 0.00 | 20.75 |
| OOMLT 2007-4 | Group 1 | 53.59 | 34.83 | 0.00 | 20.10 |
| OOMLT 2007-5 | Group 1 | 53.57 | 34.81 | 0.00 | 24.53 |
| OOMLT 2007-CP1 | Group 1 | 71.18 | 45.09 | 0.00 | 18.13 |
| OOMLT 2007-FXD2 | Group 1 | 63.09 | 44.33 | 0.00 | 18.44 |
| POPLR 2005-5 | Group II-A | 57.35 | 34.38 | 0.00 | 17.27 |
| SVHE 2005-4 | Group 1 | 50.77 | 37.51 | 0.00 | 13.09 |
| SVHE 2005-OPT3 | Group 1 | 74.48 | 58.18 | 0.00 | 9.19 |
| SVHE 2005-OPT4 | Group 1 | 70.57 | 53.16 | 0.00 | 9.42 |
| SVHE 2006-OPT1 | Group 1 | 64.17 | 42.02 | 0.00 | 16.31 |
| SVHE 2006-OPT3 | Group 1 | 62.43 | 45.88 | 0.00 | 15.54 |
| SVHE 2006-OPT4 | Group 1 | 60.03 | 45.45 | 0.00 | 13.98 |
| SVHE 2006-OPT5 | Group 1 | 62.77 | 41.66 | 0.00 | 16.59 |
| SVHE 2007-1 | Group 1 | 59.27 | 32.60 | 0.00 | 24.25 |
| SVHE 2007-OPT1 | Group 1 | 53.94 | 35.66 | 0.31 | 23.66 |
| SVHE 2007-OPT2 | Group 1 | 59.11 | 37.93 | 0.00 | 20.38 |
| SVHE 2007-OPT3 | Group 1 | 56.55 | 36.82 | 0.00 | 20.35 |
| SVHE 2007-OPT4 | Group 1 | 46.41 | 31.71 | 0.00 | 22.01 |
| SVHE 2007-OPT5 | Group 1 | 54.15 | 35.86 | 0.00 | 22.62 |
| SVHE 2007-WMC1 | Group 1 | 65.51 | 35.65 | 0.00 | 23.03 |

107.    As Table 7 demonstrates, the Prospectus Supplements for all but one of the

Securitizations reported that *none* of the mortgage loans in the Supporting Loan Groups had an

LTV ratio over 100 percent. With respect to that one exception, the percentage of mortgage

loans with a reported LTV ratio over 100 percent was very small—under 1 percent. In contrast,

the data review revealed that at least 3.12 percent of the mortgage loans for each Securitization

had an LTV ratio over 100 percent, and for most Securitizations this figure was much larger.

Indeed, for 56 of the Securitizations, the data review revealed that more than 10 percent of the mortgages in the Supporting Loan Group had a true LTV ratio over 100 percent.  For 22 Securitizations, the data review revealed that more than 20 percent of the mortgages in the Supporting Loan Group had a true LTV ratio over 100 percent.

108.    These inaccuracies with respect to reported LTV ratios also indicate that the representations in the Registration Statements relating to appraisal practices were false, and that the appraisers themselves, in many instances, furnished appraisals that they understood were inaccurate and that they knew bore no reasonable relationship to the actual value of the underlying properties.  Indeed, independent appraisers following proper practices, and providing genuine estimates as to valuation, would not systematically generate appraisals that deviate so significantly (and so consistently upward) from the true values of the appraised properties.  This conclusion is further confirmed by the findings of the Financial Crisis Inquiry Commission (the "FCIC"), which identified "inflated appraisals" as a pervasive problem during the period of the Securitizations, and determined through its investigation that appraisers were often pressured by mortgage originators, among others, to produce inflated results.  *See* FCIC, Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States (January 2011).

**B.    The Originators of the Underlying Mortgage Loans Systematically Disregarded Their Underwriting Guidelines**

109.    The Registration Statements contained material misstatements and omissions regarding compliance with underwriting guidelines.  Indeed, the originators for the loans underlying the Securitizations systematically disregarded their respective underwriting guidelines in order to increase production and profits derived from their mortgage lending businesses.  This is confirmed by the systematically misreported owner occupancy and LTV ratio

statistics, discussed above, and by (1) a forensic review of thousands of loan files in the SVHE 2007-OPT1 Securitization; (2) government investigations into originators' underwriting practices, which have revealed widespread abandonment of originators' reported underwriting guidelines during the relevant period; (3) the collapse of the Certificates' credit ratings; and (4) the surge in delinquency and default in the mortgages in the Securitizations.

1.     **A Forensic Review of Loan Files Has Revealed Pervasive Failure to Adhere to Underwriting Guidelines**

110.    A forensic review of 2,382 loans from the SVHE 2007-OPT1 Securitization, for which RBS Financial Products served as the sponsor, FAS Corp. as the depositor, and RBS Securities as the lead underwriter, has revealed that approximately 80 percent of the reviewed loans were not underwritten in accordance with the underwriting guidelines.  The forensic review consisted of an analysis of the loan file for each loan, including the documents submitted by the individual borrowers in support of their loan applications, as well as an analysis of information extrinsic to each loan file, such as the borrower's filings in bankruptcy proceedings or the borrower's motor vehicle registration or other documentation with pertinent information indicating a borrower's assets or residence.

111.    The mortgage loans in the SVHE 2007-OPT1 Securitization were originated by Option One.  The SVHE 2007-OPT1 Prospectus Supplement stated that the mortgage loans underlying the Securitizations were "originated generally in accordance with Option One's Non-Prime Guidelines."  These "Option One Underwriting Guidelines," insofar as described in this Complaint, were generally consistent with industry standard underwriting guidelines.  The results of the forensic review demonstrate, however, that the disclosures in the Registration Statements, stating that the mortgage loans were underwritten in accordance with the guidelines described in the Prospectus Supplements, were materially false.

112.     As stated in the SVHE 2007-OPT1 Prospectus Supplement: "Option One Underwriting Guidelines require a reasonable determination of an applicant's ability to repay the loan. Such determination is based on a review of the applicant's source of income, calculation of a debt service-to-income ratio based on the amount of income from sources indicated on the loan application or similar documentation, a review of the applicant's credit history and the type and intended use of the property being financed." Thus, the underwriting guidelines that were breached were designed to assess the likelihood a borrower would be able to repay the loan. The forensic review revealed numerous breaches, including the following types:

- failure to test the reasonableness of the borrower's stated income contributing to material misrepresentations of income;

- failure to investigate properly the borrower's intention to occupy the subject properties when red flags surfaced in the origination process that should have alerted the underwriter that the property was not intended as a primary residence;

- failure to calculate properly the borrower's outstanding debt causing the debt-to-income ratio ("DTI") to exceed the maximum allowed under the underwriting guidelines; and

- failure to investigate properly red flags on the borrower's credit reports that should have alerted the underwriter to potential misrepresentations of outstanding debt.

113.     The results of the forensic review demonstrate that the disclosures in the Registration Statements, stating the mortgage loans were underwritten in accordance with applicable underwriting guidelines described in the Prospectus Supplements, were materially false. Moreover, although the Prospectus Supplements state that there may be compensating factors to warrant an exception to the applicable guidelines on a case-by-case basis, none of the loan files reflecting a breach of underwriting guidelines evidenced sufficient compensating factors that would justify or support such an exception. An 80 percent breach rate, in any event, could not possibly be explained by the proper application of any such exceptions.

114.    The below examples from the forensic review of the SVHE 2007-OPT1 Securitization illustrate the types of breaches discussed above that pervade the loan groups for the Securitizations.  These are examples of violations of the underwriting guidelines and are not a complete list of all the findings from the forensic review.

### a.    Stated Income Was Not Reasonable

115.    It is standard in the industry for underwriting guidelines to require a verification of employment or reasonableness of stated income in the loan application.  In particular, as stated in the Prospectus Supplement for the SVHE 2007-OPT1 Securitization: "Generally, an employment verification is obtained from an independent source, which is typically the borrower's employer.  The verification reports the borrower's length of employment with its employer, current salary, and expectations of continued employment.  If a prospective borrower is self-employed, the borrower may be required to submit copies of signed tax returns."  At a minimum, even for stated income loans, "a verbal verification of employment [is] to be conducted within 48 hours prior to funding" for all "wage earning borrowers."

116.    The following examples from the forensic review are instances where there was no evidence that the underwriter of the mortgages tested the reasonableness of the borrower's stated income for the employment listed on the application as required by the applicable guidelines.  Additionally, the forensic review verified the borrower actually misrepresented his or her income on the loan application.  This misrepresentation resulted in a miscalculation of the borrower's DTI.  Had the loan underwriter performed a reasonableness test as required by the applicable guidelines, the unreasonableness of the borrower's stated income would have been evident.

- A loan that closed in March 2007 with a principal amount of $71,400 was originated under Option One's Stated Income loan program.  The loan application stated that the borrower was an account representative earning $20,000 per

month.  The borrower's stated income exceeded Payscale.com's 90th percentile salary for an account representative in the same geographic region, which should have put a reasonably prudent underwriter on notice for potential misrepresentation.  Moreover, in a Statement of Financial Affairs filed by the borrower as part of a Chapter 7 bankruptcy proceeding, the borrower reported an income in 2007 of $3,500 per month. A recalculation of DTI based on the borrower's verified income yields a DTI of 234.97 percent, which grossly exceeds the guideline maximum allowable DTI of 55 percent.  The loan defaulted and the property was liquidated in a foreclosure sale, resulting in a loan loss of $43,762.78, which is over 61 percent of the original loan amount.

- A loan that closed in February 2007 with a principal amount of $270,505 was originated under Option One's Low Documentation Program.  The loan application stated that the borrower was employed as a truck driver earning $9,653.00 per month.  The borrower's stated income exceeded CBSalary.com's 90th percentile salary for a truck driver in the same geographic region, which should have put a reasonably prudent underwriter on notice for potential misrepresentation.  Moreover, in a Statement of Financial Affairs filed by the borrower as part of a Chapter 7 bankruptcy proceeding, the borrower reported a 2006 income of $2,055 per month.  A recalculation of DTI based on the borrower's verified same year income yields a DTI of 219.29 percent which grossly exceeds the guideline maximum allowable DTI of 55 percent.  The loan defaulted and the property was liquidated in a foreclosure sale, resulting in a loan loss of $251,800.59, which is 93 percent of the original loan amount.

- A loan that closed in February 2007 with a principal amount of $285,000 was originated under Option One's Low Documentation loan program.  The loan application stated that the borrower was a refrigeration technician for 26 years, earning $15,000 per month.  The borrower's stated income exceeded the U.S. Bureau of Labor Statistics's 90th percentile salary for a refrigeration technician in the same geographic region, which should have put a reasonably prudent underwriter on notice for potential misrepresentation.  Moreover, in a Statement of Financial Affairs filed by the borrower as part of a Chapter 13 bankruptcy proceeding, the borrower reported an income in 2007 of $5,229 per month.  A recalculation of DTI based on the borrower's verified income yields a DTI of 120.56 percent, which grossly exceeds the guideline maximum allowable DTI of 55 percent.  The loan defaulted and the property was liquidated in a foreclosure sale, resulting in a loan loss of $217,393.96, which is 76 percent of the original loan amount.

- A loan that closed in March 2007 with a principal amount of $214,200 was originated under Option One's Low Documentation loan program.  The loan application stated that the borrower was a clinical auditor earning $8,258 a month. The borrower's stated income exceeded CBSalary.com's 90th percentile salary for a clinical auditor in the same geographic region, which should have put a reasonably prudent underwriter on notice for potential misrepresentation.

Moreover, in a Statement of Financial Affairs filed by the borrower as part of a Chapter 7 bankruptcy proceeding, the borrower reported an income in 2007 of $1,062 per month. A recalculation of DTI based on the borrower's verified income yields a DTI of 549.3 percent, which grossly exceeds the guideline maximum allowable DTI of 55 percent. The loan defaulted and the property was liquidated in a foreclosure sale, resulting in a loan loss of $92,172.92, which is over 43 percent of the original loan amount.

117.    The results of the forensic review demonstrate that the representations in the Registration Statements concerning the reasonableness of borrowers' stated income were materially false and misleading. In particular, a significant number of mortgage loans were made on the basis of "stated incomes" that were patently unreasonable, and not subject to proper underwriting.

### b.    Evidence of Occupancy Misrepresentations

118.    The following examples from the forensic review are instances where the loan underwriters did not adequately question the borrower's intended occupancy of the subject property. Although the SVHE 2007-OPT1 Prospectus Supplement reported that 94 percent of the loans in the Supporting Loan Group were for owner-occupied properties, a significant number of the loan files that were reviewed indicated facts or circumstances that would have put a reasonable loan underwriter on notice of potential occupancy misrepresentations. The lack of compliance with the underwriting process in this regard materially increased the credit risk of the loan and the portfolio as investment and second home properties generally have a higher rate of default and higher loss severities than an owner-occupied primary residence.

- A loan that closed in March 2007 with a principal amount of $171,000 was originated under Option One's Low Documentation Program. The loan was a rate and term refinance transaction. The underwriting guidelines for this loan required that at least one of the borrowers occupy the subject property and the loan was represented as owner occupied. The home owner's insurance policy for the subject property has a different mailing address for the borrower than the subject property. No evidence in the file indicates that the underwriting process addressed this inconsistency, and the loan was underwritten as if the property was owner occupied. The loan defaulted and the property was liquidated in a

foreclosure sale, resulting in a loan loss of $190,507.37, which is more than 100 percent of the original loan amount.[13]

- A loan that closed in March 2007 with a principal amount of $235,000 was originated under Option One's Full Documentation Program. The loan was a cash out refinance. The underwriting guidelines for this loan required that at least one of the borrowers occupy the subject property and the loan was represented as owner-occupied. The loan application reflected the borrowers' mailing address as being different than the subject property. One of the borrowers provided a current pay stub for primary and secondary employment and six 2006 W-2 forms that all listed a different address than the subject property. The co-borrower provided a current Social Security award letter with a different address than the subject property. At closing, the borrowers completed an "Address and Phone Number Certification" that listed the borrowers' nearest relative, who was not living with the borrowers, as the occupant of the subject property. No evidence in the file indicates that the underwriting process addressed these inconsistencies, and the loan was underwritten as if the property was owner occupied. The loan defaulted and the property was liquidated in a foreclosure sale, resulting in a loan loss of $173,112.57, which is more than 73 percent of the original loan amount.

- A loan that closed in December 2006 with a principal amount of $61,200 was originated under Option One's Full Documentation Program. The loan was a refinance. The underwriting guidelines for this loan required that at least one of the borrowers occupy the subject property and the loan was represented as owner occupied. The loan file contained income documentation, hazard insurance, origination credit report, payoff statements and 2005 tax returns that each reflected the borrowers' rental property address in Florida as their primary residence, and not the subject property's address, which is in Pennsylvania. No evidence in the file indicates that the underwriting process addressed these inconsistencies, and the loan was underwritten as if the property was owner occupied. The borrowers have filed for bankruptcy and the loan is delinquent, with a current unpaid balance of $60,243.08, which is more than 98 percent of the original loan amount.

119. The results of the forensic review demonstrate that the statements in the

Registration Statements concerning the underwriting performed with respect to the borrowers'

occupancy status were materially false. The underwriting failed to address numerous red flags

---

[13]   Loan losses may amount to more than 100 percent of the original loan amount due to loan service costs and costs incurred in the course of foreclosure and liquidation of the property.

throughout the loan files, and the Prospectus Supplements materially understated the proportion of loans secured by non-owner occupied properties.

**c.      Debts Incorrectly Calculated; Debt-to-Income Exceeded Guidelines**

120.    Failure to incorporate all of a borrower's monthly obligations precludes the lender from properly evaluating the borrower's ability to repay the loan.  The SVHE 2007-OPT1 Prospectus Supplement specified a maximum debt-to-income ratio of 55 percent.  The following is an example of an instance in which it was confirmed through the forensic review that the underwriting process failed to incorporate all of the borrower's debt.  When properly calculated, the borrower's actual DTI exceeded the 55 percent limit stated in the Prospectus Supplement. The failure to properly calculate debt led to material misstatements regarding the credit risk of the securitized loans.

- A loan that closed in March 2007 with a principal amount of $53,400 was originated under Option One's Full Documentation Program.  A credit report included in the origination loan file dated prior to closing showed additional liabilities totaling $59,330.  In addition, the borrower's pay stub dated prior to closing revealed deductions for court-ordered child support totaling $444 per month.  A recalculation of the DTI that includes the borrower's undisclosed debt results in an increase from 42.32 percent to 61.13 percent, which exceeds the applicable underwriting guideline maximum of 55 percent.  The loan defaulted and the property was liquidated in a foreclosure sale, resulting in a loss of $54,642.76, which is more than 100 percent of the original loan amount.

**d.      Credit Inquiries that Indicated Misrepresentation of Debt**

121.    Option One's underwriting guidelines required that a credit report be obtained for each loan, which would show all credit inquiries made over the previous 90 days.  Further, it is a standard requirement that, where several recent credit inquiries are listed on such a report, the loan underwriter confirm that the inquiries were not the result of additional debt undisclosed on the loan application.  The following are examples of some of the instances where the borrowers' credit reports indicated numerous credit inquiries that should have put the loan underwriters on

notice for potential misrepresentations of debt obligations to be included in the borrowers' DTI. In each case there was no evidence in the origination loan file that the loan underwriter researched these credit inquiries, as required by the applicable underwriting guidelines, or took any action to verify that such inquiries were not indicative of undisclosed liabilities of the borrower.

- A loan that closed in March 2007 with a principal amount of $205,485 was originated under Option One's Full Documentation Program. A credit report included in the origination loan file dated prior to closing shows 15 inquiries within the prior 90 days, including numerous inquiries from mortgage lenders and servicers. In the two months prior to the closing of the subject loan, the borrowers obtained three undisclosed mortgages totaling $614,725. There was no evidence in the origination loan file that the loan underwriter researched these credit inquiries or took any action to verify that such inquiries were not indicative of undisclosed liabilities of the borrowers. A recalculation of DTI based on the borrowers' undisclosed debt yielded a DTI of 108.73 percent, which grossly exceeds the applicable underwriting guideline maximum of 55 percent. The loan defaulted and the property was liquidated in a foreclosure sale, resulting in a loss of $222,500.76, which is more than 100 percent of the original loan amount.

- A loan that closed in March 2007 with a principal amount of $220,575 was originated under Option One's Full Documentation Program. A credit report included in the origination loan file dated prior to closing shows 29 inquiries within the prior 90 days, including numerous inquiries from mortgage lenders and servicers. In the six months prior to the closing of the subject loan, the borrowers obtained three undisclosed mortgages totaling $742,500. There was no evidence in the origination loan file that the loan underwriter researched these credit inquiries or took any action to verify that such inquiries were not indicative of undisclosed liabilities of the borrowers. A recalculation of DTI based on the borrowers' undisclosed debt yields a DTI of 119.07 percent, which grossly exceeds the applicable underwriting guideline maximum of 55 percent. The loan defaulted and the property was liquidated in a foreclosure sale, resulting in a loss of $165,518.85, which is 75 percent of the original loan amount.

- A loan that closed in March 2007 with a principal amount of $130,500 was originated under Option One's Low Documentation Program. A credit report included in the origination loan file dated prior to closing shows 16 inquiries within the prior 90 days, including numerous inquiries from mortgage lenders and servicers. In the month prior to the closing of the subject loan, the borrowers obtained an undisclosed mortgage in the amount of $486,400 and in

the month after the closing of the subject loan, the borrowers obtained an undisclosed mortgage in the amount of $394,250, totaling $880,650 in undisclosed mortgages. There was no evidence in the origination loan file that the loan underwriter researched these credit inquiries or took any action to verify that such inquiries were not indicative of undisclosed liabilities of the borrowers. A recalculation of DTI based on the borrowers' undisclosed debt yielded a DTI of 123.11 percent, which grossly exceeds the guideline maximum allowable DTI of 55 percent. The loan defaulted and the property was liquidated in a foreclosure sale, resulting in a loss of $95,233.28, which is more than 72 percent of the original loan amount.

- A loan that closed in March 2007 with a principal amount of $198,000 was originated under Option One's Low Documentation Program. A credit report included in the origination loan file dated prior to closing shows 17 inquiries within the prior 90 days, including numerous inquiries from mortgage lenders and servicers. Around three months prior to the closing of the subject loan, the borrower obtained an undisclosed mortgage in the amount of $713,124. There was no evidence in the origination loan file that the loan underwriter researched these credit inquiries or took any action to verify that such inquiries were not indicative of undisclosed liabilities of the borrower. A recalculation of DTI based on the borrower's undisclosed debt yields a DTI of 143.39 percent, which grossly exceeds the guideline maximum allowable DTI of 55 percent. The loan defaulted and the property was liquidated in a foreclosure sale, resulting in a loss of $164,494.75, which is 83 percent of the original loan amount.

122. Had the loan underwriting for each of these loans been conducted properly, as well as for the other loans in the Supporting Loan Group with these same fatal flaws, the credit inquiries would have been identified and the undisclosed liabilities would have been discovered. In each example, moreover, a recalculation of DTI based on the borrower's undisclosed debt yielded a DTI that exceeded the applicable underwriting guideline maximum. Failure to investigate these issues prevented the loan underwriting process from appropriately qualifying the loan and evaluating the borrower's "ability to produce timely payments."

### 2. Government Investigations Have Confirmed That the Originators of the Loans in the Securitizations Systematically Failed to Adhere to Their Underwriting Guidelines

123. The abandonment of underwriting guidelines is further confirmed by several government reports and investigations that have described rampant underwriting failures

throughout the period of the Securitizations, and, more specifically, have described underwriting failures by the very originators whose loans were included by the Defendants in the Securitizations.

124.    For instance, in November 2008, the Office of the Comptroller of the Currency, an office within the United States Department of the Treasury, issued a report identifying the "Worst Ten" mortgage originators in the "Worst Ten" metropolitan areas.  The worst originators were defined as those with the largest number of non-prime mortgage foreclosures for 2005-2007 originations.  Fremont, Countrywide, IndyMac, and Option One, which originated many of the loans for the Securitizations at issue here, were all on that list.  *See* "Worst Ten in the Worst Ten," Office of the Comptroller of the Currency Press Release, November 13, 2008.

125.    Countrywide originated the loans for 13 of the Securitizations.  In January 2011, the FCIC issued its final report, which detailed, among other things, the collapse of mortgage underwriting standards and subsequent collapse of the mortgage market and wider economy.  *See* Financial Crisis Inquiry Commission, Final Report of the National Commission of the Causes of the Financial and Economic Crisis in the United States (2011) ("FCIC Report").  The FCIC Report singled out Countrywide for its role:

> Lenders made loans that they knew borrowers could not afford and that could cause massive losses to investors in mortgage securities. As early as September 2004, Countrywide executives recognized that many of the loans they were originating could result in "catastrophic consequences."  Less than a year later, they noted that certain high-risk loans they were making could result not only in foreclosures but also in "financial and reputational catastrophe" for the firm.  But they did not stop.

*See* FCIC Report, at xxii.

126.    Countrywide has also been the subject of several investigations and actions concerning its lax and deficient underwriting practices.  In June 2009, for instance, the SEC

initiated a civil action against Countrywide executives Angelo Mozilo (founder and Chief Executive Officer), David Sambol (Chief Operating Officer), and Eric Sieracki (Chief Financial Officer) for securities fraud and insider trading.  In a September 16, 2010 opinion denying these defendants' motions for summary judgment, the United States District Court for the Central District of California found that the SEC raised genuine issues of fact as to, among other things, whether the defendants had misrepresented the quality of Countrywide's underwriting processes.  The court noted that the SEC presented evidence that Countrywide "routinely ignored its official underwriting to such an extent that Countrywide would underwrite any loan it could sell into the secondary mortgage market," and that "a significant portion (typically in excess of 20%) of Countrywide's loans were issued as exceptions to its official underwriting guidelines ...."  The court concluded that "a reasonable jury could conclude that Countrywide all but abandoned managing credit risk through its underwriting guidelines . . . .."  *S.E.C. v. Mozilo*, No. CV 09-3994, 2010 WL 3656068, at *10 (C.D. Cal. Sept. 16, 2010).  Mozilo, Sambol, and Sieracki subsequently settled with the SEC.

127.    The testimony and documents only recently made available to the GSEs by way of the SEC's investigation confirm that Countrywide was systematically abusing "exceptions" and low-documentation processes in order to circumvent its own underwriting standards.  For example, in an April 13, 2006 e-mail, Mozilo wrote to Sieracki and others that he was concerned that certain subprime loans had been originated "with serious disregard for process [and] compliance with guidelines," resulting in the delivery of loans "with deficient documentation."  Mozilo further stated that "I have personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan[s]."

128.    IndyMac, which originated the loans for two of the Securitizations, was the subject of a February 26, 2009 report issued by the Office of Inspector General ("OIG") of the U.S. Department of Treasury entitled "Safety and Soundness: Material Loss Review of IndyMac Bank, FSB" (the "OIG Report"). The OIG Report found that IndyMac Bank had "embarked on a path of aggressive growth" that was supported by its high risk business strategy of "originating . . . Alt-A loans on a large scale" and then "packag[ing] them together in securities" and selling "them on the secondary market" to investors. OIG Report at 2, 6, 7. The OIG Report further stated that: "To facilitate this level of [loan] production . . . IndyMac often did not perform adequate underwriting." *Id*. at 2.

129.    A June 30, 2008 report issued by the Center for Responsible Lending ("CRL") also found that IndyMac Bank often ignored its stated underwriting and appraisal standards and encouraged its employees to approve loans regardless of the borrower's ability to repay them. *See* IndyMac: What Went Wrong? How an 'Alt-A' Leader Fueled its Growth with Unsound and Abusive Mortgage Lending (the "CRL Report"). For example, the CRL Report noted that IndyMac Bank "engaged in unsound and abusive lending practices" and "allowed outside mortgage brokers and in-house sales staffers to inflate applicants' [financial information] . . . [to] make them look like better credit risks." *See* CRL Report at 2, 8.

130.    Option One, which originated the loans for 19 of the Securitizations, has also been identified through multiple reports and investigations for its faulty underwriting. On June 3, 2008, for instance, the Attorney General for the Commonwealth of Massachusetts filed an action against Option One (the "Option One Complaint"), and its past and present parent companies, for their unfair and deceptive origination and servicing of mortgage loans. *See* Complaint, *Commonwealth v. H&R Block, Inc.,* CV NO. 08-2474-BLS (Mass. Super. Ct. June 3,

2008).  According to the Massachusetts Attorney General, since 2004, Option One had "increasingly disregarded underwriting standards . . . and originated thousands of loans that [Option One] knew or should have known the borrowers would be unable to pay, all in an effort to increase loan origination volume so as to profit from the practice of packaging and selling the vast majority of [Option One's] residential subprime loans to the secondary market." *See* Option One Complaint.  The Massachusetts Attorney General alleged that Option One's agents and brokers "frequently overstated an applicant's income and/or ability to pay, and inflated the appraised value of the applicant's home," and that Option One "avoided implementing reasonable measures that would have prevented or limited these fraudulent practices."  Option One's "origination policies . . . employed from 2004 through 2007 have resulted in an explosion of foreclosures."  *Id.*  On November 24, 2008, the Superior Court of Massachusetts granted a preliminary injunction that prevented Option One from foreclosing on thousands of its loans issued to Massachusetts residents.  *Commonwealth v. H&R Block, Inc.*, No. 08-2474-BLS1, 2008 WL 5970550 (Mass. Super. Ct. Nov. 24, 2008).  On October 29, 2009, the Appeals Court of Massachusetts affirmed the preliminary injunction.  *See Commonwealth v. Option One Mortgage Co.*, No. 09-P-134, 2009 WL 3460373 (Mass. App. Ct. Oct. 29, 2009).

131.    On August 9, 2011, the Massachusetts Attorney General announced that H&R Block Inc., Option One's parent company, had agreed to settle the suit for approximately $125 million.  *See* Massachusetts Attorney General Press Release, "H&R Block Mortgage Company Will Provide $125 Million in Loan Modifications and Restitution," August 9, 2011.  Media reports noted that the suit was being settled amidst ongoing discussions among multiple states attorneys general, federal authorities, and five major mortgage servicers, aimed at resolving investigations of the lenders' foreclosure and mortgage-servicing practices.  The Massachusetts

Attorney General released a statement saying that no settlement should include a release for conduct relating to the lenders' packaging of mortgages into securitizations. *See, e.g.,* Bloomberg.com, H&R Block, Massachusetts Reach $125 Million Accord in State Mortgage Suit, Aug. 9, 2011.

132.     On October 4, 2007, the Commonwealth of Massachusetts, through its Attorney General, brought an enforcement action against Fremont, which originated loans for seven of the Securitizations, for an array of "unfair and deceptive business conduct," "on a broad scale." *See* Complaint, *Commonwealth v. Fremont Investment & Loan and Fremont General Corp.*, No. 07-4373 (Mass Super. Ct.) (the "Fremont Complaint"). According to the Massachusetts Attorney General's complaint, Fremont (i) "approve[ed] borrowers without considering or verifying the relevant documentation related to the borrower's credit qualifications, including the borrower's income"; (ii) "approv[ed] borrowers for loans with inadequate debt-to-income analyses that do not properly consider the borrowers' ability to meet their overall level of indebtedness and common housing expenses"; (iii) "failed to meaningfully account for [ARM] payment adjustments in approving and selling loans"; (iv) "approved borrowers for these ARM loans based only on the initial fixed 'teaser' rate, without regard for borrowers' ability to pay after the initial two year period"; (v) "consistently failed to monitor or supervise brokers' practices or to independently verify the information provided to Fremont by brokers"; and (vi) "ma[de] loans based on information that Fremont knew or should have known was inaccurate or false, including, but not limited to, borrowers' income, property appraisals, and credit scores." *See* Fremont Complaint.

133.     On December 9, 2008, the Supreme Judicial Court of Massachusetts affirmed a preliminary injunction that prevented Fremont from foreclosing on thousands of its loans issued

to Massachusetts residents. As a basis for its unanimous ruling, the Supreme Judicial Court found that the record supported the lower court's conclusions that "Fremont made no effort to determine whether borrowers could 'make the scheduled payments under the terms of the loan,'" nd that "Fremont knew or should have known that [its lending practices and loan terms] would operate in concert essentially to guarantee that the borrower would be unable to pay and default would follow." *Commonwealth v. Fremont Inv. & Loan*, 897 N.E.2d 548, 556 (Mass. 2008). The terms of the preliminary injunction were made permanent by a settlement reached on June 9, 2009.[14]

134.    The originators of the mortgage loans underlying the Securitizations went beyond the systematic disregard of their own underwriting guidelines. Indeed, as the FCIC has confirmed, mortgage loan originators throughout the industry pressured appraisers, during the period of the Securitizations, to issue inflated appraisals that met or exceeded the amount needed for the subject loans to be approved, regardless of the accuracy of such appraisals, and especially when the originators aimed at putting the mortgages into a package of mortgages that would be sold for securitization. This resulted in lower LTV ratios, discussed above, which in turn made the loans appear to the investors less risky than they were.

135.    As described by Patricia Lindsay, a former wholesale lender who testified before the FCIC in April 2010, appraisers "fear[ed]" for their "livelihoods," and therefore cherry-picked data "that would help support the needed value rather than finding the best comparables to come up with the most accurate value." *See* Written Testimony of Patricia Lindsay to the FCIC, April 7, 2010, at 5. Likewise, Jim Amorin, President of the Appraisal Institute, confirmed in his

---

[14] Downey, which originated the loans for four of the Securitizations, has been the subject of similar enforcement action in connection with its loan origination practices. Downey received an order from the Office of Thrift Supervision, on September 5, 2008, directing it to "cease and desist from any unsafe and unsound practices regarding lending."

testimony that "[i]n many cases, appraisers are ordered or severely pressured to doctor their reports and to convey a particular, higher value for a property, or else never see work from those parties again …. [T]oo often state licensed and certified appraisers are forced into making a 'Hobson's Choice.'" *See* Testimony of Jim Amorin to the FCIC, available at www.appraisalinstitute.org/newsadvocacy/downloads/ltrs_tstmny/2009/AI-ASA-ASFMRA-NAIFATestimonyonMortgageReform042309final.pdf.  Faced with this choice, appraisers systematically abandoned applicable guidelines and over-valued properties in order to facilitate the issuance of mortgages that could then be collateralized into mortgage-backed securitizations.

### 3.   The Collapse of the Certificates' Credit Ratings Further Indicates that the Mortgage Loans were not Originated in Adherence to the Stated Underwriting Guidelines

136.   The total collapse in the credit ratings of the GSE Certificates, typically from AAA or its equivalent to non-investment speculative grade, is further evidence of the originators' systematic disregard of underwriting guidelines, amplifying that the GSE Certificates were impaired from the start.

137.   The GSE Certificates that Fannie Mae and Freddie Mac purchased were originally assigned credit ratings of AAA or its equivalent, which purportedly reflected the description of the mortgage loan collateral and underwriting practices set forth in the Registration Statements. These ratings were artificially inflated, however, as a result of the very same misrepresentations that the Defendants made to investors in the Prospectus Supplements.

138.   RBS provided or caused to be provided loan-level information to the rating agencies that they relied upon in order to calculate the Certificates' assigned ratings, including the borrower's LTV ratio, debt-to-income ratio, owner occupancy status, and other loan level information described in aggregation reports in the Prospectus Supplements.  Because the information that RBS provided or caused to be provided was false, the ratings were inflated and

the level of subordination that the rating agencies required for the sale of AAA (or its equivalent) certificates was inadequate to provide investors with the level of protection that those ratings signified. As a result, the GSEs paid RBS inflated prices for purported AAA (or its equivalent) Certificates, unaware that those Certificates actually carried a severe risk of loss and carried inadequate credit enhancement.

139.    Since the issuance of the Certificates, the ratings agencies have dramatically downgraded their ratings to reflect the revelations regarding the true underwriting practices used to originate the mortgage loans, and the true value and credit quality of the mortgage loans. Table 8 details the extent of the downgrades.[15]

### Table 8

| Transaction | Tranche | Rating at Issuance (Moody's/S&P/Fitch) | Rating at July 31, 2011 (Moody's/S&P/Fitch) |
|---|---|---|---|
| ARSI 2006-M3 | A1 | Aaa/AAA/AAA | Caa3/CCC/C |
| ARSI 2006-W5 | A1 | Aaa/AAA/AAA | Caa2/CCC/C |
| AHMA 2007-3 | IIA1 | Aaa/AAA/-- | Ca/CC/-- |
| | IIIA1 | Aaa/AAA/-- | Caa3/D/-- |
| AMSI 2005-R9 | A1 | Aaa/AAA/AAA | Ba1/AAA/BB |
| DSLA 2005-AR6 | 1A1A | Aaa/AAA/-- | Caa3/CC/-- |
| | 1A1B | Aaa/AAA/-- | Aa3/AA+/-- |
| DSLA 2006-AR2 | 1A1B | Aaa/AAA/-- | C/D/-- |
| | 1A1A | Aaa/AAA/-- | Caa3/BB/-- |
| DSLA 2007-AR1 | 1A1A | Aaa/AAA/-- | Caa2/AA/-- |
| | 1A1B | Aaa/AAA/-- | C/D/-- |
| FFML 2005-FFH4 | 1A1 | Aaa/--/AAA | A1/--/AA |
| FFML 2006-FF16 | 1A1 | Aaa/AAA/-- | Caa3/CCC/-- |
| FFML 2006-FF8 | 1A1 | Aaa/AAA/-- | B2/B-/-- |
| FHLT 2006-1 | 1A1 | Aaa/AAA/-- | B1/B/-- |
| FHLT 2006-2 | 1A1 | Aaa/AAA/-- | Ba3/AA/-- |
| FHLT 2006-3 | 1A1 | Aaa/AAA/-- | Caa3/CCC/-- |
| FHLT 2006-A | 1A1 | Aaa/AAA/AAA | Caa2/B-/CC |

---

[15]    Applicable ratings are shown in sequential order separated by forward slashes: Moody's/S&P/Fitch. A hyphen between forward slashes indicates that the relevant agency did not provide a rating at issuance.

| Transaction | Tranche | Rating at Issuance (Moody's/S&P/Fitch) | Rating at July 31, 2011 (Moody's/S&P/Fitch) |
|---|---|---|---|
| FHLT 2006-D | 1A1 | Aaa/AAA/AAA | Ca/CCC/C |
| HELT 2007-FRE1 | 1AV1 | Aaa/AAA/-- | Caa2/CCC/-- |
| HVMLT 2005-12 | 1A1A | Aaa/AAA/-- | Ca/CC/-- |
| HVMLT 2005-13 | 1A1B | Aa2/AA-/-- | C/CCC/-- |
| | 1A1A | Aaa/AAA/-- | Caa3/B/-- |
| HVMLT 2005-15 | 1A1A | Aaa/AAA/AAA | Caa3/CCC/C |
| | 1A1B | Aaa/AAA/AAA | Ca/CC/C |
| HVMLT 2005-16 | 1A1A | Aaa/AAA/AAA | Caa3/CCC/C |
| | 1A1B | Aaa/AAA/AAA | C/CCC/C |
| HVMLT 2006-1 | 1A1A | Aaa/AAA/-- | Ca/CCC/-- |
| | 1A1B | Aaa/AAA/-- | Aa3/AA+/-- |
| HVMLT 2006-10 | 1A1A | Aaa/AAA/-- | Caa3/CC/-- |
| | 1A1B | Aaa/AAA/-- | Aa3/AA+/-- |
| HVMLT 2006-12 | 1A1A | Aaa/AAA/-- | Ca/CC/-- |
| HVMLT 2006-14 | 1A1A | Aaa/AAA/-- | Ca/D/-- |
| HVMLT 2006-4 | 1A2A | Aaa/AAA/AAA | Ca/CC/C |
| | 1A2B | Aaa/AAA/AAA | Ca/D/WD |
| | 1A1B | Aaa/AAA/AAA | Ca/D/WD |
| | 1A1A | Aaa/AAA/AAA | Ca/CCC/C |
| HVMLT 2006-5 | 1A1A | Aaa/AAA/-- | Ca/CC/-- |
| | 1A1B | Aaa/AAA/-- | Ca/CC/-- |
| HVMLT 2006-6 | 2A1A | --/AAA/AAA | --/CCC/C |
| HVMLT 2006-7 | 1A | Aaa/AAA/-- | Ca/D/-- |
| HVMLT 2006-8 | 1A1 | Aaa/AAA/-- | Ca/CCC/-- |
| HVMLT 2006-9 | 1A1A | Aaa/AAA/-- | Ca/CCC/-- |
| HVMLT 2006-BU1 | 1A1A | Aaa/AAA/-- | Caa3/AA+/-- |
| | 1A1B | Aaa/AAA/-- | Ca/B+/-- |
| HVMLT 2006-CB1 | 2A2 | Aaa/AAA/-- | Ca/CC/-- |
| HVMLT 2007-1 | 1A1A | Aaa/AAA/-- | Caa3/B/-- |
| | 1A1B | Aaa/AAA/-- | Aa3/AA+/-- |
| HVMLT 2007-2 | 1A1A | Aaa/AAA/-- | Ca/D/-- |
| HVMLT 2007-3 | 1A1A | Aaa/AAA/AAA | Ca/D/D |
| HVMLT 2007-4 | 1A1 | Aaa/--/AAA | Caa3/--/D |
| HVMLT 2007-6 | 1A1A | Aaa/AAA/-- | Caa3/CCC/-- |
| HVMLT 2007-7 | 1A1A | Aaa/AAA/AAA | Caa3/CCC/C |
| INABS 2007-B | 1A1 | Aaa/AAA/AAA | Ca/CCC/C |
| | 1A2 | Aaa/AAA/AAA | Ca/CCC/C |
| INDX 2006-AR6 | 1A1A | Aaa/AAA/-- | Caa3/CC/-- |
| | 1A1B | Aaa/AAA/-- | Ca/D/-- |
| INDX 2006-AR35 | 1A1A | Aaa/AAA/-- | Ca/D/-- |
| MHL 2006-1 | 1A1 | Aaa/AAA/-- | Ca/D/-- |

| Transaction | Tranche | Rating at Issuance (Moody's/S&P/Fitch) | Rating at July 31, 2011 (Moody's/S&P/Fitch) |
|---|---|---|---|
| NHEL 2007-2 | A1A | Aaa/AAA/-- | Caa2/CCC/-- |
| NMFT 2006-MTA1 | 1A1 | Aaa/AAA/-- | Ca/CCC/-- |
| NSTR 2007-B | 1AV1 | Aaa/AAA/-- | Caa3/CCC/-- |
| OOMLT 2005-4 | A1 | Aaa/AAA/AAA | Aa1/AAA/A |
| OOMLT 2006-1 | 1A1 | Aaa/AAA/AAA | Ba1/AAA/CCC |
| OOMLT 2006-3 | 1A1 | Aaa/AAA/-- | Caa3/CCC/-- |
| OOMLT 2007-3 | 1A1 | Aaa/AAA/-- | Caa3/CCC/-- |
| OOMLT 2007-4 | 1A1 | Aaa/AAA/-- | Caa3/CCC/-- |
| OOMLT 2007-5 | 1A1 | Aaa/AAA/-- | Caa3/CCC/-- |
| OOMLT 2007-CP1 | 1A1 | Aaa/AAA/-- | Caa1/B-/-- |
| OOMLT 2007-FXD2 | 1A1 | Aaa/AAA/-- | Aa3/AA+/-- |
| POPLR 2005-5 | AV1 | Aaa/AAA/-- | Aaa/AAA/-- |
| SVHE 2005-4 | 1A1 | Aaa/AAA/AAA | A2/AAA/BB |
| SVHE 2005-OPT3 | A1 | --/AAA/AAA | --/AAA/BB |
| SVHE 2005-OPT4 | A1 | Aaa/AAA/-- | --/AAA/BB |
| SVHE 2006-OPT1 | 1A1 | Aaa/AAA/AAA | B1/AAA/CCC |
| SVHE 2006-OPT3 | 1A1 | Aaa/AAA/-- | Ba3/A+/-- |
| SVHE 2006-OPT4 | 1A1 | Aaa/AAA/-- | B2/B/-- |
| SVHE 2006-OPT5 | 1A1 | Aaa/AAA/-- | Caa1/BBB/-- |
| SVHE 2007-1 | 1A1 | Aaa/AAA/AAA | Caa3/B-/CC |
| SVHE 2007-OPT1 | 1A1 | Aaa/AAA/AAA | Caa3/B/C |
| SVHE 2007-OPT2 | 1A1 | Aaa/AAA/-- | Caa3/CCC/-- |
| SVHE 2007-OPT3 | 1A1 | Aaa/AAA/AAA | Caa3/B/C |
| SVHE 2007-OPT4 | 1A1 | Aaa/AAA/-- | Caa3/CCC/-- |
| SVHE 2007-OPT5 | 1A1 | Aaa/AAA/-- | Caa3/CCC/-- |
| SVHE 2007-WMC1 | 1A1 | Aaa/AAA/AAA | Ca/CCC/C |

### 4. The Surge in Mortgage Delinquency and Default Further Demonstrates that the Mortgage Loans Were Not Originated in Adherence to the Stated Underwriting Guidelines

140. Even though the Certificates purchased by Fannie Mae and Freddie Mac were supposed to represent long-term, stable investments, a significant percentage of the mortgage loans backing the Certificates have defaulted, have been foreclosed upon, or are delinquent, resulting in massive losses to the Certificateholders. The overall poor performance of the mortgage loans is a direct consequence of the fact that they were not underwritten in accordance with applicable underwriting guidelines as represented in the Registration Statements.

141.   Loan groups that were properly underwritten and contained loans with the characteristics represented in the Registration Statements would have experienced substantially fewer payment problems and substantially lower percentages of defaults, foreclosures, and delinquencies than occurred here.  Table 9 reflects the percentage of loans in the Supporting Loan Groups that are in default, have been foreclosed upon, or are delinquent as of July 2011.

**Table 9**

| Transaction | Supporting Loan Group | Percentage of Delinquent/Defaulted/Foreclosed Loans |
|---|---|---|
| ARSI 2006-M3 | Group 1 | 42.5 |
| ARSI 2006-W5 | Group 1 | 43.9 |
| AHMA 2007-3 | Group 1-1 | 53.1 |
| | Group II-1 | 45.0 |
| AMSI 2005-R9 | Group 1 | 28.2 |
| DSLA 2005-AR6 | Group 1 | 24.3 |
| DSLA 2006-AR2 | Group 1 | 32.2 |
| DSLA 2007-AR1 | Group 1 | 32.2 |
| FFML 2005-FFH4 | Group 1 | 49.4 |
| FFML 2006-FF16 | Group 1 | 54.0 |
| FFML 2006-FF8 | Group 1 | 47.9 |
| FHLT 2006-1 | Group 1 | 56.1 |
| FHLT 2006-2 | Group 1 | 50.8 |
| FHLT 2006-3 | Group 1 | 52.7 |
| FHLT 2006-A | Group 1 | 57.5 |
| FHLT 2006-D | Group 1 | 51.7 |
| HELT 2007-FRE1 | Group 1 | 35.5 |
| HVMLT 2005-12 | Group 1 | 57.6 |
| HVMLT 2005-13 | Group 1 | 53.8 |
| HVMLT 2005-15 | Group 1 | 24.6 |
| HVMLT 2005-16 | Group 1 | 62.1 |
| HVMLT 2006-1 | Group 1 | 67.5 |
| HVMLT 2006-10 | Group 1 | 34.9 |
| HVMLT 2006-12 | Group 1 | 66.7 |
| HVMLT 2006-14 | Group 1 | 41.2 |
| HVMLT 2006-4 | Group 1A1 | 65.6 |
| | Group 1A2 | 63.1 |
| HVMLT 2006-5 | Group 1 | 70.0 |
| HVMLT 2006-6 | Group 2 | 45.6 |

| | | |
|---|---|---|
| HVMLT 2006-7 | Group 1 | 35.1 |
| HVMLT 2006-8 | Group 1 | 45.2 |
| HVMLT 2006-9 | Group 1 | 63.6 |
| HVMLT 2006-BU1 | Group 1 | 28.7 |
| HVMLT 2006-CB1 | Group 2C | 66.3 |
| HVMLT 2007-1 | Group 1 | 62.0 |
| HVMLT 2007-2 | Group 1 | 42.2 |
| HVMLT 2007-3 | Group 1 | 36.9 |
| HVMLT 2007-4 | Group 1 | 28.2 |
| HVMLT 2007-6 | Group 1 | 29.2 |
| HVMLT 2007-7 | Group 1 | 31.8 |
| INABS 2007-B | Group 1 | 67.8 |
| INDX 2006-AR6 | Group 1 | 39.2 |
| INDX 2006-AR35 | Group 1 | 42.9 |
| MHL 2006-1 | Group 1-A1 | 17.6 |
| NHEL 2007-2 | Group 1 | 42.1 |
| NMFT 2006-MTA1 | Group 1 | 41.5 |
| NSTR 2007-B | Group 1 | 30.8 |
| OOMLT 2005-4 | Group 1 | 37.3 |
| OOMLT 2006-1 | Group 1 | 39.3 |
| OOMLT 2006-3 | Group 1 | 45.2 |
| OOMLT 2007-3 | Group 1 | 44.0 |
| OOMLT 2007-4 | Group 1 | 43.4 |
| OOMLT 2007-5 | Group 1 | 43.8 |
| OOMLT 2007-CP1 | Group 1 | 48.6 |
| OOMLT 2007-FXD2 | Group 1 | 36.7 |
| POPLR 2005-5 | Group II-A | 48.2 |
| SVHE 2005-4 | Group 1 | 48.2 |
| SVHE 2005-OPT3 | Group 1 | 39.1 |
| SVHE 2005-OPT4 | Group 1 | 38.6 |
| SVHE 2006-OPT1 | Group 1 | 45.7 |
| SVHE 2006-OPT3 | Group 1 | 43.9 |
| SVHE 2006-OPT4 | Group 1 | 43.4 |
| SVHE 2006-OPT5 | Group 1 | 44.6 |
| SVHE 2007-1 | Group 1 | 35.9 |
| SVHE 2007-OPT1 | Group 1 | 40.2 |
| SVHE 2007-OPT2 | Group 1 | 39.4 |
| SVHE 2007-OPT3 | Group 1 | 40.8 |
| SVHE 2007-OPT4 | Group 1 | 42.2 |
| SVHE 2007-OPT5 | Group 1 | 38.1 |
| SVHE 2007-WMC1 | Group 1 | 73.0 |

142.   The confirmed misstatements concerning owner occupancy and LTV ratios, the review of over two thousand loan files for one of the Securitizations, the confirmed systematic underwriting failures by the originators responsible for the mortgage loans across the Securitizations, and the extraordinary drop in credit rating and rise in delinquencies across those Securitizations, all confirm that the mortgage loans in the Supporting Loan Groups, contrary to the representations in the Registration Statements, were not originated in accordance with the stated underwriting guidelines.

## V.   FANNIE MAE'S AND FREDDIE MAC'S PURCHASES OF THE GSE CERTIFICATES AND THE RESULTING DAMAGES

143.   In total, between September 30, 2005 and January 23, 2008, Fannie Mae and Freddie Mac purchased over $30.4 billion in residential mortgage-backed securities issued in connection with the Securitizations.  Table 10 reflects each of Freddie Mac's purchases of the Certificates.[16]

**Table 10**

| Transaction | Tranche | CUSIP | Settlement Date of Purchase by Freddie Mac | Initial Unpaid Principal Balance ($) | Purchase Price (% of Par) | Seller to Freddie Mac |
|---|---|---|---|---|---|---|
| AMSI 2005-R9 | A1 | 03072SN92 | 10/27/2005 | 669,500,000 | 100 | RBS Securities |
| AHMA 2007-3 | IIA1 | 026935AA4 | 6/6/2007 | 86,835,000 | 100 | RBS Securities |
| | IIIA1 | 026935AH9 | 6/6/2007 | 192,050,000 | 99.9 | RBS Securities |
| ARSI 2006-M3 | A1 | 03076MAA2 | 9/27/2006 | 786,305,000 | 100 | RBS Securities |
| ARSI 2006-W5 | A1 | 04012XAA3 | 5/25/2006 | 535,800,000 | 100 | RBS Securities |
| DSLA 2005-AR6 | 1A1A | 23332UFU3 | 9/30/2005 | 128,243,000 | 100 | RBS Securities |
| | 1A1B | 23332UGJ7 | 9/30/2005 | 63,681,000 | 100 | RBS Securities |
| FFML 2005-FFH4 | 1A1 | 32027NWY3 | 12/15/2005 | 370,777,000 | 100 | RBS Securities |
| FFML 2006-FF16 | 1A1 | 320275AA8 | 11/30/2006 | 162,923,500 | 100 | RBS Securities |
| FFML 2006-FF8 | 1A1 | 320278AR5 | 6/29/2006 | 243,559,000 | 100 | RBS Securities |
| FHLT 2006-1 | 1A1 | 35729PNX4 | 4/13/2006 | 334,852,000 | 100 | RBS Securities |
| FHLT 2006-3 | 1A1 | 35729MAA5 | 10/19/2006 | 263,553,446 | 100 | RBS Securities |

---

[16]   Purchases of securities in Tables 10 and 11 are stated in terms of unpaid principal balance of the relevant Certificates.  Purchase prices are stated in terms of percentage of par.

| Transaction | Tranche | CUSIP | Settlement Date of Purchase by Freddie Mac | Initial Unpaid Principal Balance ($) | Purchase Price (% of Par) | Seller to Freddie Mac |
|---|---|---|---|---|---|---|
| HELT 2007-FRE1 | 1AV1 | 43710XAA6 | 7/10/2007 | 635,924,000 | 100 | RBS Securities |
| HVMLT 2005-12 | 1A1A | 41161PVF7 | 9/30/2005 | 429,357,000 | 102.25 | RBS Securities |
| HVMLT 2005-15 | 1A1A | 41161PXF5 | 10/31/2005 | 144,466,000 | 100 | RBS Securities |
| | 1A1B | 41161PXG3 | 10/31/2005 | 36,116,000 | 100 | RBS Securities |
| HVMLT 2005-16 | 1A1A | 41161PA52 | 11/30/2005 | 75,120,400 | 100 | RBS Securities |
| | 1A1B | 41161PYV9 | 11/30/2005 | 50,080,000 | 100 | RBS Securities |
| HVMLT 2006-1 | 1A1A | 41161PA60 | 2/7/2006 | 156,259,000 | 100 | RBS Securities |
| | 1A1B | 41161PA78 | 2/7/2006 | 104,172,000 | 100 | RBS Securities |
| HVMLT 2006-10 | 1A1A | 41162CAA9 | 11/13/2006 | 450,326,000 | 100 | RBS Securities |
| | 1A1B | 41162CAB7 | 11/13/2006 | 112,582,000 | 100 | RBS Securities |
| HVMLT 2006-12 | 1A1A | 41162DAA7 | 12/13/2006 | 1,200,000,000 | 100 | RBS Securities |
| HVMLT 2006-14 | 1A1A | 41162NAA5 | 12/22/2006 | 544,308,000 | 100 | RBS Securities |
| HVMLT 2006-4 | 1A2A | 41161PP98 | 4/28/2006 | 278,494,000 | 100 | RBS Securities |
| | 1A2B | 41161PQ22 | 4/28/2006 | 69,623,000 | 100 | RBS Securities |
| HVMLT 2006-5 | 1A1A | 41161MAA8 | 6/29/2006 | 424,667,000 | 100 | RBS Securities |
| | 1A1B | 41161MAB6 | 6/29/2006 | 106,166,000 | 100 | RBS Securities |
| HVMLT 2006-7 | 1A | 41161VAA8 | 8/15/2006 | 756,376,000 | 100 | RBS Securities |
| HVMLT 2006-8 | 1A1 | 41161GAA1 | 8/30/2006 | 360,539,000 | 100 | RBS Securities |
| HVMLT 2006-9 | 1A1A | 41161XAA4 | 10/4/2006 10/6/2006 | 675,375,000 157,084,000 | 100 100 | RBS Securities |
| HVMLT 2006-BU1 | 1A1A | 41161PG56 | 3/30/2006 | 212,112,000 | 100 | RBS Securities |
| | 1A1B | 41161PG64 | 3/30/2006 | 53,028,000 | 100 | RBS Securities |
| HVMLT 2006-CB1 | 2A2 | 41161PE41 | 2/28/2006 | 65,551,000 | 103.7 | RBS Securities |
| HVMLT 2007-1 | 1A1A | 41164MAA5 | 1/23/2008 | 379,466,000 | 93.75 | RBS Securities |
| HVMLT 2007-2 | 1A1A | 41164LAA7 | 3/30/2007 | 331,371,000 | 99.98 | RBS Securities |
| HVMLT 2007-3 | 1A1A | 41164UAA7 | 4/27/2007 | 293,300,000 | 100 | RBS Securities |
| HVMLT 2007-4 | 1A1 | 41164YAA9 | 6/14/2007 | 244,312,000 | 100 | RBS Securities |
| HVMLT 2007-6 | 1A1A | 41165BAA8 | 7/31/2007 | 199,253,000 | 100 | RBS Securities |
| HVMLT 2007-7 | 1A1A | 411640AA3 | 10/2/2007 | 531,326,000 | 100 | RBS Securities |
| INABS 2007-B | 1A1 | 43710EAA8 | 6/12/2007 | 129,689,000 | 100 | Lehman Brothers |
| INDX 2006-AR6 | 1A1A | 456612AA8 | 4/28/2006 | 650,332,000 | 100 | RBS Securities |
| | 1A1B | 456612AB6 | 4/28/2006 | 162,583,000 | 100 | RBS Securities |
| MHL 2006-1 | 1A1 | 61915RBY1 | 2/22/2006 | 178,942,000 | 100 | RBS Securities |
| NHEL 2007-2 | A1A | 66989EAA3 | 6/1/2007 | 779,369,000 | 100 | RBS Securities |
| NMFT 2006-MTA1 | 1A1 | 66988UAA8 | 6/8/2006 | 518,700,000 | 100 | RBS Securities |
| NSTR 2007-B | 1AV1 | 63860LAA8 | 4/19/2007 | 234,882,000 | 100 | RBS Securities |
| OOMLT 2005-4 | A1 | 68389FJD7 | 10/5/2005 | 841,679,000 | 100 | RBS Securities |
| OOMLT 2006-1 | 1A1 | 68389FKL7 | 2/3/2006 | 1,424,974,000 | 100 | RBS Securities |

| Transaction | Tranche | CUSIP | Settlement Date of Purchase by Freddie Mac | Initial Unpaid Principal Balance ($) | Purchase Price (% of Par) | Seller to Freddie Mac |
|---|---|---|---|---|---|---|
| OOMLT 2006-3 | IA1 | 68389BAN3 | 10/27/2006 | 269,509,500 | 100 | RBS Securities |
| OOMLT 2007-3 | IA1 | 68402BAA4 | 4/12/2007 | 398,178,000 | 100 | RBS Securities |
| OOMLT 2007-4 | IA1 | 68403FAA4 | 4/19/2007 | 462,095,000 | 100 | RBS Securities |
| OOMLT 2007-5 | IA1 | 68403HAA0 | 4/27/2007 | 629,973,000 | 100 | RBS Securities |
| OOMLT 2007-CP1 | IA1 | 68402YAA4 | 2/22/2007 | 335,983,000 | 100 | RBS Securities |
| OOMLT 2007-FXD2 | IA1 | 68403BAA3 | 3/29/2007 | 388,352,000 | 100 | RBS Securities |
| POPLR 2005-5 | AV-1 | 73316PHJ2 | 10/21/2005 | 160,250,000 | 100 | Friedman Billings Ramsey |
| SVHE 2005-OPT3 | A1 | 83611MHD3 | 9/30/2005 | 639,502,000 | 100 | RBS Securities |
| SVHE 2005-4 | IA1 | 83611MJY5 | 12/21/2005 | 331,971,000 | 100 | RBS Securities |
| SVHE 2006-OPT3 | IA1 | 83611MPE2 | 5/12/2006 | 375,766,500 | 100 | RBS Securities |
| SVHE 2006-OPT4 | IA1 | 83611YAA0 | 5/26/2006 | 160,613,000 | 100 | RBS Securities |
| SVHE 2006-OPT5 | IA1 | 83612CAA7 | 6/19/2006 | 616,654,000 | 100 | RBS Securities |
| SVHE 2007-1 | IA1 | 83612PAA8 | 2/28/2007 | 227,948,000 | 100 | RBS Securities |
| SVHE 2007-OPT1 | IA1 | 83612TAA0 | 5/15/2007 | 925,181,000 | 100 | RBS Securities |
| SVHE 2007-OPT2 | IA1 | 83613DAA4 | 7/10/2007 | 270,982,000 | 100 | RBS Securities |
| SVHE 2007-OPT3 | IA1 | 83612KAA9 | 7/10/2007 | 258,585,000 | 100 | RBS Securities |
| SVHE 2007-OPT4 | IA1 | 83613AAA0 | 10/11/2007 | 233,489,000 | 100 | RBS Securities |
| SVHE 2007-OPT5 | IA1 | 83613FAA9 | 11/1/2007 | 542,518,000 | 100 | RBS Securities |
| SVHE 2007-WMC1 | IA1 | 83612NAA3 | 3/21/2007 | 254,857,000 | 99.97 | RBS Securities |

144.   Table 11 reflects each of Fannie Mae's purchases of the Certificates:

**Table 11**

| Transaction | Tranche | CUSIP | Settlement Date of Purchase by Fannie Mae | Initial Unpaid Principal Balance ($) | Purchase Price (% of Par) | Seller to Fannie Mae |
|---|---|---|---|---|---|---|
| DSLA 2005-AR6 | 1A1A | 23332UFU3 | 9/30/2005 | 126,483,000 | 100 | RBS Securities |
| DSLA 2006-AR2 | 1A1B | 23332QAB9 | 9/12/2006 | 146,549,000 | 100 | RBS Securities |
| | 1A1A | 23332QAA1 | 9/12/2006 | 341,948,000 | 100 | RBS Securities |
| DSLA 2007-AR1 | 1A1A | 23333YAA3 | 2/22/2007 | 168,508,000 | 100 | RBS Securities |
| | 1A1B | 23333YAB1 | 2/22/2007 | 112,339,000 | 100 | RBS Securities |
| FHLT 2006-2 | 1A1 | 35729PPU8 | 4/28/2006 | 278,772,000 | 100 | RBS Securities |
| FHLT 2006-3 | Ia1 | 35729MAA5 | 10/19/2006 | 263,553,554 | 100 | RBS Securities |

| Transaction | Tranche | CUSIP | Settlement Date of Purchase by Fannie Mae | Initial Unpaid Principal Balance ($) | Purchase Price (% of Par) | Seller to Fannie Mae |
|---|---|---|---|---|---|---|
| FHLT 2006-A | 1A1 | 35729RAA4 | 5/10/2006 | 235,410,000 | 100 | RBS Securities |
| FHLT 2006-D | 1A1 | 35729VAA5 | 11/3/2006 | 602,413,000 | 100 | RBS Securities |
| FFML 2006-FF16 | IA1 | 320275AA8 | 11/30/2006 | 162,923,500 | 100 | RBS Securities |
| HVMLT 2005-13 | 1A1B | 41161PWA7 | 11/30/2005 | 87,465,000 | 100 | RBS Securities |
|  | 1A1A | 41161PVZ3 | 11/30/2005 | 131,197,000 | 100 | RBS Securities |
| HVMLT 2005-16 | 1A1A | 41161PA52 | 11/30/2005 | 75,612,600 | 99.98 | RBS Securities |
|  | 1A1B | 41161PYV9 | 11/30/2005 | 50,407,900 | 100 | RBS Securities |
| HVMLT 2006-6 | 2A1A | 41161UAC6 | 6/30/2006 | 112,861,000 | 100.46 | RBS Securities |
| HVMLT 2006-1 | 1A1A | 41161PA60 | 2/7/2006 | 156,259,000 | 100 | RBS Securities |
|  | 1A1B | 41161PA78 | 2/7/2006 | 104,172,000 | 100 | RBS Securities |
| HVMLT 2006-4 | 1A1A | 41161PL27 | 4/28/2006 | 353,429,000 | 100 | RBS Securities |
|  | 1A1B | 41161PL35 | 4/28/2006 | 151,470,000 | 100 | RBS Securities |
| HVMLT 2007-1 | 1A1B | 41164MAB3 | 3/9/2007 | 252,977,000 | 100 | RBS Securities |
| INABS 2007-B | 1A2 | 43710EAB6 | 6/12/2007 | 129,689,000 | 100 | Lehman Brothers |
| INDX 2006-AR35 | 1A1A | 45667SAK3 | 11/29/2006 | 346,464,000 | 100 | RBS Securities |
| OOMLT 2006-3 | IA1 | 68389BAN3 | 10/27/2006 | 269,509,500 | 100 | RBS Securities |
| SVHE 2005-OPT4 | IA1 | 83611MJF6 | 11/30/2005 | 557,005,000 | 100 | RBS Securities |
| SVHE 2006-OPT1 | IA1 | 83611MLR7 | 3/10/2006 | 464,580,000 | 100 | RBS Securities |
| SVHE 2006-OPT3 | IA1 | 83611MPE2 | 5/12/2006 | 375,766,500 | 100 | RBS Securities |
| SVHE 2006-OPT4 | IA1 | 83611YAA0 | 5/26/2006 | 160,613,000 | 100 | RBS Securities |
| SVHE 2006-OPT5 | IA1 | 83612CAA7 | 6/19/2006 | 616,654,000 | 100 | RBS Securities |

145.    The statements and assurances in the Registration Statements regarding the credit quality and characteristics of the mortgage loans underlying the GSE Certificates, and the origination and underwriting practices pursuant to which the mortgage loans were originated, which were summarized in such documents, were material to a reasonable investor's decision to purchase the GSE Certificates.

146.    The false statements of material facts and omissions of material facts in the Registration Statements, including the Prospectuses and Prospectus Supplements, directly caused Fannie Mae and Freddie Mac to suffer billions of dollars in damages, including without limitation depreciation in the value of the securities. The mortgage loans underlying the GSE Certificates experienced defaults and delinquencies at a much higher rate than they would have had the loan originators adhered to the underwriting guidelines set forth in the Registration

Statements, and the payments to the trusts were therefore much lower than they would have been had the loans been underwritten as described in the Registration Statements.

147.    Defendants' misstatements and omissions in the Registration Statements regarding the true characteristics of the loans were the proximate cause of Fannie Mae's and Freddie Mac's losses relating to their purchases of the GSE Certificates.  Based upon sales of the Certificates or similar certificates in the secondary market, Defendants proximately caused billions of dollars in damages to Fannie Mae and Freddie Mac in an amount to be determined at trial.

## FIRST CAUSE OF ACTION

### Violation of Section 11 of the Securities Act of 1933
### (Against Defendants RBS Securities, RBS Acceptance, FAS Corp., and the Individual Defendants)

148.    Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

149.    This claim is brought by Plaintiff pursuant to Section 11 of the Securities Act of 1933 and is asserted on behalf of Fannie Mae and Freddie Mac, which purchased the GSE Certificates issued pursuant to the Registration Statements.  This claim is brought against Defendant RBS Securities with respect to each of the Registration Statements, and is brought against Defendants RBS Acceptance, FAS Corp., and the Individual Defendants with respect to the Registration Statements filed by RBS Acceptance or FAS Corp. that registered securities that were bona fide offered to the public on or after September 6, 2005.

150.    This claim is predicated upon Defendant RBS Securities' strict liability for making false and materially misleading statements in each of the Registration Statements for the Securitizations and for omitting facts necessary to make the facts stated therein not misleading. Defendants RBS Acceptance, FAS Corp., and the Individual Defendants are strictly liable for

making false and materially misleading statements in the Registration Statements filed by RBS Acceptance and FAS Corp. that registered securities that were bona fide offered to the public on or after September 6, 2005, which are applicable to 47 of the 68 Securitizations (as specified in Tables 1 and 2 above), and for omitting facts necessary to make the facts stated therein not misleading.

151.     Defendant RBS Securities served as underwriter of each of the Securitizations, and as such, is liable for the misstatements and omissions in the Registration Statements under Section 11 of the Securities Act.

152.     Defendants RBS Acceptance and FAS Corp. filed three Registration Statements under which 47 of the 68 Securitizations were carried out.  As depositors, Defendants RBS Acceptance and FAS Corp. are issuers of the GSE Certificates issued pursuant to the Registration Statements they filed within the meaning of Section 2(a)(4) of the Securities Act, 15 U.S.C. § 77b(a)(4), and in accordance with Section 11(a), 15 U.S.C. § 77k(a).  As such, they are liable under Section 11 of the Securities Act for the misstatements and omissions in those Registration Statements that registered securities that were bona fide offered to the public on or after September 6, 2005.

153.     At the time Defendants RBS Acceptance and FAS Corp. filed three Registration Statements applicable to 47 of the Securitizations, the Individual Defendants were officers and/or directors of RBS Acceptance and FAS Corp.  In addition, the Individual Defendants signed those Registration Statements and either signed or authorized another to sign on their behalf the amendments to those Registration Statements.  As such, the Individual Defendants are liable under Section 11 of the Securities Act for the misstatements and omissions in those Registration

Statements that registered securities that were bona fide offered to the public on or after September 6, 2005.

154.    At the time that they became effective, each of the Registration Statements contained material misstatements of fact and omitted information necessary to make the facts stated therein not misleading, as set forth above. The facts misstated or omitted were material to a reasonable investor reviewing the Registration Statements.

155.    The untrue statements of material facts and omissions of material fact in the Registration Statements are set forth above in Section IV and pertain to compliance with underwriting guidelines, occupancy status and loan-to-value ratios.

156.    Fannie Mae and Freddie Mac purchased or otherwise acquired the GSE Certificates pursuant to the false and misleading Registration Statements. Fannie Mae and Freddie Mac made these purchases in the primary market. At the time they purchased the GSE Certificates, Fannie Mae and Freddie Mac did not know of the facts concerning the false and misleading statements and omissions alleged herein, and if the GSEs would have known those facts, they would not have purchased the GSE Certificates.

157.    RBS Securities owed to Fannie Mae, Freddie Mac, and other investors a duty to make a reasonable and diligent investigation of the statements contained in the Registration Statements at the time they became effective to ensure that such statements were true and correct and that there were no omissions of material facts required to be stated in order to make the statements contained therein not misleading. The Individual Defendants owed the same duty with respect to the Registration Statements that registered securities that were bona fide offered to the public on or after September 6, 2005, which are applicable to 47 of the Securitizations.

158.    RBS Securities and the Individual Defendants did not exercise such due diligence and failed to conduct a reasonable investigation.  In the exercise of reasonable care, these Defendants should have known of the false statements and omissions contained in or omitted from the Registration Statements filed in connection with the Securitizations, as set forth herein. In addition, RBS Acceptance and FAS Corp., though subject to strict liability without regard to whether they performed diligence, also failed to take reasonable steps to ensure the accuracy of the representations.

159.    Fannie Mae and Freddie Mac sustained substantial damages as a result of the misstatements and omissions in the Registration Statements.

160.    The time period from May 18, 2009 through August 29, 2011 is tolled for for purposes of the statute of limitation by virtue of a tolling agreement entered into between Fannie Mae, RBS Securities, RBS Acceptance, RBS Financial Products and FAS Corp.  In addition, this action is brought within three years of the date that the FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

161.    By reason of the conduct herein alleged, RBS Securities, RBS Acceptance, FAS Corp. and the Individual Defendants are jointly and severally liable for their wrongdoing.

## SECOND CAUSE OF ACTION

**Violation of Section 12(a)(2) of the Securities Act of 1933
(Against RBS Securities, RBS Acceptance, and FAS Corp.)**

162.    Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

163.    This claim is brought by Plaintiff pursuant to Section 12(a)(2) of the Securities Act of 1933 and is asserted on behalf of Fannie Mae and Freddie Mac, which purchased the GSE

Certificates issued pursuant to the Registration Statements in the Securitizations listed in paragraph 2.

164.     This claim is predicated upon RBS Securities' negligence for making false and materially misleading statements in the Prospectuses (as supplemented by the Prospectus Supplements, hereinafter referred to in this Section as "Prospectuses") for each of the Securitizations listed in paragraph 2, other than the INABS 2007-B and POPLR 2005-5 Securitizations, for which RBS Securities was not the selling underwriter and as to which the allegations in this section to do not apply.  Defendants RBS Acceptance and FAS Corp. acted negligently in making false and materially misleading statements in the Prospectuses for the Securitizations carried out under the Registration Statements they filed, which are applicable to 47 of the Securitizations.

165.     RBS Securities is prominently identified in the Prospectuses, the primary documents that it used to sell the GSE Certificates.  RBS Securities offered the Certificates publicly, including selling to Fannie Mae and Freddie Mac their GSE Certificates, as set forth in the "Plan of Distribution" or "Underwriting" sections of the Prospectuses.

166.     RBS Securities offered and sold the GSE Certificates to Fannie Mae and Freddie Mac by means of the Prospectuses, which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading.  RBS Securities reviewed and participated in drafting the Prospectuses.

167.     RBS Securities successfully solicited Fannie Mae's and Freddie Mac's purchases of the GSE Certificates.  As underwriter, RBS Securities obtained substantial commissions based upon the amount received from the sale of the Certificates to the public.

168.     RBS Securities offered the GSE Certificates for sale, sold them, and distributed them by the use of means or instruments of transportation and communication in interstate commerce.

169.     RBS Acceptance and FAS Corp. are prominently identified in the Prospectuses for the Securitizations carried out under the Registration Statements that they filed.  These Prospectuses were the primary documents each used to sell Certificates for the 47 Securitizations under those Registration Statements.  RBS Acceptance and FAS Corp. offered the Certificates publicly and actively solicited their sale, including to Fannie Mae and Freddie Mac.

170.     With respect to the 47 Securitizations for which they filed Registration Statements, RBS Acceptance and FAS Corp. offered the GSE Certificates to Fannie Mae and Freddie Mac by means of Prospectuses which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in the light of the circumstances under which they were made, not misleading.  Upon information and belief, RBS Acceptance and FAS Corp. reviewed and participated in drafting the Prospectuses.

171.     RBS Acceptance and FAS Corp. offered the GSE Certificates for sale by the use of means or instruments of transportation and communication in interstate commerce.

172.     Each of RBS Securities, RBS Acceptance and FAS Corp. actively participated in the solicitation of the GSEs' purchase of the GSE Certificates, and did so in order to benefit themselves.  Such solicitation included assisting in preparing the Registration Statements, filing the Registration Statements, and assisting in marketing the GSE Certificates.

173.     Each of the Prospectuses contained material misstatements of fact and omitted information necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Prospectuses.

174.    The untrue statements of material facts and omissions of material fact in the Registration Statements, which include the Prospectuses, are set forth above in Section IV, and pertain to compliance with underwriting guidelines, occupancy status, and loan-to-value ratios.

175.    RBS Securities, RBS Acceptance and FAS Corp. offered and sold the GSE Certificates offered pursuant to the Registration Statements directly to Fannie Mae and Freddie Mac, pursuant to the false and misleading Prospectuses.

176.    RBS Securities owed to Fannie Mae and Freddie Mac, as well as to other investors in these trusts, a duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses, to ensure that such statements were true, and to ensure that there was no omission of a material fact required to be stated in order to make the statements contained therein not misleading.  RBS Acceptance and FAS Corp. owed the same duty with respect to the Prospectuses for the Securitizations carried out under the three Registration Statements filed by them.

177.    RBS Securities, RBS Acceptance and FAS Corp. failed to exercise such reasonable care.  These Defendants in the exercise of reasonable care should have known that the Prospectuses contained untrue statements of material facts and omissions of material facts at the time of the Securitizations as set forth above.

178.    In contrast, Fannie Mae and Freddie Mac did not know of the untruths and omissions contained in the Prospectuses at the time they purchased the GSE Certificates.  If the GSEs would have known of those untruths and omissions, they would not have purchased the GSE Certificates.

179.    Fannie Mae and Freddie Mac acquired the GSE Certificates in the primary market pursuant to the Prospectuses.

180.    Fannie Mae and Freddie Mac sustained substantial damages in connection with their investments in the GSE Certificates and have the right to rescind and recover the consideration paid for the GSE Certificates, with interest thereon.

181.    The time period from May 18, 2009 through August 29, 2011 is tolled for for purposes of the statute of limitation by virtue of a tolling agreement entered into between Fannie Mae, RBS Securities, RBS Acceptance, RBS Financial Products and FAS Corp.  In addition, this action is brought within three years of the date that the FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

### THIRD CAUSE OF ACTION

### Violation of Section 15 of the Securities Act of 1933
### (Against RBS Financial Products, RBS Holdings, RBS Group, and the Individual Defendants)

182.    Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

183.    This claim is brought under Section 15 of the Securities Act of 1933, 15 U.S.C. §77o ("Section 15"), against RBS Group, RBS Holdings, RBS Financial Products and the Individual Defendants for controlling-person liability with regard to the Section 11 and Section 12(a)(2) causes of actions set forth above.

184.    The Individual Defendants at all relevant times participated in the operation and management of RBS Acceptance and/or FAS Corp. and their related subsidiaries, and conducted and participated, directly and indirectly, in the conduct of RBS Acceptance's and/or FAS Corp.'s business affairs.  Defendant Joseph N. Walsh III was the President, a Managing Director, and a Director of RBS Acceptance and FAS Corp.  Defendant Robert J. McGinnis was the President, a Managing Director, and a Director of RBS Acceptance and FAS Corp.  Defendant Carol P. Mathis was the Chief Financial Officer and a Managing Director of RBS Acceptance and FAS

Corp.  Defendant John C. Anderson served as a Managing Director and Director of RBS Acceptance and FAS Corp.  Defendant James M. Esposito served as the General Counsel and Secretary, and a Managing Director and Director, of RBS Acceptance and FAS Corp.

185.    Defendant RBS Financial Products was the sponsor for 39 of the 47 Securitizations carried out under the three Registration Statements filed by RBS Acceptance and FAS Corp., and culpably participated in the violations of Sections 11 and 12(a)(2) set forth above with respect to the offering of the GSE Certificates by initiating these Securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, selecting RBS Acceptance and FAS Corp. as the special purpose vehicles, and selecting RBS Securities as underwriter.  In its role as sponsor, RBS Financial Products knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the mortgages would be issued by the relevant trusts.

186.    Defendant RBS Financial Products also acted as the seller of the mortgage loans for the 47 Securitizations carried out under the three Registration Statements filed by Defendants RBS Acceptance and FAS Corp., in that it conveyed such mortgage loans to RBS Acceptance and FAS Corp. pursuant to an Assignment and Recognition Agreement or a Mortgage Loan Purchase Agreement.

187.    Defendant RBS Financial Products also controlled all aspects of the business of RBS Acceptance and FAS Corp., as RBS Acceptance and FAS Corp. were merely special purpose entities created for the purpose of acting as a pass-through for the issuance of the Certificates.  Upon information and belief, the officers and directors of RBS Financial Products overlapped with the officers and directors of RBS Acceptance and FAS Corp.  In addition,

because of its position as sponsor, RBS Financial Products was able to, and did in fact, control the contents of the three Registration Statements filed by RBS Acceptance and FAS Corp., including the Prospectuses and Prospectus Supplements, which pertained to 47 Securitizations and which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

188.    Defendant RBS Holdings controlled the business operations of RBS Acceptance, FAS Corp. and RBS Securities.  Defendant RBS Holdings is the corporate parent of RBS Securities, RBS Acceptance, and FAS Corp.  As the sole corporate parent of RBS Securities, RBS Acceptance, and FAS Corp., RBS Holdings had the practical ability to direct and control the actions of RBS Securities, RBS Acceptance, and FAS Corp. in issuing and selling the Certificates, and in fact exercised such direction and control over the activities of RBS Securities, RBS Acceptance, and FAS Corp. in connection with the issuance and sale of the Certificates.

189.    RBS Holdings expanded its share of the residential mortgage-backed securitization market in order to increase revenue and profits.  The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.

190.    RBS Holdings culpably participated in the violations of Section 11 and 12(a)(2) set forth above.  It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and established special-purpose financial entities such as RBS Acceptance and the issuing trusts to serve as conduits for the mortgage loans.

191.    Defendant RBS Group wholly owns RBS Holdings and is the ultimate parent of RBS Securities, RBS Financial Products, RBS Acceptance and FAS Corp.  RBS Group culpably participated in the violations of Section 11 and 12(a)(2) set forth above.  It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and established special-purpose financial entities such as RBS Acceptance and the issuing trusts to serve as conduits for the mortgage loans.

192.    RBS Group, RBS Holdings, RBS Financial Products, and the Individual Defendants are controlling persons within the meaning of Section 15 by virtue of their actual power over, control of, ownership of, and/or directorship of RBS Securities, FAS Corp. and RBS Acceptance at the time of the wrongs alleged herein and as set forth herein, including their control over the content of the Registration Statements.

193.    Fannie Mae and Freddie Mac purchased in the primary market Certificates issued pursuant to the Registration Statements, including the Prospectuses and Prospectus Supplements, which, at the time they became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Registration Statements.

194.    Fannie Mae and Freddie Mac did not know of the misstatements and omissions in the Registration Statements; had the GSEs known of those misstatements and omissions, they would not have purchased the GSE Certificates.

195.    Fannie Mae and Freddie Mac have sustained damages as a result of the misstatements and omissions in the Registration Statements, for which they are entitled to compensation.

196.    The time period from May 18, 2009 through August 29, 2011 is tolled for purposes of the statute of limitation by virtue of a tolling agreement entered into between Fannie Mae, RBS Securities, RBS Acceptance, RBS Financial Products and FAS Corp.  In addition, this action is brought within three years of the date that the FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

## FOURTH CAUSE OF ACTION

### Violation of Section 13.1-522(A)(ii) of the Virginia Code
### (Against RBS Securities, RBS Acceptance, and FAS Corp.)

197.    Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

198.    This claim is brought by Plaintiff pursuant to Section 13.1-522(A)(ii) of the Virginia Code and is asserted on behalf of Freddie Mac.  The allegations set forth below in this cause of action pertain to only those GSE Certificates identified in Table 10 above that were purchased by Freddie Mac on or after September 6, 2006.

199.    This claim is predicated upon RBS Securities' negligence for making false and materially misleading statements in the Prospectuses for each of the Securitizations listed in paragraph 2, other than the INABS 2007-B and POPLR 2005-5 Securitizations, for which RBS Securities was not the selling underwriter and as to which the allegations in this section to do not apply.  Defendants RBS Acceptance and FAS Corp. acted negligently in making false and materially misleading statements in the Prospectuses for the Securitizations carried out under the Registration Statements they filed.

200.    RBS Securities is prominently identified in the Prospectuses, the primary documents that it used to sell the GSE Certificates.  RBS Securities offered the Certificates

publicly, including selling to Freddie Mac its GSE Certificates, as set forth in the "Plan of Distribution" or "Underwriting" sections of the Prospectuses.

201.    RBS Securities offered and sold the GSE Certificates to Freddie Mac by means of the Prospectuses, which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading.  RBS Securities reviewed and participated in drafting the Prospectuses.

202.    RBS Securities successfully solicited Freddie Mac's purchases of the GSE Certificates.  As underwriter, RBS Securities obtained substantial commissions based upon the amount received from the sale of the Certificates to the public.

203.    RBS Securities offered the GSE Certificates for sale, sold them, and distributed them to Freddie Mac in the State of Virginia.

204.    RBS Acceptance and FAS Corp. are prominently identified in the Prospectuses for the Securitizations carried out under the Registration Statements that they filed.  These Prospectuses were the primary documents each used to sell Certificates for those Securitizations. RBS Acceptance and FAS Corp. offered the Certificates publicly and actively solicited their sale, including to Freddie Mac.

205.    With respect to the Securitizations for which they filed Registration Statements, RBS Acceptance and FAS Corp. offered the GSE Certificates to Freddie Mac by means of Prospectuses which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in the light of the circumstances under which they were made, not misleading.  RBS Acceptance and FAS Corp. reviewed and participated in drafting the Prospectuses.

206.     Each of RBS Securities, RBS Acceptance, and FAS Corp. actively participated in the solicitation of Freddie Mac's purchase of the GSE Certificates, and did so in order to benefit themselves.  Such solicitation included assisting in preparing the Registration Statements, filing the Registration Statements, and assisting in marketing the GSE Certificates.

207.     Each of the Prospectuses contained material misstatements of fact and omitted information necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Prospectuses.

208.     The untrue statements of material facts and omissions of material fact in the Registration Statements, which include the Prospectuses, are set forth above in Section IV, and pertain to compliance with underwriting guidelines, occupancy status, and loan-to-value ratios.

209.     RBS Securities, RBS Acceptance and FAS Corp. offered and sold the GSE Certificates offered pursuant to the Registration Statements directly to Freddie Mac, pursuant to the false and misleading Prospectuses.

210.     RBS Securities owed to Freddie Mac, as well as to other investors in these trusts, a duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses, to ensure that such statements were true, and to ensure that there was no omission of a material fact required to be stated in order to make the statements contained therein not misleading.  RBS Acceptance and FAS Corp. owed the same duty with respect to the Prospectuses for the Securitizations carried out under the three Registration Statements filed by them.

211.     RBS Securities, RBS Acceptance and FAS Corp. failed to exercise such reasonable care.  These Defendants in the exercise of reasonable care should have known that the

Prospectuses contained untrue statements of material facts and omissions of material facts at the time of the Securitizations as set forth above.

212.    In contrast, Freddie Mac did not know of the untruths and omissions contained in the Prospectuses at the time it purchased the GSE Certificates.  If Freddie Mac would have known of those untruths and omissions, it would not have purchased the GSE Certificates.

213.    Freddie Mac sustained substantial damages in connection with their investments in the GSE Certificates and has the right to rescind and recover the consideration paid for the GSE Certificates, with interest thereon.

214.    This action is brought within three years of the date that the FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

### FIFTH CAUSE OF ACTION

**Violation of Section 13.1-522(C) of the Virginia Code**
**(Against RBS Financial Products, RBS Holdings, RBS Group, and the Individual Defendants)**

215.    Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

216.    This claim is brought by Plaintiff under Section 13.1-522(C) of the Virginia Code and is asserted on behalf of Freddie Mac.  The allegations set forth below in this cause of action pertain only to those GSE Certificates identified in Table 10 above that were purchased by Freddie Mac on or after September 6, 2006.  This claim is brought against RBS Financial Products, RBS Holdings, RBS Group, and the Individual Defendants or controlling-person liability with regard to the Fourth Cause of Action set forth above.

217.    The Individual Defendants at all relevant times participated in the operation and management of RBS Acceptance and/or FAS Corp. and their related subsidiaries, and conducted

and participated, directly and indirectly, in the conduct of RBS Acceptance's and/or FAS Corp.'s business affairs. Defendant Joseph N. Walsh III was the President, a Managing Director, and a Director of RBS Acceptance and FAS Corp. Defendant Robert J. McGinnis was the President, a Managing Director, and a Director of RBS Acceptance and FAS Corp. Defendant Carol P. Mathis was the Chief Financial Officer and a Managing Director of RBS Acceptance and FAS Corp. Defendant John C. Anderson served as a Managing Director and Director of RBS Acceptance and FAS Corp. Defendant James M. Esposito served as the General Counsel and Secretary, and a Managing Director and Director, of RBS Acceptance and FAS Corp.

218. Defendant RBS Financial Products was the sponsor for Securitizations carried out under the three Registration Statements filed by RBS Acceptance and FAS Corp., and culpably participated in the violations of Section 13.1-522(A)(ii) set forth above with respect to the offering of the GSE Certificates by initiating these Securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, selecting RBS Acceptance and FAS Corp. as the special purpose vehicles, and selecting RBS Securities as underwriter. In its role as sponsor, RBS Financial Products knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the mortgages would be issued by the relevant trusts.

219. Defendant RBS Financial Products also acted as the seller of the mortgage loans for Securitizations carried out under the three Registration Statements filed by Defendants RBS Acceptance and FAS Corp., in that it conveyed such mortgage loans to RBS Acceptance and FAS Corp. pursuant to an Assignment and Recognition Agreement or a Mortgage Loan Purchase Agreement.

220.    Defendant RBS Financial Products also controlled all aspects of the business of RBS Acceptance and FAS Corp., as RBS Acceptance and FAS Corp. were merely special purpose entities created for the purpose of acting as a pass-through for the issuance of the Certificates.  Upon information and belief, the officers and directors of RBS Financial Products overlapped with the officers and directors of RBS Acceptance and FAS Corp.  In addition, because of its position as sponsor, RBS Financial Products was able to, and did in fact, control the contents of the three Registration Statements filed by RBS Acceptance and FAS Corp., including the Prospectuses and Prospectus Supplements, which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

221.    Defendant RBS Holdings controlled the business operations of RBS Acceptance, FAS Corp. and RBS Securities.  Defendant RBS Holdings is the corporate parent of RBS Acceptance, RBS Acceptance, and FAS Corp.  As the sole corporate parent of RBS Securities, RBS Acceptance, and FAS Corp., RBS Holdings had the practical ability to direct and control the actions of RBS Securities, RBS Acceptance, and FAS Corp. in issuing and selling the Certificates, and in fact exercised such direction and control over the activities of RBS Securities, RBS Acceptance and FAS Corp. in connection with the issuance and sale of the Certificates.

222.    RBS Holdings expanded its share of the residential mortgage-backed securitization market in order to increase revenue and profits.  The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.

223.    RBS Holdings culpably participated in the violations of Section 13.1-522(A)(ii) set forth above.  It oversaw the actions of its subsidiaries and allowed them to misrepresent the

mortgage loans' characteristics in the Registration Statements and established special-purpose financial entities such as RBS Acceptance and the issuing trusts to serve as conduits for the mortgage loans.

224.    Defendant RBS Group wholly owns RBS Holdings and is the ultimate parent of RBS Securities, RBS Financial Products, RBS Acceptance and FAS Corp.  RBS Group culpably participated in the violations of Section 13.1-522(A)(ii) set forth above.  It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and established special-purpose financial entities such as RBS Acceptance and the issuing trusts to serve as conduits for the mortgage loans.

225.    RBS Group, RBS Holdings, RBS Financial Products, and the Individual Defendants are controlling persons within the meaning of Section 13.1-522(C) by virtue of their actual power over, control of, ownership of, and/or directorship of RBS Securities, FAS Corp. and RBS Acceptance at the time of the wrongs alleged herein and as set forth herein, including their control over the content of the Registration Statements.

226.    Freddie Mac purchased Certificates issued pursuant to the Registration Statements, including the Prospectuses and Prospectus Supplements, which, at the time they became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Registration Statements.

227.    Freddie Mac did not know of the misstatements and omissions in the Registration Statements; had Freddie Mac known of those misstatements and omissions, it would not have purchased the GSE Certificates.

228.    Freddie Mac has sustained damages as a result of the misstatements and omissions in the Registration Statements, for which they are entitled to compensation.

229.    This action is brought within three years of the date that the FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

## SIXTH CAUSE OF ACTION

### Violation of Section 31-5606.05(a)(1)(B) of the District of Columbia Code (Against RBS Securities, RBS Acceptance, and FAS Corp.)

230.    Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

231.    This claim is brought by Plaintiff pursuant to 31-5606.05(a)(1)(B) of the District of Columbia Code and is asserted on behalf of Fannie Mae.  The allegations set forth below in this cause of action pertain only to those GSE Certificates identified in Table 11 above, which were purchased by Fannie Mae.

232.    This claim is predicated upon RBS Securities' negligence for making false and materially misleading statements in the Prospectuses for each of the Securitizations listed in paragraph 2, other than the INABS 2007-B and POPLR 2005-5 Securitizations, for which RBS Securities was not the selling underwriter and as to which the allegations in this section to do not apply.  Defendants RBS Acceptance and FAS Corp. acted negligently in making false and materially misleading statements in the Prospectuses for the Securitizations carried out under the Registration Statements they filed.

233.    RBS Securities is prominently identified in the Prospectuses, the primary documents that it used to sell the GSE Certificates.  RBS Securities offered the Certificates

publicly, including selling to Fannie Mae its GSE Certificates, as set forth in the "Plan of Distribution" or "Underwriting" sections of the Prospectuses.

234.    RBS Securities offered and sold the GSE Certificates to Fannie Mae by means of the Prospectuses, which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading.  RBS Securities reviewed and participated in drafting the Prospectuses.

235.    RBS Securities successfully solicited Fannie Mae's purchases of the GSE Certificates.  As underwriter, RBS Securities obtained substantial commissions based upon the amount received from the sale of the Certificates to the public.

236.    RBS Securities offered the GSE Certificates for sale, sold them, and distributed them to Fannie Mae in the District of Columbia.

237.    RBS Acceptance and FAS Corp. are prominently identified in the Prospectuses for the Securitizations carried out under the Registration Statements that they filed.  These Prospectuses were the primary documents each used to sell Certificates for those Securitizations. RBS Acceptance and FAS Corp. offered the Certificates publicly and actively solicited their sale, including to Fannie Mae.

238.    With respect to the Securitizations for which they filed Registration Statements, RBS Acceptance and FAS Corp. offered the GSE Certificates to Fannie Mae by means of Prospectuses which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in the light of the circumstances under which they were made, not misleading.  RBS Acceptance and FAS Corp. reviewed and participated in drafting the Prospectuses.

239.    Each of RBS Securities, RBS Acceptance and FAS Corp. actively participated in the solicitation of Fannie Mae's purchase of the GSE Certificates, and did so in order to benefit themselves.  Such solicitation included assisting in preparing the Registration Statements, filing the Registration Statements, and assisting in marketing the GSE Certificates.

240.    Each of the Prospectuses contained material misstatements of fact and omitted information necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Prospectuses.

241.    The untrue statements of material facts and omissions of material fact in the Registration Statements, which include the Prospectuses, are set forth above in Section IV, and pertain to compliance with underwriting guidelines, occupancy status, and loan-to-value ratios.

242.    RBS Securities, RBS Acceptance and FAS Corp. offered and sold the GSE Certificates offered pursuant to the Registration Statements directly to Fannie Mae, pursuant to the false and misleading Prospectuses.

243.    RBS Securities owed to Fannie Mae, as well as to other investors in these trusts, a duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses, to ensure that such statements were true, and to ensure that there was no omission of a material fact required to be stated in order to make the statements contained therein not misleading.  RBS Acceptance and FAS Corp. owed the same duty with respect to the Prospectuses for the Securitizations carried out under the three Registration Statements filed by them.

244.    RBS Securities, RBS Acceptance and FAS Corp. failed to exercise such reasonable care.  These Defendants in the exercise of reasonable care should have known that the

Prospectuses contained untrue statements of material facts and omissions of material facts at the time of the Securitizations as set forth above.

245.    In contrast, Fannie Mae did not know of the untruths and omissions contained in the Prospectuses at the time they purchased the GSE Certificates.  If Fannie Mae would have known of those untruths and omissions, they would not have purchased the GSE Certificates.

246.    Fannie Mae sustained substantial damages in connection with their investments in the GSE Certificates and have the right to rescind and recover the consideration paid for the GSE Certificates, with interest thereon.

247.    The time period from May 18, 2009 through August 29, 2011 is tolled for for purposes of the statute of limitation by virtue of a tolling agreement entered into between Fannie Mae, RBS Securities, RBS Acceptance, RBS Financial Products and FAS Corp.  In addition, this action is brought within three years of the date that the FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

## SEVENTH CAUSE OF ACTION

### Violation of Section 31-5606.05(c) of the District of Columbia Code
### (Against RBS Financial Products, RBS Holdings, RBS Group, and the Individual Defendants)

248.    Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

249.    This claim is brought under Section 31-5606.05(c) of the District of Columbia Code and is asserted on behalf of Fannie Mae.  The allegations set forth below in this cause of action pertain only to those GSE Certificates identified in Table 11 above, which were purchased by Fannie Mae.  This claim is brought against RBS Financial Products, RBS Holdings, RBS Group, and the Individual Defendants for controlling-person liability with regard to the Sixth Cause of Action set forth above.

250.    The Individual Defendants at all relevant times participated in the operation and management of RBS Acceptance and/or FAS Corp. and their related subsidiaries, and conducted and participated, directly and indirectly, in the conduct of RBS Acceptance's and/or FAS Corp.'s business affairs.  Defendant Joseph N. Walsh III was the President, a Managing Director, and a Director of RBS Acceptance and FAS Corp.  Defendant Robert J. McGinnis was the President, a Managing Director, and a Director of RBS Acceptance and FAS Corp.  Defendant Carol P. Mathis was the Chief Financial Officer and a Managing Director of RBS Acceptance and FAS Corp.  Defendant John C. Anderson served as a Managing Director and Director of RBS Acceptance and FAS Corp.  Defendant James M. Esposito served as the General Counsel and Secretary, and a Managing Director and Director, of RBS Acceptance and FAS Corp.

251.    Defendant RBS Financial Products was the sponsor for Securitizations carried out under the three Registration Statements filed by RBS Acceptance and FAS Corp., and culpably participated in the violations of Section 31-5606.05(a)(1)(B) set forth above by initiating these Securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, selecting RBS Acceptance and FAS Corp. as the special purpose vehicles, and selecting RBS Securities as underwriter.  In its role as sponsor, RBS Financial Products knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the mortgages would be issued by the relevant trusts.

252.    Defendant RBS Financial Products also acted as the seller of the mortgage loans for Securitizations carried out under the three Registration Statements filed by Defendants RBS Acceptance and FAS Corp., in that it conveyed such mortgage loans to RBS Acceptance and

FAS Corp. pursuant to an Assignment and Recognition Agreement or a Mortgage Loan Purchase Agreement.

253. Defendant RBS Financial Products also controlled all aspects of the business of RBS Acceptance and FAS Corp., as RBS Acceptance and FAS Corp. were merely special purpose entities created for the purpose of acting as a pass-through for the issuance of the Certificates. Upon information and belief, the officers and directors of RBS Financial Products overlapped with the officers and directors of RBS Acceptance and FAS Corp. In addition, because of its position as sponsor, RBS Financial Products was able to, and did in fact, control the contents of the three Registration Statements filed by RBS Acceptance and FAS Corp., including the Prospectuses and Prospectus Supplements, which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

254. Defendant RBS Holdings controlled the business operations of RBS Acceptance, FAS Corp. and RBS Securities. Defendant RBS Holdings is the corporate parent of RBS Securities, RBS Acceptance, and FAS Corp. As the sole corporate parent of RBS Securities, RBS Acceptance, and FAS Corp., RBS Holdings had the practical ability to direct and control the actions of RBS Securities, RBS Acceptance, and FAS Corp. in issuing and selling the Certificates, and in fact exercised such direction and control over the activities of RBS Securities, RBS Acceptance, and FAS Corp. in connection with the issuance and sale of the Certificates.

255. RBS Holdings expanded its share of the residential mortgage-backed securitization market in order to increase revenue and profits. The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.

256.    RBS Holdings culpably participated in the violations of Section 31-5606.05(a)(1)(B) set forth above.  It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and established special-purpose financial entities such as RBS Acceptance and the issuing trusts to serve as conduits for the mortgage loans.

257.    Defendant RBS Group wholly owns RBS Holdings and is the ultimate parent of RBS Securities, RBS Financial Products, RBS Acceptance, and FAS Corp.  RBS Group culpably participated in the violations of Section 31-5606.05(a)(1)(B) set forth above.  It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and established special-purpose financial entities such as RBS Acceptance and the issuing trusts to serve as conduits for the mortgage loans.

258.    RBS Group, RBS Holdings, RBS Financial Products, and the Individual Defendants are controlling persons within the meaning of Section 31-5606.05(c) by virtue of their actual power over, control of, ownership of, and/or directorship of RBS Securities, FAS Corp. and RBS Acceptance at the time of the wrongs alleged herein and as set forth herein, including their control over the content of the Registration Statements.

259.    Fannie Mae purchased Certificates issued pursuant to the Registration Statements, including the Prospectuses and Prospectus Supplements, which, at the time they became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Registration Statements.

260.    Fannie Mae did not know of the misstatements and omissions in the Registration Statements; had Fannie Mae known of those misstatements and omissions, it would not have purchased the GSE Certificates.

261.    Fannie Mae has sustained damages as a result of the misstatements and omissions in the Registration Statements, for which they are entitled to compensation.

262.    The time period from May 18, 2009 through August 29, 2011 is tolled for for purposes of the statute of limitation by virtue of a tolling agreement entered into between Fannie Mae, RBS Securities, RBS Acceptance, RBS Financial Products and FAS Corp.  In addition, this action is brought within three years of the date that the FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

## EIGHTH CAUSE OF ACTION
### Common Law Negligent Misrepresentation
### (Against RBS Securities, RBS Acceptance, and FAS Corp.)

263.    Plaintiff realleges each allegation above as if fully set forth herein.

264.    This is a claim for common law negligent misrepresentation against Defendants RBS Securities, RBS Acceptance, and FAS Corp.

265.    Between September 30, 2005 and January 23, 2008, RBS Securities, RBS Acceptance, and FAS Corp. sold the GSE Certificates to the GSEs as described above.  Because RBS Acceptance and FAS Corp. owned and then conveyed the underlying mortgage loans that collateralized the Securitizations for which they served as depositors, RBS Acceptance and FAS Corp. had unique, exclusive, and special knowledge about the mortgage loans in the Securitizations through their possession of the loan files and other documentation.

266.    Likewise, as underwriter of the Securitizations, RBS Securities was obligated — and had the opportunity—to perform sufficient due diligence to ensure that the Registration

Statements for those Securitizations, including without limitation the corresponding Prospectus Supplements, did not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading. As a result of this privileged position as underwriter—which gave it access to loan file information and obligated it to perform adequate due diligence to ensure the accuracy of the Registration Statements—RBS Securities had unique, exclusive, and special knowledge about the underlying mortgage loans in the Securitizations.

267.    RBS Securities, RBS Acceptance, and FAS Corp. also had unique, exclusive, and special knowledge of the work of third-party due diligence providers, such as Clayton, who identified significant failures of originators to adhere to the underwriting standards represented in the Registration Statements. The GSEs, like other investors, had no access to borrower loan files prior to the closing of the Securitizations and their purchase of the Certificates. Accordingly, when determining whether to purchase the GSE Certificates, the GSEs could not evaluate the underwriting quality or the servicing practices of the mortgage loans in the Securitizations on a loan-by-loan basis. The GSEs therefore reasonably relied on RBS Securities', RBS Acceptance's, and FAS Corp.'s knowledge and their express representations made prior to the closing of the Securitizations regarding the underlying mortgage loans.

268.    RBS Securities, RBS Acceptance, and FAS Corp. were aware that the GSEs reasonably relied on RBS Securities', RBS Acceptance's, and FAS Corp.'s reputations and unique, exclusive, and special expertise and experience, as well as their express representations made prior to the closing of the Securitizations, and that the GSEs depended upon these Defendants for complete, accurate, and timely information. The standards under which the

underlying mortgage loans were actually originated were known to these Defendants and were not known, and could not be determined, by the GSEs prior to the closing of the Securitizations.

269.    Based upon their unique, exclusive, and special knowledge and expertise about the loans held by the trusts in the Securitizations, RBS Securities, RBS Acceptance, and FAS Corp. had a duty to provide the GSEs complete, accurate, and timely information regarding the mortgage loans and the Securitizations.  RBS Securities, RBS Acceptance, and FAS Corp. negligently breached their duty to provide such information to the GSEs by instead making to the GSEs untrue statements of material facts in the Securitizations, or otherwise misrepresenting to the GSEs material facts about the Securitizations.  The misrepresentations are set forth in Section IV above, and include misrepresentations as to the accuracy of the represented credit ratings, compliance with underwriting guidelines for the mortgage loans, and the accuracy of the owner-occupancy statistics and the loan-to-value ratios applicable to the Securitizations, as disclosed in the term sheets and Prospectus Supplements.

270.    In addition, having made actual representations about the underlying collateral in the Securitizations and the facts bearing on the riskiness of the Certificates, RBS Securities, RBS Acceptance, and FAS Corp. had a duty to correct misimpressions left by their statements, including with respect to any "half truths."  The GSEs were entitled to rely upon RBS Securities', RBS Acceptance's, and FAS Corp.'s representations about the Securitizations, and these Defendants failed to correct in a timely manner any of their misstatements or half truths, including misrepresentations as to compliance with underwriting guidelines for the mortgage loans.

271.    Fannie Mae and Freddie Mac purchased the GSE Certificates based upon the representations by RBS as the sponsor, depositor, and lead and selling underwriter in all 39 of

the RBS-sponsored Securitizations.  The GSEs received term sheets containing critical data as to the Securitizations, including with respect to anticipated credit ratings by the credit rating agencies, loan-to-value and combined loan-to-value ratios for the underlying collateral, and owner occupancy statistics, which term sheets were delivered, upon information and belief, by RBS Securities.  This data was subsequently incorporated into Prospectus Supplements that were received by the GSEs upon the close of each Securitization.

272.    The GSEs relied upon the accuracy of the data transmitted to them and subsequently reflected in the Prospectus Supplements.  In particular, the GSEs relied upon the credit ratings that the credit rating agencies indicated they would bestow on the Certificates based on the information provided by RBS Acceptance, FAS Corp., and RBS Securities relating to the collateral quality of the underlying loans and the structure of the Securitization.  These credit ratings represented a determination by the credit rating agencies that the GSE Certificates were AAA quality (or its equivalent)—meaning the Certificates had an extremely strong capacity to meet the payment obligations described in the respective PSAs.

273.    Detailed information about the underlying collateral and structure of each Securitization was provided to the credit rating agencies by, upon information and belief, RBS Financial Products.  The credit rating agencies based their ratings on the information provided to them by RBS, and the agencies' anticipated ratings of the Certificates were dependent on the accuracy of that information.  The GSEs relied on the accuracy of the anticipated credit ratings and the actual credit ratings assigned to the Certificates by the credit rating agencies, and upon the accuracy of RBS's representations in the term sheets and Prospectus Supplements.

274.    In addition, the GSEs relied on the fact that the originators of the mortgage loans in the Securitizations had acted in conformity with their underwriting guidelines, which were

described in the Prospectus Supplements.  Compliance with underwriting guidelines was a precondition to the GSE's purchase of the GSE Certificates in that the GSEs' decision to purchase the Certificates was directly premised on their reasonable belief that the originators complied with applicable underwriting guidelines and standards.

275.    In purchasing the GSE Certificates, the GSEs justifiably relied on RBS's false representations and omissions of material fact detailed above, including the misstatements and omissions in the term sheets about the underlying collateral, which were reflected in the Prospectus Supplements.

276.    But for the above misrepresentations and omissions, the GSEs would not have purchased or acquired the Certificates as they ultimately did, because those representations and omissions were material to their decision to acquire the GSE Certificates, as described above.

277.    The GSEs were damaged in an amount to be determined at trial as a direct, proximate, and foreseeable result of the misrepresentations, including any half truths, by Defendants RBS Securities, RBS Acceptance, and FAS Corp.

278.    The time period from May 18, 2009 through August 29, 2011 is tolled for for purposes of the statute of limitation by virtue of a tolling agreement entered into between Fannie Mae, RBS Securities, RBS Acceptance, RBS Financial Products and FAS Corp.  In addition, this action is brought within three years of the date that the FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

## PRAYER FOR RELIEF

WHEREFORE Plaintiff prays for relief as follows:

279.    An award in favor of Plaintiff against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, but including:

a.      Rescission and recovery of the consideration paid for the GSE
        Certificates, with interest thereon;

b.      Each GSE's monetary losses, including any diminution in value of the
        GSE Certificates, as well as lost principal and lost interest payments
        thereon;

c.      Attorneys' fees and costs;

d.      Prejudgment interest at the maximum legal rate; and

e.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

280.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a

trial by jury on all issues triable by jury.

FEDERAL HOUSING FINANCE AGENCY,
AS CONSERVATOR FOR THE FEDERAL
NATIONAL MORTGAGE ASSOCIATION
AND THE FEDERAL HOME LOAN
MORTGAGE CORPORATION,


By:/s/Ross H. Garber
    Ross H. Garber (ct17689)
    Sara J. Goldfarb (ct28370)
    For Shipman & Goodwin LLP
    One Constitution Plaza
    Hartford, CT 06103
    Telephone: 860-251-5901
    Fax: 860-251-5219
    rgarber@goodwin.com

    Its Attorneys

Of Counsel:

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Adam M. Abensohn
Philippe Z. Selendy
Julia M. Guaragna
51 Madison Avenue, 22nd Floor
New York, New York  10010-1601
(212) 849-7000